# EXHIBIT A

ANDREW M. ZACKS (SBN 147794)
EMILY L. BROUGH (SBN 284943)
ZACKS, FREEDMAN & PATTERSON, PC
235 Montgomery Street, Suite 400
San Francisco, CA 94104
Tel: (415) 956-8100
Fax: (415) 288-9755
az@zfplaw.com
emily@zfplaw.com

Attorneys for Petitioner
1049 Market Street, LLC




ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

**SUPERIOR COURT – STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO – UNLIMITED CIVIL JURISDICTION**

| | |
|---|---|
| 1049 MARKET STREET, LLC, a California Limited Liability Company,<br><br>Petitioners,<br><br>vs.<br><br>CITY AND COUNTY OF SAN FRANCISCO, BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO, PLANNING DEPARTMENT OF THE CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO DEPARTMENT OF BUILDING INSPECTION, SAN FRANCISCO BUILDING INSPECTION COMMISSION, SAN FRANCISCO BOARD OF APPEALS, and DOES 1-25,<br><br>Respondents. | Case Number: CPF-16-515046<br><br>**PETITION FOR WRITS OF MANDATE AND REQUEST FOR IMMEDIATE STAY**<br><br>(Pub. Res. Code § 21168.5; Cal. Civ. Proc. Code § 1085 or § 1094.5) |

Petitioner 1049 Market Street, LLC, ("Petitioner") by and through its attorneys, Zacks, Freedman & Patterson, PC, files this Petition for Writs of Mandate against Respondents City and County of San Francisco, Board of Supervisors of the City and County of San Francisco, Planning Department of the City and County of San Francisco, San Francisco Department of

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1  Building Inspection, San Francisco Building Inspection Commission, San Francisco Board of

2  Appeals, and Does 1-25 (collectively, "the City") to compel compliance with the California

3  Environmental Quality Act, Public Resources Code 21000, et. al ("CEQA"), and; Petitioner

4  files this Petition for Writs of Mandate against the City to enjoin the City from enforcing

5  
6  Ordinance No. 23-16 and Ordinance No. 33-16.   In addition to the aforesaid Writs of Mandate,

7  Petitioner also seeks issuance of an immediate stay.

8        Upon information and belief, Petitioner alleges as follows:

9                              **BACKGROUND**

10       1.      Petitioner is a California limited liability company with its principle place of

11  
12  business in San Francisco, California.  Petitioner is the owner of the real property commonly

13  known as, and situated at, 1049 Market Street, San Francisco, California ("1049 Market").  The

14  Property is located within San Francisco County and Judicial District.

15       2.      1049 Market is a six-story building constructed in 1907 as a commercial office

16  
17  building with ground-floor retail.  It has no kitchens, and over half of the office units have no

18  windows.  Prior to Petitioners purchase of 1049 Market, a previous owner changed the legal

19  use of only the sixth floor of 1049 Market to live/work units under a local ordinance.  The legal

20  and principally permitted use of floors one through five of 1049 Market have remained strictly

21  commercial since the building's construction.

22       3.      In or about 1995, a former owner of 1049 Market entered into commercial

23  
24  leases for units on floors 1 through 5 of 1049 Market with a number of tenants.  Thereafter, due

25  to the extreme blight of the area and a lack of police presence at this time, burglary became

26  common in the building and some tenants began to reside in their commercial units to limit

27  these crimes. There are presently 77 individual units on floors one through five in 1049

28

1  Market.  As recently as last year, 32 of these units had been occupied illegally as residential

2  spaces; there are currently 23 units occupied illegally as residential spaces (collectively,

3  "Subject Units").  Floors one through five of 1049 Market are zoned and legally permitted only

4  for commercial use; the present residential use is illegal.  The current management company,

5  SFOL, Inc. ("SFOL"), has managed the property since June of 2010.  Petitioner purchased

6  1049 Market in December of 2012.  The individual members of Petitioner are also owners of

7  and/or associated with SFOL.

8  

9      4.      Respondent City and County of San Francisco ("City") is an incorporated

10  municipality of the State of California.

11     5.      Respondent City and County of San Francisco Board of Appeals ("Board of

12  Appeals") is a quasi-judicial municipal appellate body with authority to hear appeals of

13  building permits, as well as orders, requirements, decisions, and determinations made by the

14  Zoning Administrator.

15     6.      Respondent Building Inspection Commission ("BIC") is a policy making and

16  supervisory body, which enforces City and County Codes and provides policy direction to the

17  San Francisco Department of Building Inspection.

18     7.      Respondent San Francisco Department of Building Inspection ("DBI") is an

19  executive agency, which issues permits and enforces the San Francisco Building Code.

20     8.      Respondent San Francisco Planning Department ("Planning Department") is an

21  executive agency and enforces the San Francisco Planning Code (the "Planning Code").

22     9.      Petitioner is not aware of the identities of respondents DOES 1-25, who are

23  responsible for the acts and omissions alleged herein and that caused damage to Petitioner;

235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104
ZACKS & FREEDMAN, P.C.

therefore Petitioner will amend this Complaint when the true identities of DOES 1-25 are ascertained.

10.     Petitioner is informed and believes that at all times mentioned in this Complaint, all respondents were the agents or employees of their co-respondents, and in doing the things alleged in this Complaint, were acting within the course and scope of that agency and employment.

11.     Prior to Petitioners purchase of 1049 Market, on October 25, 2007, DBI issued a Notice of Violation (2007 NOV) for 1049 Market for "existing office units converted to habitable space . . . No permit exists for this conversion." A true and correct copy of the 2007 NOV is attached hereto as Exhibit 1.

12.     On or about December 6, 2010, after SFOL began managing 1049 Market, SFOL met with the Planning Department to discuss curing the 2007 NOV. At this meeting, SFOL brought a list of tenants occupying the Subject Units, many of them artists, and asked the Planning Department if having an artist community was in line with its vision for the Market Street neighborhood. The Planning Department indicated that it was, but was unable to offer SFOL any meaningful advice on how to legalize the present illegal residential use.

13.     On or about December 22, 2010, in a continuing attempt to cure the 2007 NOV, SFOL hired a local structural engineer to assist it in its efforts to change 1049 Market's zoning from commercial to "commercial with residential accessory use" ("commercial/residential accessory").

14.     On February 28, 2011, SFOL attempted to submit architectural plans to the Planning Department to change the legal use of 1049 Market from commercial to commercial/residential accessory. However, the Planning Department denied the submission

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

of SFOL's plans because the lack of windows in the Subject Units presented life-safety issues that violated the California Fire Code, and the "natural light requirement" of San Francisco Building Code ("SF Building Code") section 1205.1 (the "Natural Light Requirement") was not met.  The Natural Light Requirement requires certain rooms within a "dwelling unit" to have natural light by means of exterior glazed openings.

15.     On or about April 25, 2011, after months of back and forth communication with the Planning Department, and no remedy to the 2007 NOV in sight, SFOL requested a personal meeting with Mark Luellen (the then-manager of the area in which 1049 was located) of the Planning Department.  In response to SFOL's request, Luellen advised SFOL to set up a project review meeting with the Planning Department, which SFOL did, for September 8, 2011.

16.     At the project review meeting on September 8, 2011, SFOL again indicated to the Planning Department its interest in obtaining a permit to change the legal use of 1049 Market from commercial to commercial/residential accessory in order to cure the 2007 NOV. Jeff Ma of the Planning Department advised SFOL that there might be an exception to the Natural Light Requirement that 1049 Market may be able to meet.  However, several weeks later, SPOL was informed that 1049 Market did not meet this possible exception, and thus SFOL was unable to attain its requested change of use.

17.     Over the next several months, SFOL attempted without avail to set another meeting with the Planning Department to discuss curing the 2007 NOV by changing the legal use of 1049 Market from commercial to commercial residential/accessory.  In or about January of 2012, the Planning Department advised SFOL that an amendment to the SF Building Code that would remove the Natural Light Requirement was being brought before the San Francisco Building Inspection Committee on May 16, 2012.  At this meeting, the proposed amendment

1   was brought before the BIC and SFOL spoke at length about its efforts to legalize 1049 Market

2   use from commercial to commercial/residential accessory in order to keep the artist community

3   at the property intact.  Members of the BIC appeared confused and unaware that an amendment

4   to the SF Building Code was being introduced at this meeting.  The amendment did not pass.

5       18.     On February 16, 2013, after Petitioner had purchased the building, DBI issued

6   another Notice of Violation (the "2013 NOV") for 1049 Market, citing Petitioner for failing to

7   comply with 2007 NOV and initiated abatement proceedings against 1049 Market.  A true and

8   correct copy of the 2013 NOV is attached hereto as Exhibit 2.

9       19.     On April 4, 2013, in a further attempt to cure the – now two – NOVs against

10  1049 Market and halt abatement proceedings, Petitioner met with the Planning Department and

11  DBI.  Petitioner brought substantial research on potential methods of meeting the Natural Light

12  Requirement at 1049 Market, including new and widely used technology of tubed lighting.

13  However, DBI and the Planning Department were still unable to advise Petitioner of a viable

14  solution.  Instead, Petitioner was told to wait until July, when the new SF Building Code would

15  be available, to see if the Natural Light Requirement was removed from the code.  On July 12,

16  2013, Petitioner was told by David Leung of DBI's Technical Services Division that the

17  Natural Light Requirement was not removed from the new Building Code and thus, these

18  requirements still applied to 1049 Market.

19      20.     Unable to comply with the Natural Light Requirement and the California State

20  Fire Code which was required to change 1049 Market's legal use from commercial to

21  commercial/residential accessory, Petitioner was left with no other choice but to remove the

22  illegal residential use from 1049 Market to cure the 2013 NOV and stop abatement

23  proceedings against its property.  On or about August 2, 2013, DBI issued to Petitioner permit

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

number 201307262890 (the "Permit") permitting and authorizing Petitioner to recover possession of 1049 Market by altering the Subject Units to permanently remove the illegal residential use from the building. The Permit related to floors 1, 2, 3, 4, and 5 of 1049 Market, all of which collectively contain the Subject Units described in Paragraph 3 of this Complaint. The Permit was required in order to start the process of vacating the building and abating the 2013 NOV. A true and correct copy of the Permit is attached hereto as Exhibit 3.

21.     On or about September 1, 2013, Consistent with the authorization and authority set forth in the Permit, and on reliance of said Permit, Petitioner took out a two million dollar loan with Hidl. Inc. ("Loan"), which required Petitioner to correct the 2013 NOV and achieve conforming office space at 1049 Market within the next 18 months.

22.     On or about September 13, 2013, Petitioner sent a memorandum to the tenants of the Subject Units, informing them that despite Petitioner spending "extraordinary time and money with the hopes to accommodate a local building code ordinance that is necessary for accessory residential use" at 1049 Market, Petitioner was unable to overcome the code requirements, and, as a result, in order to comply with the Notice of Violation, Petitioner had been required to obtain the Permit to remove the illegal residential use entirely.

23.     Consistent with the authorization and authority set forth in the Permit, and on reliance of said Permit, on September 27, 2013, Petitioner properly served the tenants on floors 3, 4, and 5 of 1049 Market with a Sixty Day Notice of Termination of Tenancy under Rent Ordinance 37.9(a)(10) ("Sept. 27th Notices"),   Including a check for $2,630.50 which represented the first half of each individual's relocation payment.

24.     Several days after Petitioner served the September 27th Notices, on October 1, 2013, Petitioner was required to attend a Director's Hearing at San Francisco Code

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Enforcement (the "Director's Hearing") regarding the 2013 NOV. At the Director's Hearing, Petitioner informed San Francisco Code Enforcement that it had begun the process of curing the 2013 NOV by obtaining the Permit and serving the Sept. 27th Notices on floors 3-5 of 1049 Market, and would continue its efforts to remove the illegal residential use from 1049 Market. As Petitioner had undertaken substantial measures to abate the 2013 NOV, San Francisco Code Enforcement agreed to give Petitioner 30 additional days to abate the code violation, prior to placing an abatement on 1049 Market.

25.    In or about this same time - in an apparent reaction to the Sept. 27th Notices being served on the occupants of the 3, 4, & 5 floors of 1049 Market – DBI, BOS, and the Mayor's Office began to have almost daily, internal discussions regarding Petitioner and 1049 Market. Within hours after the Director's Hearing of October 1, 2013, John Hinchon of DBI emailed William Strawn ("Strawn") and Tom Hui ("Hui") of DBI, advising them that Petitioner had "provided notification to the tenants" and of the outcome of the Directors Hearing. The following day, on October 2, 2015, April Veneracion ("Veneracion"), aide to Supervisor Jane Kim ("Supervisor Kim"), in an email to Strawn, stated that Mayor's Office suggested that Supervisor Kim talk to Strawn about the outcome of the Director's Hearing. The same day, Strawn forwarded this email to other member of DBI, stating **"[g]iven Supervisor Kim's ongoing interest in 1049 Market Street,** perhaps one or more of you might join me this afternoon in a call to her aide to describe the outcome of the recent Director's Hearing on this?"

26.    Several days later, on October 9, 2013, Strawn emailed Jeff Buckley ("Buckley") of the Mayor's Office, advising him that Petitioner had contacted DBI and would be "pleased to meet again" to map out a path to legalize the existing residential units, and that Strawn and Buckley should "discuss our media approach . . . given this new possibility." In

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

response, Buckley stated "[Petitioner] needs to agree to stop any legal proceedings against the tenants until further notice. Has he agreed to that?" The next day, Buckley sent an email out to other city officials, including members of DBI, stating:

> Good news to report. DBI has found a pathway for the property owner of 1049 Market Street to legalize the building as commercial with an accessory residential use without jeopardizing the life safety of the residents there. This could prevent the evictions of the 150+ residents who live there and at another Mid-Market property owned by the same property owner . . . . Ultimately it's the property owner's decision but he has consistently told me, DBI, Jeremy, and others that it's his preference to legalize the residential use and prevent the evictions. Now a pathway is open for him. We should all encourage him to follow that path.

27.     On October 4, 2013 Veneracion emailed Strawn, asking, "In addition to 1049 Market, can you please provide a briefing on the other properties that are part of SF Office Lofts – 1005, 1067 Market Street." Only a few days after this information was requested, on October 9, 2015, Supervisor Kim held a meeting with the tenants of 1049 Market as well as with tenants in neighboring properties that were associated with Petitioner[1], at 1067 Market Street ("1067 Market") and 1005 Market Street ("1005 Market"). Almost immediately following this meeting, the tenants at 1005 Market and 1067 Market became hostile and began retaliating. Prior to the City's involvement, Petitioners had a pleasant and cordial relationship with all of these tenants, as well as its tenants in 1049 Market. This hostility continues and Petitioner continues to spend thousands of dollars each month to defend itself against legal retaliation.

28.     Later that week, on or about October 15, 2013, an article titled "MAYOR LEE, SUPERVISOR KIM, DBI DIRECTOR HUI UNITE TO STOP MARKET STREET

---

[1] Individual members of Petitioner are also owners of and/or associated with 1067 Market Street and 1005 Market Street.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

EVICTIONS," was published in the San Francisco Chronicle, applauding the Mayor, DBI, and Supervisor Kim for "formulating a powerful strategy to stop the evictions" at 1049 Market.

29.     The same day, Petitioner met with members of the Planning Department, DBI, and the Mayor's Office to discuss the abatement of the 2013 NOV. Petitioner was surprised about the sudden, substantial attention it had received from these offices and the press releases regarding 1049 Market, given the lack of attention and effort the Planning Department and DBI had made in prior years when Petitioner and SFOL had made diligent (and ultimately unsuccessful) efforts to legalize the residential use at 1049 Market. Individual members of Petitioner, who had previously legalized 1005 Market from commercial to commercial/residential accessory - which took over ten years and hundreds of thousands of dollars - advised the City that Petitioner was not willing to follow a similar arduous and expensive road in legalizing residential use at 1049 Market. Thereafter - contrary to the press release and Buckley's statements regarding an alleged solution to legalize the accessory residential use - DBI stated that they could not make a decision regarding legalization until they walked through 1049 Market. Petitioner was also informed that the City was now willing to "waive" the Natural Light Requirement (a provision of a County Code). However, the City was unable to offer a solution to the additional life-safety issues that violated the California Fire Code, which the City could not and cannot legally waive. In order to continue its attempts to facilitate a solution to cure the 2013 NOV, Petitioner agreed to tentatively schedule a walkthrough of 1049 Market (the Inspection") with DBI on October 17, 2013. Several hours later, however, Petitioner discovered it had a prior engagement that conflicted with the tentatively scheduled Inspection made for October 17, 2013. Immediately upon learning this, Petitioner contacted DBI and other parties involved, requesting the Inspection be scheduled the

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

following week, October 24, 2013.  However, despite other DBI and San Francisco Fire Department ("Fire") members' willingness to reschedule, Director Hui of DBI replied to Petitioner by email that there was "no rescheduling [sic] of site visits [sic] and the meeting is still on Oct. 17 (Thursday) 2pm. Bye."  Additionally, in response to Jeremy Hallisey of the Mayor's Office request that the meeting date be changed due to Petitioners schedule conflicts, Hui replied by email, stating that "[Petitioner] called me at noon and I said it is better to keep the time."  However, this statement was a blatant lie as this phone call never took place. Petitioner, who was accidentally copied on this email chain, immediately became aware of Hui's deceitful actions.

30.   On October 16, 2013, a BIC meeting (the "BIC Meeting") was held in which many tenants of 1049 Market and their attorneys were present.  Petitioner was not informed that this meeting would take place, nor was Petitioner invited to attend.  At this meeting, DBI and the BIC again falsely stated to tenants of 1049 Market that it had given Petitioner a "path" to legalize the existing residential use at 1049 Market.  DBI and the BIC also expressed its grave concern that the press portrayed DBI as being responsible for the Sept. 27th Notices and asked that the tenants of 1049 Market reach out to the press to inform it that "DBI is doing everything it can."  Members of DBI and the BIC also asked several tenants of 1049 Market to be present during the Inspection.

31.   Also during the BIC Meeting, **Hui suggested that "someone appeal" the Permit,** before being informed by another BIC member that the normal appeal deadline had passed, but that a potential appeals process could still take place based on "extenuating circumstances."  Next, an attorney of several tenants of 1049 Market spoke, stating that the appeals process would take over 40 days, the expiration of some tenancies at 1049 Market

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

would occur prior to 40 days, and the tenants of 1049 Market were hoping they could appeal the Permit prior to the expiration of their tenancies in order to invalidate the Notices; that **"if the Permit were invalid, we could stop these evictions."** Finally, Ivy Lee ("Lee"), legislative aide to Supervisor Kim, spoke. Lee advised the BIC that Supervisor Kim was interested in the possibility of putting a temporary "moratorium" on removal of housing uses on Market Street to determine the extent of illegal residential use in the area. Agreeing with Lee, the President of the BIC, Angus McCarthy (President McCarthy), stated that **1049 Market was a "perfect example"** and that **"we need to be out the gate and all over this one because we do not want this to be the model of what's going to go down there."** Lee agreed, stating, **"that's right."** Debra Walker of BIC also agreed, and stated there should be a **"legislative response to this post-haste"** and suggested that **Supervisor Kim talk to the City attorney as how to "handle" 1049 Market, as DBI had already issued the Permit**. President McCarthy also stated that in addition to having DBI and the Supervisor's support, the Mayor's Office was also on board with stopping the evictions at 1049 Market, and thus **"the Gods are all aligned here to do the right thing."**

32.     On October 17, 2013, DBI, Planning Department, Fire, and the tenants of the Subject Units met at 1049 Market for the Inspection without Petitioner in attendance. The Inspection was unprecedented in that among the numerous members of DBI and Fire in attendance, Hui and Strawn – top officials at DBI, who normally do not attend site visits –were also present for the Inspection.

33.     One week later, on October 25, 2013, in a response to an email titled "Minutes from Oct. [16th] BIC - **any chance you have the testimony by the 1049 Market Street tenants? Planning is requesting these today, if possible**," Strawn forwarded to Dan Sider

*PETITION FOR WRITS (Pub. Res. Code § 21168.5; Cal. Civ. Proc. Code § 1085 or § 1094.5)*
-12-

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

("Sider") of the Planning Department a rough transcript of the BIC Meeting and stated cryptically "[s]orry to make you wade through this raw testimony, though **hopefully it yields what you need."**

34.     In a continuing effort to cure the 2013 NOV, comply with the deadline given to Petitioner at the Director's Hearing, and halt the abatement proceeding against 1049 Market, and consistent with the authorization and authority set forth in the Permit, and in reliance on said Permit, on October 28, 2013, Petitioner properly served the tenants on floors 1 and 2 of 1049 Market with a Sixty Day Notice of Termination of Tenancy under Rent Ordinance 37.9(a)(l0) ("Oct 28th Notices"), including a check for $2,630.50 which represented the first half of each individual's relocation payment. Petitioner is seeking, in good faith, without ulterior motives, and with honest intent, possession of each unit in 1049 Market, including the Subject Units, in order to alter or to otherwise permanently remove each unit from housing use and had obtained all the necessary permits on or before the date upon which each respective notice to vacate was given to each tenant at 1049 Market.

35.     Just hours after the Oct 28th Notices were served on the tenants of floors 1 and 2 of 1049 Market, the Planning Department requested that DBI suspend the Permit "in order to obtain and analyze permits, plans, and relevant occupancy information related to existing and proposed uses of the Building" ("Request for Suspension"). A true and correct copy of the Request for Suspension is attached hereto as Exhibit 4. In the Request for Suspension, the Planning Department stated that 1049 Market's principally permitted use – commercial – "may have been abandoned" under the Planning Code, due to the presence of the illegal residential use for over five years. In fact, while the Planning Code addresses "abandonment" of nonconforming uses, there are no such provisions addressing abandonment of principally

*PETITION FOR WRITS (Pub. Res. Code § 21168.5; Cal. Civ. Proc. Code § 1085 or § 1094.5)*

-13-

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

permitted uses. Indeed, *nowhere* in California land use and zoning law does the concept of an "abandonment" of a property's use apply to its principally permitted use. The request to suspend the Permit was granted by DBI that same day. Thereafter, the City took no action on the Permit for almost a year and a half, and instead, continued to systematically and maliciously target Petitioner in order to prevent Petitioner from exercising its vested rights under the Permit, which it had already relied on to its detriment.

36.     Several days later, on November 1, 2013, a joint press release was issued by the Planning Department and DBI, which announced the Request for Suspension of the Permit, and again referred to the alleged "path" that had never been provided to Petitioner: "[a]s **DBI and the Planning Department have made clear to [Petitioner] there is a path to legalize and retain the building's residential occupancies.**"

37.     The day following the Request for Suspension of the Permit, on October 29, 2013, Supervisor Kim introduced Resolution No. 428-13 ("Resolution No. 428-13"), which – as is apparent from the amendments to and final language of – was introduced to directly target Petitioner and prevent Petitioner from exercising its vested rights under the Permit.

38.     From its initial introduction, Resolution No. 428-13 only applied to a limited area in the Market Street district of San Francisco ("Market Street Area"), the very area in which 1049 Market was located. Resolution No. 428-13 directed that buildings in the Market Street Area with **"some commercial use"** post a notice of **"structural or architectural work above the ground floor"** and delay work for 15 days (the appeal period of the permit) thereafter. Resolution No. 428-13 also provided – as did the Request for Suspension – that under the Planning Code, principally permitted commercial uses that had been converted (even illegally) over five years ago to include residential use had been abandoned.

39.     On November, 22, 2013, Veneracion emailed several tenants of 1049 Market, urging the tenants to come support Resolution No. 428-13 at the Land Use and Economic Development Committee on November 25, 2013, stating that the Resolution: **"would close the loophole on the problem that we discovered during 1049 Market: there is no noticing requirement for changes to commercial buildings."**

40.     On December 10, 2013, the Board of Supervisors amended Resolution No. 428-13 and adopted it as amended. These amendments, which were further aimed at preventing Petitioner from exercising its vested rights under the Permit, mandated that **"the reestablishment of a commercial use that has been converted to residential use shall require Planning Commission approval through either an authorization under Planning Code section 320, et. seq. or a conditional use authorization . . . "** The final version of Resolution No. 428-13 (the "2013 Controls") was signed by the Mayor on December 13, 2013.

41.     Meanwhile, during the Board of Supervisor's introduction, amendments to, and enactment of 2013 Controls, and following the suspension of the Permit, DBI and Planning also continued to systematically target and prevent Petitioner from exercising its vested rights under the Permit.  On October 30, 2013, Strawn emailed Hui and other members of DBI and the Planning Department regarding language for a press release about the suspension of the Permit, though he noted he was not sure it was **"strategically sound"** to issue such a press release.  Included in this proposed language was again DBI's deceitful, self-serving statement that it had given Petitioner a "path" to legalize the existing residential use at 1049 Market: "DBI and Planning **have made it clear to the owners on several occasions, there is a path to legalization and retention of the buildings' 'accessory use' as residential."**

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

42.     On or about October 31, 2013, Petitioner called DBI to request the results of the Inspection that took place (without Petitioner) on October 17, 2013.  The following day, Hui of DBI responded to Gall the following:

> While I will attach the notes each of the above [inspectors] provided me following the inspection visit, **which do make clear ongoing questions about a number of life safety code compliance matters . . . it is my overall opinion is that your ownership group could manage in economically feasible ways the corrections of the buildings life safety systems and meet code compliance requirements to retain the existing accessory residential uses** . . . .

> I again urge you and your partners to make a formal pre-application meeting request . . . and meet formally with Building, Planning, Fire, and respective professional staffs so that we could map out precisely . . . **specific steps you would need to take in order to meet code requirements to legalize the accessory residential use.**

> As you know, Planning requested on Monday, October 28th, and we suspended, the building permit issued to you on August 2, 2013 . . . . **This action . . . provides additional time for your ownership group to meet formally with the City's reviewing agencies and to mutually agree upon steps you would take to achieve code compliance in the buildings' life-safety systems and thus be enabled to retain your existing accessory residential occupancy.**

43.     On November 8, 2013, Petitioner appealed DBI's suspension of the Permit.  At a regular meeting of the BIC on November 20, 2013, Strawn acknowledged Petitioners appeal of the suspension of the Permit, recognized that DBI's suspension of the Permit – which Petitioner had relied upon in serving the Notices and making the Relocation Payments – prevented Petitioner from taking any "formal action" on the Notices already served, and in a reference to "working on 1049 Market" described the introduction of the 2013 Controls:

> Mr. Strawn stated that there will be a Permit Appeals Board Hearing on this matter on December 16th. **Mr. Strawn said that it was his understanding that while the owners have issued another round of eviction notices there cannot be any formal action on that before the Appeals Board meeting.**

> Strawn stated that **DBI is working on 1049 Market Street and legislation that would suspend the issuance of building permits subject to a Planning review to make sure that commercial buildings that have accessory residential units**

*PETITION FOR WRITS (Pub. Res. Code § 21168.5; Cal. Civ. Proc. Code § 1085 or § 1094.5)*
-16-

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

or buildings that for many years have had residential units are not suddenly being converted to commercial and office use in order to protect existing residential units.

44.     As a result of having relied on the Permit to its detriment by taking out the Loan, serving the Notices, and making the Relocation Payments – all of which (as Strawn recognized) Petitioner could now no longer act upon – Petitioner was now under extreme pressure to legalize the residential use at 1049 Market to in order to prevent incurring any further monetary losses.  Moreover, the suspension of the Permit prior to the expiration of the tenancies of the Subject Units left Petitioner open to substantial liability as Petitioner no longer could rely on the Permit as grounds to vacate 1049 Market.  As such, Petitioner requested a pre-application meeting with DBI on November 21, 2013, stating "[a]s you may be aware, notices to vacate are still active at 1049 for several tenants, and the sooner we can get the code determination and the planning approval for our current 'accessory use' set up, the closer we may be to a resolution."

45.     On December 2, 2013, several days prior to the pre-application meeting, Strawn of DBI emailed Supervisor Kim and other City agency members, stating "Tom [Hui] wanted you to know we scheduled a formal Pre-Application meeting with [Petitioner], this Friday December 6th. **We're hopeful this will lead to the legalization path for the accessory residential units, per our earlier discussions.**"

46.     At a pre-application meeting on December 6, 2013, Petitioner, members of Fire, DBI, as well as members of San Francisco Electrical and Plumbing were in attendance, all prepared to discuss and/or assist with this "path" that DBI had continuously promised to Petitioner via emails, meetings, and press releases, yet had never actually presented to Petitioner. During the meeting, Petitioner again informed DBI that it was willing to explore

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

changing the legal use of some floors of 1049 Market from commercial to commercial/residential accessory, provided there was a viable solution, and presented its zoning proposal ("Zoning Proposal"). Petitioner's Zoning Proposal submitted a portion of 1049 Market be legalized to commercial/residential accessory use, and another portion remain its present legal use as strictly commercial. The Proposal removed some, but not all, of the illegal residential use already present at 1049 Market. To Petitioners dismay, the Planning Department and DBI were still unable to offer Petitioner a viable solution to meeting the code requirements necessary to change 1049 Market's legal use. There was still no "path" as had been promised multiple times by the Mayor's Office, DBI and Planning. At the end of what was another unsuccessful meeting, the Planning Department advised Petitioner that it would need to have an additional meeting with the Planning Department.

47.     On December 12, 2013, Petitioner again met with the Planning Department as requested. Petitioner again presented its Zoning Proposal. In response, the Planning Department, in continuing to delay and stall Petitioners abatement of the 2013 NOV, stated Petitioner would need "political backing" – i.e. approval from Supervisor Kim and the Mayor's Office – before any decisions could be made on its Zoning Proposal. During a recent deposition of Sider on March 10, 2015, Sider admitted that the Planning Department knew the high cost of such delay to Petitioner: "[i]n this case, clearly there was money at stake and clearly time was relevant."

48.     Shortly thereafter, Petitioner sent by mail and hand delivered the Zoning Proposal to Supervisor Kim's office. Supervisor Kim did not respond to Petitioners proposal.

49.     Meanwhile, the Sept. 27th Notices had expired on November 26, 2013, (terminating the tenancies of the individual units of 1049 Market on floors 3, 4, & 5) and the

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Oct. 28th Notices had expired on December 27, 2013 (terminating the tenancies of the individual units of 1049 Market on floors 1 & 2). However, despite their tenancies having been terminated, many of the individuals failed to release possession of the units at 1049 Market as required. Pursuant to California and local law, Petitioner was precluded from accepting rent from any individual still in possession of their respective unit subsequent to the expiration of each of their respective Notices, as doing so would invalidate each Notice in which Petitioner had accepted rent for. Moreover, as the Permit had been suspended, which Petitioner had relied upon to vacate the building in the first instance, Petitioner was unable to take further action – i.e. file unlawful detainer suits – against the tenants that resided illegally at 1049 Market, as without a valid Permit, Petitioner was without a basis to recover possession of the illegally-occupied units. In other words, because the Permit had been suspended, the now-former tenants of 1049 Market could illegally occupy the units at 1049 Market for free and Petitioner, deprived of all economically viable use of 1049 Market and continuing to incur substantial losses due to the suspension of the Permit, was without legal recourse.

50.     On December 16, 2013, fueled by angst from Supervisor Kim and the Mayor's office, tenants and activists, who were followed by a news crew, gathered together to protest outside of one of Petitioners member's, Amy Bogart, real estate office at Coldwell Banker in Los Altos. Within an hour after the protest started, Ms. Bogart was fired from Coldwell Banker due to the negative press. Since this time, because of the substantial and ongoing threat of negative press, protests, and targeting of Petitioner, Ms. Bogart has been unable to secure a job practicing real estate in the Bay Area.

51.     Petitioner's monetary losses due to the DBI's suspension of the Permit dramatically increased when, on January 8, 2014, eleven of 1049 Market's former tenants, all

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

of which still occupied 1049 Market illegally, filed a wrongful eviction suit against Petitioner in San Francisco Superior Court, *Wilson et al. v. 1049 Market Street, LLC.*, Case No. CGC-14-536672. On January 24, 2014, twelve more of 1049 Market's former tenants, all of which still occupied 1049 Market illegally, also filed a wrongful eviction suit against Petitioner in San Francisco Superior Court, *Arreola v. 1049 Market Street, LLC,* Case No. CGC-14-536968. On February 14, 2014, twelve more of 1049 Market's former tenants, all of which still occupied 1049 Market illegally, also filed wrongful eviction suits against Petitioner in San Francisco Superior Court, *Potter v. 1049 Market Street, LLC,* Case No. CGC-14-537501. (Collectively, "Wrongful Eviction Actions") Further, while Hui and Supervisor Kim have been the leading forces behind the City's suspension of the Permit and the subsequent interim zoning controls intended to target Petitioner, they continued to deny Petitioner access to their depositions in the Wrongful Eviction Actions. Supervisor Kim and Hui's ongoing refusal to be deposed merely illustrates the City's willingness to hide key witnesses and to obstruct Petitioners right to pertinent information for their defense.

52.     On February 18, 2014, under continued pressure from the City to legalize all illegal residential use at 1049 Market, and determined to stop the significant damages already incurred by the suspension of the Permit, Petitioner withdrew its appeal of the Permit. However, the next day, DBI reinstated the Permit.

53.     In or about early March of 2014, Petitioner confirmed with Mike Gunnel of DBI that the Permit had indeed been reinstated, and Gunnel confirmed with Petitioner that Petitioner could begin construction on 1049 Market that very day. Thus, consistent with the authorization and authority set forth in the Permit, and on reliance of said Permit, which authorized Petitioner to recover the possession of 1049 Market and remove the illegal

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

residential use from Subject Units, Petitioner filed unlawful detainer actions against the remaining tenants illegally occupying 1049 Market on March 20, 2014.

54.    Two days later, on March 22, 2014, Veneracion emailed Supervisor Kim and Buckley, advising them that tenants at the Property had been served with unlawful detainer actions and stated **"Let's regroup Monday."**

55.    On March 24, 2014, in a series of emails between Buckley, Sider, and Strawn, Strawn stated that it appeared that the Board of Appeals "made a mistake" in reinstating the Permit, and that **"the good news is we are back to the suspension - so if Jeff Buckley is correct and the owner has re-issued eviction notices based on the reinstatement of the original permit, the owner is in error."** Sider also added "In any event, the permit shows as suspended (again) as of today, **so that's good."**

56.    On April 15, 2014, Petitioner contacted Sider requesting a meeting to discuss a resolution to the suspension of the Permit. Sider responded, "we welcome the opportunity to again help the project team understand the path forward toward legalization of these residences. **I assume that this will be the purpose of the meeting."** Several days later, in an email to Strawn from Sider regarding a potential call back from counsel for Petitioner, Sider stated "I'm not holding my breath ... "perhaps it wasn't [Petitioners] intent to move forward as I suggested in my email, eh? Strawn replied, "[f]unny how synchronously our respective minds read such 'silences,' is it not?"

57.    The following week, bewildered by the length of time that the Planning Department was taking to allegedly conduct its study on whether 1049 Market's principally permitted use had been abandoned under the Planning Code, Petitioner emailed Sider regarding the basis for the continued suspension of the Permit, inquiring "if Planning has ever found an

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

abandonment of office use in the past that would require a new authorization and entitlement process." Several days later, Petitioner received a vague reply from Sider stating he **"couldn't provide a specific example off-hand"** and that if Petitioner "wishes to change direction from our meeting ... in December and pursue elimination of the residential uses and re-establishment of an office use, **we can discuss next steps."**

58.    On June 13, 2014, in an email to city officials, Sider sent an email to several city officials, including Buckley, which summarized the actions taken against Petitioner: **"[Petitioner] began eviction proceedings against a number of artists living in illegal units he had created 10-ish years earlier. We suspended a permit related to the project [at 1049 Market] and things have been effectively on hold since."**

59.    On June 20, 2014, in an email to other City department officials Buckley stated he had a **"general lack of trust . . . – and from multiple conversations with other city staff I believe I'm not alone in that regard – with [Petitioner]."** Buckley also acknowledged the high interest loan Petitioner had taken out in reliance on the Permit: "I also think [Petitioner] took out a commercial loan that I imagine requires a high return that Michael's concept may not be able to yield."

60.    In September of 2014, during the discovery process of the Wrongful Eviction Actions, counsel for the tenants in the Wrongful Eviction Actions served upon Petitioner a document that contained a forged signature of one of Petitioner's members, John Gall.  The document was entitled "Notice to Applicant For Building Permit Sign Posting Required" ("Forged Document").  Petitioner had never seen the Forged Document prior to receiving it in a discovery production.  It has recently been confirmed by a handwriting expert that John Gall's signature on the Forged Document is indeed forged.  Upon inspection of the Forged Document,

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Petitioner observed the Forged Document referred to the Permit application number, 2013-0726-289, and, per San Francisco Ordinance No. 417-86, provided "notice" to the applicant that the applicant was required to post a sign in the building in which a permit was requested for "if alteration work is to be done that would displace tenants from their residence" (the "Notice of Posting Requirement"). Upon further review and inquiry, Petitioner learned that DBI is required to give Notice of Posting Requirement to anyone who is applying for a building permit that has any residential occupancy with 5 or more units. The Notice of Posting Requirement expressly states that the requirement would apply to **"REMOVAL OF ILLEGAL UNIT. a) Unit cannot be legalized because of state or local codes. b) Because owner chooses not to legalize the unit."** Right above the forged signature of Mr. Gall on the Forged Document was a box checked that stated: "I hereby certify that I have read the above notice ... I **will not post a sign because it is not required** . .. " this statement was followed by a warning that **"If this box is determined to have been incorrectly checked, your permit will be revoked."** In utter dismay that someone would have forged Mr. Gall's name on a document associated with the issuance of the Permit, Petitioner began investigating who would have had access to enter the Forged Document into the application folder for the Permit. Upon inquiry, Petitioner learned that the Notice of Posting Requirement would normally have been given upon application of a permit at DBI, which it was not during Petitioners application for the Permit. Petitioner further learned that upon completion of the Notice of Posting Requirement, the Notice of Posting Requirement is then scanned and entered into DBI's electronic database – along with the other documents making up a permit application – as part of a permit application folder. During this process, only staff and officials of DBI have access to these application folders. As such, on information and belief: the Forged Document was

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

forged internally at DBI: DBI had exclusive access to the Forged Document, and – in its efforts

to remedy it's extremely politically unpopular issuance of the Permit and revoke the Permit –

was motivated in forging Mr. Gall's signature.  The forging of Mr. Gall's signature on the

Forged Document was a direct attempt of DBI to create evidence to base the revocation of the

Permit upon and halt the negative press that DBI was receiving.  However – and tellingly of its

unreliable and fraudulent nature – DBI has never actually relied upon the Forged Document as

evidence for suspension of the Permit.

In addition, the Forged Document added fuel to the already-contentious Wrongful

Eviction Actions as the tenants prosecuting the Wrongful Eviction Actions believed that Mr.

Gall signed the Forged Document and thus knew of the potential Posting Requirement when

applying for the Permit.  In a radio interview with Real Party in Interest Chandra Redack

("Redack"), Redack directly addressed the Forged Document, claiming that because John

Gallhad signed this form, and had failed to complete the Posting Requirement, he was clearly

acting in bad faith and could not be trusted.

61.     In early December 2014, over a year after the Permit had been suspended and

yet still no word from the Planning Department on whether the Planning Code deemed 1049

Market's principally permitted use abandoned, Petitioner contacted Sider and requested that the

Planning Department either seek reinstatement or revocation of the Permit.  In response, Sider

suggested that Petitioner meet with him and other relevant City officials in an attempt to find a

resolution of the matter.

62.     On January 21, 2015, Petitioner met with Sider, Buckley, and members of DBI,

however the parties were unable to come to an agreement on the issues.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

63.     Several days later, on January 27, 2015, Supervisor Kim introduced Resolution No. 61-15 to the Board of Supervisors, which initially was a substantive duplicate to the 2013 Controls (which had expired in December of 2014), and again directly targeted Petitioner.

64.     Meanwhile, the City continued to use every available avenue they had to block Petitioner's attempts to run a successful business.  In January of 2015, Petitioner rented two vacant commercial office units at 1049 Market Street, units 106 & 107 ("Units 106 & 1 07"), to one commercial tenant.  Units 106 & 107 were sectioned off from one another via partition. The new commercial tenant asked if they could take down the partition between Units 106 & 107 to enable them easier access to both units.  Petitioners informed the tenant that while the Permit allowed removal of the partition, it was currently still suspended.  In order to satisfy the tenant's needs of easier access between Units 1 06 & 107, Petitioner installed a temporary door in the partition (the "Temporary Door").

65.     On January 13, 2015, the tenants in the Wrongful Eviction Actions filed a complaint with DBI regarding the Temporary Door, and shortly thereafter, Petitioner received an NOV for the Temporary Door.  In response, though fearing that DBI would be hostile to Petitioner – as Petitioner had been told by DBI there was a flag on 1049 Market's file at DBI due to the pending evictions – Petitioner immediately went to DBI to obtain an over-the-counter permit for the Temporary Door.  Upon applying for a permit for the Temporary Door – a process which would have normally been unimpeded due to the simplicity of the project – Petitioners' fears were confirmed when DBI told Petitioner that they would need a complete set of architectural, engineering and structural drawings for the building, or they would not issue a permit for the Temporary Door.  This request by DBI was not only absurd and unprecedented, but would cost Petitioners upwards or $10,000 to obtain such drawings and review.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

66.     On February 2, 2015, a year and a half after its initial suspension of the Permit, and just days after Resolution No. 61-15 was introduced, the Planning Department requested that DBI release the suspension of the Permit ("Release Request"), finding that the legal and principally permitted use of 1049 Market was commercial, it had not been abandoned under the Planning Code, and thus the Permit "does not constitute a change of use or reestablishment of the office use, nor any associated Planning Code provisions that would apply to such activity." Prior to issuing its findings however, the Planning Department proceeded to blame *Petitioner* for the City's outrageously long suspension period and for its own failure to conduct the "study" it had promised over the past year and a half.  The Planning Department stated that **despite its "understanding" that Petitioner was going to seek to convert some or all of the Subject Units into commercial/residential use, the Planning Department had "'received no communication" from Petitioner since January 2014, until December 2014, when Petitioner requested that Planning Department either seek reinstatement or revocation of the Permit.**  The Planning Department also stated that **it "understood it to be implicit in this request" that Petitioner no longer intended to move forward with a conversion of 1049 Market's commercial use to commercial/residential accessory, "as had been previously discussed."** Following these statements, the Planning Department concluded that "[a]s such" it was Planning's finding – almost a year and a half subsequent to suspending the Permit – that 1049 Market's principally permitted use had not in fact been abandoned per the Planning Code. A true and correct copy of the Release Request is attached hereto as Exhibit 5.

67.     The following day, on February 3, 2015, the Board or Appeals notified Petitioner that the release of the suspension of the Permit had been appealed by the individuals

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1   still occupying 1049 Market, in Board of Appeals case no. 15-022 ("Tenants' Suspension

2   Release Appeal").

3   68.   On February 23, 2015, pending the hearing on the Tenants' Suspension Release

4   Appeal, Resolution No. 61-15 was heard and amended by the Land Use and Economic

5   Development Committee.  While Resolution No. 61-15 purported to deem abandoned certain

6   buildings' principally permitted commercial uses, as did the 2013 Controls, it did so this time

7   

8   without relying on Planning Code provisions: "any commercial use that has been converted in

9   whole or in part to residential use without benefit of a permit **shall be deemed abandoned."**

10  Indeed, as the Planning Department had stated in the Release Request, the principally

11  permitted use of 1049 Market *had not* been abandoned pursuant to the Planning Code, thus the

12  Board of Supervisors could no longer rely on this particular legal fallacy and instead had to

13  invent their own.  Further, in a continuing effort to directly single out and target Petitioner and

14  prevent Petitioner from exercising its vested rights under the Permit, Supervisor Kim amended

15  Resolution No. 61-15 to apply *retroactively* to permits that had already been issued

16  ("Retroactivity Clause"), and deem said permits invalid unless a conditional use authorization

17  

18  was obtained ("Conditional Use Requirement").  In pertinent part, the amendment read:

19  

20      Any permit, subject to the posted notice and 15-day hold requirements above, to
       re-establish any commercial use shall not be issued or reinstated, or, **if already
21     issued, shall not remain effective, unless the project sponsor obtains a
       Conditional Use Authorization under Planning Code section 303, in addition
22     to all requirements of the Planning Code applicable to the establishment of
       any such use.**

23

24  A "conditional use" is a use that is not principally permitted in a particular zoning

25  district.  Generally, a conditional use authorization is required to establish a use that is not

26  permitted as of right, not – as it was designed to do in the 2015 Controls – to "reestablish" a

27  

28  preexisting, principally permitted use.  In other words, Resolution No. 61-15 (1) purported to

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1  deem abandoned a principally permitted use of a building, (2) purported to invalidate finalized

2  permits for projects related to a building's principally permitted use, and finally (3) mandate

3  that in order to "reestablish" a building's principally permitted use, a project sponsor must

4  obtain a condition use authorization for a use that is *already principally permitted.*  During the

5  hearing, Supervisor Kim confirmed that the intended effect of the Retroactivity Provision was

6  to invalidate already-valid permits: "To clarify, the conditional use requirement will apply to

7  all permits to reestablish a commercial use.  **If the city has already issued a permit, then the**

8  **permit will no longer be effective unless the city grants a conditional use authorization.**"

9

10        69.      During Public comment, Petitioner objected to Resolution No. 61-15 being

11  specifically directed at 1049 Market, as well as objected to Supervisor Kim's participation

12  based on her demonstrated bias in favor of the tenants at 1049 Market.   In response to

13  Petitioners objection that Supervisor Kim had demonstrated bias in favor of the tenants, the

14  President of the BOS asked Supervisor Kim if she was going to recuse herself from voting on

15  Resolution No. 61-15.  However, Supervisor Kim refused to recuse herself and instead replied:

16  **"Yes I have taken a position. So to the accusation that I am biased around this issue, I do**

17  **believe that preservation of housing of existing tenants is absolutely a priority of this city;**

18  **and that is why that we've introduced this [Resolution 61-15]."** Supervisor Weiner, joining

19  as a cosponsor to Resolution 61-15, stated: **"I was actually surprised when this came back**

20  **that this was still happening because I remember when this first came up . . . the**

21  **statement by [Petitioner] saying that the city is forcing us to evict these tenants, and then**

22  **I know that there was a lot of work among different departments to figure it out and that**

23  **was no longer the case.  And so I find it very sad that we're still in a situation where these**

24  **residents are being faced with eviction.  And so I think these interim controls are very**

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

**important."** In a later deposition in the Wrongful Eviction Actions of Veneracion, on March 17, 2015, Veneracion confirmed this legislative targeting by verifying that the Retroactivity Clause had in fact been drafted solely to address the Permit and 1049 Market.

70.     On March 2, 2015, Resolution No. 61-15 was heard by the Land Use and Transportation Committee.   During public comment, Petitioner objected to the proposed retroactivity of Resolution No. 61-15, as well as advised the committee that Petitioner had relied on the Permit and had a vested right to complete work under the Permit, and that invalidating the Permit after the fact would expose Petitioner to substantial liability for pursuing evictions based on the Permit.

71.   On March 3, 2015, Resolution No. 61-15 was passed by the Board of Supervisors, and signed by the Mayor on March 12, 2015 ("2015 Controls").

72.     On March 26, 2015 at 11:40 am, Leiasa Beckham, from the San Francisco Community Land Trust ("SFCLT") handed Petitioner a vague and suspicious offer to purchase 1049 Market for $10,000,000 – **less than 1/3 of market value – nervously stating "you did not receive this offer from me."**  Before leaving, Beckham quickly advised Petitioner that SFCLT knew of the pending lawsuits and issues at the building, and if the owners wanted out, SFCLT would talk about a deal.  The purpose of the SFCLT, as stated on their website is, "San Francisco Community Land Trust is a membership-based organization whose mission is to create permanently affordable, resident-controlled housing for low-to moderate-income people in San Francisco through community ownership of the land."  One of the largest funders of the SFCLT are Respondents City and County of San Francisco and the Mayor's Office, who, over the past year and a half, had drastically devalued 1049 Market with legislative targeting, political harassment culminating in lawsuit, and administrative red tape.  The sheer "back-

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

door" nature of the offer to purchase 1049 Market, and its carefully designed timing, illustrates the City's attempts at using all available resources to impel Petitioner into following their political demands, no matter the cost to Petitioner.

73.    On April 2, 2015, though not a party to the Tenants' Suspension Release Appeal — but in continuing to single out and target Petitioner to prevent Petitioner from exercising its vested rights under the Permit — the Planning Department filed a brief in the Tenants' Suspension Release Appeal supporting the appellants' position and requested that revocation proceedings be commenced for the Permit. In support for this unfounded request, the Planning Department argued that the Retroactivity Clause applied to the Permit and per the 2015 Controls, the principally permitted commercial use at 1049 Market had been abandoned and thus Petitioner was required to apply for a conditional use authorization and be subject to other discretionary Planning Code procedures.

74.    On April 8, 2015, the hearing for the Tenants' Suspension Release Appeal took place. In presenting its argument, the Planning Department confirmed that, per the Release Request, it had determined that 1049 Market's principally permitted use had not been abandoned under the provisions of the Planning Code. Instead, the Planning Department now relied on the language of the 2015 Controls, arguing that, per the 2015 Controls, 1049 Market's principally permitted commercial use had been abandoned, and in any event, the Retroactivity Provision invalidated the Permit. The Planning Department ended its argument against Petitioner by stating that the Board of Appeals should uphold the suspension, and Planning Department would work with DBI to take "appropriate action" on the Permit, which "would include revocation of the Permit." Thereafter, the Board of Appeals granted Tenants' Suspension Release Appeal and overturned the Release Request. However, the Board of

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Appeals' conclusion was not based on any argument that was before it, but on arbitrary grounds that the San Francisco Zoning Administrator should not have released the Permit, but instead should have revoked the Permit because the Permit application form stated 1049 Market's *legal* use rather than its current *actual* use. It was not until the last few minutes of the hearing for the Tenants' Suspension Release Appeal that this alleged issue regarding the validity of the Permit was brought up, and Petitioner did not have the opportunity to properly respond to this claim. In fact, earlier in the hearing, when asked about the validity of the permit, Scott Sanchez of the Board of Appeals acknowledged that the Permit was valid based on the Planning Code and the 1049 Market's current use. Despite this acknowledgement, the Board of Appeals then deemed the Permit defective despite any viable legal justification for doing so.

75.     On April 10, 2015, in a continuing effort to actively harm Petitioner and its individual members, the Mayor's Office blocked yet another attempt by Petitioners members to maintain a viable business. Petitioner's members and a prospective retail tenant at 1005 Market were preparing to enter into a five-year lease, of which a condition precedent was the changing of a fixed window into an opening window. As 1005 Market was a historical building – which could have meant further architectural review prior to changing the window - the prospective tenant and their broker (who Petitioners members had a long, successful working relationship with) inquired into the process further at the Historical Preservation division of the Planning Department and San Francisco Office of Workforce Development (OEWD).

76.     On April 10, 2015, Mr. Gall spoke to the prospective tenant's broker, who advised Mr. Gall that the Historical Preservation division of the Planning Department would not approve the change in the window at 1005 Market, and thus the tenant would have to walk

away from the lease. The prospective tenant's broker advised Mr. Gall that Amy Cohen at OEWD informed her that the Planning Department wouldn't work with Mr. Gall because of the issues "down the block" at 1049 Market. Upon conversing with Eiliesh Tuffy of the historical Preservation Committee, Mr. Gall learned that this hostility originated directly from Eiliesh Tuffy's superior, Tim Frye of the Planning Department's Historical Preservation Committee.

77.    On April 20, 2015, in a further effort to enforce its vested rights under the Permit, Petitioner filed a request for a rehearing of the Tenants' Suspension Release Appeal pursuant to the Rule of the Board of Appeals section V.9(b) based on the manifest injustice of the Board of Appeal's decision. On May 6, 2015, Petitioners request for a rehearing was denied.

78.    On May 21, 2015, Petitioner initiated a writ proceeding against the City, naming the appellants to the Tenants' Suspension Release Appeal as real parties in interest (RPI). On November 2, 2015, Petitioner filed a first amended petition for writ of mandate and mandamus, alleging the following two causes of action: (1) Writ of Mandate to compel compliance with the California Environmental Quality Act (CEQA) prior to enforcing the 2015 Controls, against the City only ("CEQA Petition"); and (2) Writ of Mandate CCP § 1094.5 or § 1085 ("Mandamus Petition"), against the City and RPIs. In the Mandamus Action, Petitioner alleged that (1) the City abused its discretion and exceeded its jurisdiction by granting Tenants' Suspension Release Appeal, in that it granted the Appeal on grounds that were not properly before it; (2) this abuse of discretion and interference deprived Petitioner of its vested rights in the Permit; and (3) this abuse of discretion and interference, and the resulting inability to terminate the RPIs' tenancies, combined with the prohibition against collecting rent, constituted a taking of Petitioner's Property without just compensation, in that it deprived

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

Petitioner of economically productive use of its Property for the benefit of the RPIs and others, and sanctioned and compelled a physical occupation of Petitioner's Property, all without adequate compensation. The Petition was heard on October 30, 2015 and December 15, 2015.

79.     After the hearing on the Petition (but before the Court issued a determination), on February 23, 2016 – because the City had, for over two years, forced Petitioner to remain virtually *uncompensated* – Petitioner invoked its right under the Ellis Act, Government Code section 7060, *et seq.* (the "Ellis Act") to leave the landlord business and served NOTs on the 23 remaining illegal residential tenants that occupied floors 1-5 of the Property.

80.     On April 12, 2016, the Court filed an order denying the CEQA Petition and granting the Mandamus Petition in part, holding that the City exceeded its jurisdiction in deciding the Tenants' Suspension Release Appeal on grounds that were not properly before it, and remanded the Tenants' Suspension Release Appeal back to the BOA for a decision on the merits of the abandonment issue under the Planning Code.[2]  By the time the Court had issued its decision, the 2015 Controls had expired, and the Court ordered that "[g]iven the interim nature of the [2015 Controls], the question of what law applies is up to the BOA in the first instance."

## THE PRESENT DISPUTE

81.     Meanwhile, subsequent to the hearing on the CEQA and Mandamus Petitions and just prior to the Court issuing its decision in the matter, the City continued to vindictively target Petitioner through a new legislative vehicle: Ordinance no. 23-16 (the "CU Controls").

---

[2]  The Court denied Petitioner's remaining claims in the Mandamus Petition. Petitioner filed a notice of intention to move for a new trial on the takings and vested rights claims in the Mandamus Petition, which is scheduled to be heard on May 26, 2016. Petitioner also filed a motion for reconsideration of its taking's claim, scheduled to be heard the same day, based on new evidence relating to its Ellis Act invocation.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

The City enacted the CU Controls on March 4, 2016.  A true and correct copy of the CU Controls is attached hereto as Exhibit 6.  In enacting the CU Controls, the City amended the Planning Code to revise section 132, add a new section, Section 317.1 ("PC Section 317.1), and revised Building Code section 102A ("BC Section 102A").

82.    In pertinent part, PC Section 317.1 targets Petitioner with the following requirements:

1)  only targets properties in the C-3 District, the very area in which Petitioner's Property is located;

2)  requires that upon any application for a permit that would result in the removal of a legal or illegal residential unit (alteration, demolition, or otherwise), the targeted properties must first obtain a discretionary, conditional use authorization (CUA) from the City;

3)  in determining whether to grant a CUA for the removal of a residential unit – legal or illegal – the City will *not* consider the (usual) requirements set forth in San Francisco Planning Code section 303 for granting a CUA – that is, whether the project would provide a necessary or desirable development for the community that is not detrimental to the health/safety of the community, and would comply with San Francisco's General Plan, Planning Code, and provide conformity with the applicable uses in the district – but instead, the City will consider "the adverse impact on the public health, safety, and general welfare of the loss of housing stock in the zoning district and to any unreasonable hardship to the applicant if the permit is denied."

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

4) when the applicant desires to remove illegal housing, the City shall also determine whether it is "financially feasible" to legalize the illegal use, and shall deem the legalization "financially feasible" if the gain in value to the property by legalizing the illegal units is equal to or greater than the cost to legalize the illegal units ("Feasibility Test");

5) upon any denial of an application to remove the illegal units, the property owner is required to file an application to legalize the illegal use or be subject to a NOV;

6) the City will deny any permit application in which the applicant desires to "merge" either legal or illegal units – that is, combine two or more units, or reduce the size of any unit – if a tenant has been evicted pursuant to a permit that authorized the eviction or via the Ellis Act, (or a number of other methods authorized by the San Francisco Rent Ordinance), where the tenant was served a NOT after December 10, 2013, and the application is submitted within 10 years of the date of service of the NOT; and,

7) purports to retroactively apply to any permit for the removal of an unauthorized residential unit "issued prior to March 1, 2016, that has been suspended by the City or in which the applicant's rights have not vested."

83.    In pertinent part, BC Section 102A targets Petitioner by requiring property owners to apply for a permit to legalize the illegal use of the property if the City deems a property containing illegal units to be unsafe pursuant to the standards set forth in the Building Code. It also mandates that any NOV issued prior to the enactment of the CU Controls shall be reissued.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

84.    Prior to the enactment of the CU Controls, the City found the CU Controls not a "project" under the California Environmental Quality Act (CEQA) Guidelines §§ 15378 and 15060(c)(2) in that "it does not result in a physical change to the environment."

85.    On February 1, 2016 and February 8, 2016, Petitioner objected to the CU Controls in writing on the following grounds:

a. The Land Use and Transportation Committee's hearing on the CU Controls was premature in violation of San Francisco Charter Article IV §4.105, Planning Code § 302, San Francisco Administrative Code § 31.08;

b. The City erroneously misclassified the CU Controls as "not a project" pursuant to CEQA in that the Controls require more dwelling units than under existing law, and conflict with the City's General Plan. The CU Controls are a "project" under CEQA as its enforcement would cause property deterioration, degradation, blight and urban decay in that it was designed to result in a denial of a change in use, so that the targeted units are likely to sit empty after any eviction of the tenants that occupied them. The CU Controls compel residential use of nonresidential structures, which is unsafe – especially as these unlawful uses did not receive proper CEQA review in the first instance – and puts an additional burden on public safety resources and infrastructure.

c. The CU Controls conflict with California Building Code §§ 3408 and 8302 in that they seek to maintain all unwarranted units, rather than leave this decision up to the property owner;

d. The CU Controls conflict with property owners' rights to leave the landlord business via the Ellis Act in that once owners exercise their right to leave the landlord business by evicting their tenants, these owners will be unable to obtain authorization to remove a unit's

1  unwarranted status, given that the CU Controls were designed to result in a denial of a change

2  in use;

3        e. The enactment of the CU Controls pursuant to the Granny Flat law, Ca. Gov't

4  Code § 65852.2 exceeds the City's authority in that the Granny Flat law only applies to single

5  family homes;

6        f. The CU Controls violate property owners' Due Process rights and vested

7  rights in its retroactive application, and specifically targets Petitioner and its wrongfully

8  suspended Permit, in which its rights had vested;

9        g. The City does not have a legitimate state interest in enacting the CU Controls,

10  but instead the CU Controls purpose is to specifically target and punish Petitioner for its

11  unpopular but lawful attempt to evict their tenants for illegal and unsafe residential use; and

12        h. The CU Controls make even desirable unit mergers virtually impossible in

13  that it applies landscaping and permeable surface requirements for new buildings and building

14  additions to unit mergers which do not change the square footage or building footprint in any

15  way;

16        j. The CU Controls makes merging units extremely costly and time-consuming,

17  which discourages family-friendly housing;

18        k. The CU Controls' Feasibility Test is unworkable in that while legalization

19  costs must be paid up front, the property owner would only realize a gain after the sale; many

20  property owners will not be able to afford these up-front costs, and even if they could, they are

21  not permitted to "pass through" these capital improvement costs to tenants to reimburse an

22  owner. Moreover, the value of an illegal unit will generally be reduced by legalization as

23  opposed to increased;

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

l. The CU Controls constitute unjust interference with the Department of Building Inspection's and Planning Department's Charter obligations to enforce the City Codes; and

m. The CU Controls would effect a taking of private property without compensation. Property owners cannot charge rent for illegal residential use, and the CU Controls seek to prevent any other use.

86.     The CU Controls were passed by the Board of Supervisors on February 23, 2016, and approved by the San Francisco Mayor on March 4, 2016.

87.     Inexplicably, just seven (7) days after the CU Controls had been enacted, on March 11, 2016, the City enacted Ordinance No. 33-16 (the "Broad CU Controls"), which specifically *deleted PC Section 317.1* of the CU Controls, notwithstanding the fact this Section had been enacted just one week earlier.  A true and correct copy of the Broad CU Controls are attached hereto as Exhibit 7.   Specifically, the Land Use and Transportation Committee duplicated the CU Controls on February 11, 2016, and further amended the CU Controls to create the Broad CU Controls.  The Broad CU Controls not only repealed PC Section 317.1 enacted by the CU Controls, but it also amended Planning Code section 317 to implement the exact language and subject matter of PC Section 317.1, only this time, mandated city-wide application.  The Broad CU Controls also provided the exact additions to the SF Building Code, as had the CU Controls per the BC Section 102A revision.

88.     The substantive differences between the CU Controls and Broad CU Controls are as follows:

a. The Broad CU Controls applied generally to the City and County of San Francisco – rather than just the C3 District.  However, while the CUA requirement applied

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

city-wide, the criteria for determining when a CUA would be granted still only targeted the C3 District. As did the CU Controls, the Broad CU Controls required that when considering whether to grant a CUA for a property in the C3 District (the district in which Petitioner's Property was located) that, in lieu of the considerations set forth under Planning Code § 303, the City instead consider "the adverse impact on the public health, safety, and general welfare of the loss of housing stock in the district and to any unreasonable hardship to the applicant if the permit is denied";

b. The Broad CU Controls specifically exempted single family residential buildings in certain districts "that are demonstrably not affordable or financially accessible housing" (subject to City discretion) from obtaining a CUA prior to obtaining a permit to demolish the units;

c. The Broad CU Controls added multiple additional criteria for consideration by the City during the City's review of permits for residential demolition. These additional criterion included whether the project converted residential housing into other uses, removed units subject to rent control, preserved neighborhood "character," and whether the project protected the relative affordability of housing.

89.  Prior to the enactment of the Broad CU Controls, the City found the Broad CU Controls not a "project" under the California Environmental Quality Act (CEQA) Guidelines §§ 15378 and 15060(c)(2) in that "it does not result in a physical change to the environment."

90.  On February 22, 2016, Petitioner objected to the Broad CU Condition in writing upon substantially the same grounds it objected to the CU Controls.

//

//

**FIRST CAUSE OF ACTION**
(Writ of Mandate to compel CEQA Compliance (CCP § 1085 or 1094.5;
Pub. Resources Code §21168.5))

91. Petitioner incorporates herein by reference the allegations contained in Paragraphs 1 through 90 of this Petition.

92. Petitioner has a beneficial interest in this action under Code of Civil Procedure § 1086 as 1049 Market is located in the area in which the CU Controls and Broad CU Controls will have adverse environmental impacts, and the City's actions in failing to review the CU Controls and Broad CU Controls under CEQA will thus have a direct, substantial effect on it.

93. San Francisco County Superior Court has initial jurisdiction of the matters alleged herein pursuant to Public Resources Code § 21168, which authorizes the Court to review and set aside a public agency action that violate CEQA. Venue is proper pursuant to Code of Civil Procedure section 394(a), which provides that "[a]n action . . . against a . . . city and county . . . may be tried in [that] . . . city and county . . . ."

94. Petitioner exhausted the available administrative remedies required to be pursued by it as follows: Petitioner served written comments and oral objections on the City regarding the CU Controls and Broad CU Controls prior to their enactment and during the period of administrative hearings, on or about February 1, 2016, February 8, 2016, and February 22, 2016, in which each of the legal deficiencies plead in this cause of action were raised.

95. Petitioner has performed all actions required by law precedent to filing this action, including complying with the requirement of Public Resources Code § 21167.5 by mailing notice to the City that this action would be filed. A copy of this notice is attached hereto as Exhibit 8.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

96.     Under CEQA, an agency prejudicially abuses its discretion when (1) it fails to proceed in the manner required by law; or (2) its decision is not supported by substantial evidence. (Pub. Resources Code§ 21168.5).

97.     The CU Controls and the Broad CU Controls and their environmental determination violate CEQA as follows:

(1) The CU Controls and Broad CU Controls conflict with the San Francisco General Plan. Pursuant to the General Plan, office use is principally permitted within areas covered by the CU Controls and Broad CU Controls.

(2) The City erroneously misclassified the CU Controls and the Broad CU Controls as "not a project" pursuant to CEQA.  The CU Controls and the Broad CU Controls are a "project" under CEQA, in that the Controls require more dwelling units than under existing law, and change zoning classifications and the permissible uses of land.  The CU Controls and Broad CU Controls seek to prioritize and/or mandate residential uses over commercial use, but residential use imposes higher burdens on public services, traffic, public transit, and parking, and thus may result in a direct or reasonably foreseeable indirect physical change in the environment.  The CU Controls and Broad CU Controls are a project under CEQA as their enforcement would cause property deterioration, degradation, blight and urban decay in that it was designed to result in a denial of a change in use, so that the targeted units are likely to sit empty after any eviction of the tenants that occupied them. The CU Controls and the Broad CU Controls compel residential use of nonresidential structures, which is unsafe – especially as these unlawful uses did not receive proper CEQA review in the first instance – and puts an additional burden on public safety resources and infrastructure.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

98.     For the aforesaid reasons, Petitioner seeks an immediate stay of the CU Controls and Broad CU Controls.

99.     It is reasonably foreseeable that zoning ordinances that are designed to prohibit property owners from removing illegal residential use from commercially zoned buildings will result in a direct, or reasonably foreseeable indirect, physical change in the environment. Additionally, the CU Controls and Broad CU Controls will inarguably result in the perpetuation of blight, and the spread of urban decay, among other adverse impacts. Thus, the City's findings that the CU Controls and Broad CU Controls are not projects subject to CEQA are not supported by substantial evidence.

100.     Because of these impacts, the CU Controls and Broad CU Controls are projects within the meaning of CEQA. Thus, the City was required to complete, at a minimum, an initial study on the potential for significant effects on the environment and thereafter, if necessary, an environmental impact report. The City failed to do so, and thus did not proceed in a manner required by law.

101.     Petitioner has a beneficial interest in ensuring the City complies with CEQA. In deeming the CU Controls and Broad CU Controls "not a project" the City abused its discretion in failing to comply with CEQA and failing to proceed in the manner required by law.

102.     As a result of the City's violations of CEQA, Petitioner has been harmed in that Petitioner and other members of the public were not fully informed about the significant environmental impacts of the CU Controls and Broad CU Controls prior to the City's enactment of the Controls.

103.     Petitioner, as well as members of the general public, will suffer irreparable harm if the relief requested herein is not granted, as the CU Controls and Broad CU Controls have

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1  been implemented in the absence of an initial study and a full and adequate environmental

2  impact report and absent compliance with other applicable provisions of CEQA.

3      104.    This action involves the enforcement of important rights affecting the public

4  interest: as alleged, the CU Controls and Broad CU Controls conflict with the General Plan and

5  are projects subject to CEQA review.  Environmental review under CEQA would allow any

6  environmental risks to be fully investigated and mitigated in advance, thereby protecting the

7  public interest.  As such, Petitioner is entitled to recover its attorneys' fees under CCP §

8

9  1021.5.  Furthermore, since the City's conduct in finding the CU Controls and Broad CU

10  Controls not a project subject to CEQA – even after the CU Controls were amended to broaden

11  the scope via the Broad CU Controls – was arbitrary and capricious, Petitioner requests $7,500

12  in attorneys' fees under Government Code § 800.

13

14              **SECOND CAUSE OF ACTION**
              (Writ of Mandate CCP § 1085)

15

16      105.    Petitioner incorporates herein by reference the allegations contained in

17  Paragraphs 1 through 104 of this Petition.

18      106.    Venue is proper in this Court pursuant to Code of Civil Procedure section

19  394(a), which provides that "[a]n action . . .  against a . . . city and county . . . may be tried in

20

21  [that] . . . city and county . . . ."

22      107.    Petitioner requests the Court issue writs of mandate, setting aside and voiding

23  the CU Controls and the Broad CU Controls, for reasons specified in paragraph nos. 85-90 of

24  this Petition, including, but not limited to, the following: that the CU Controls and Broad CU

25  Controls are facially preempted by the Ellis Act and are invalid as applied to Petitioner; the

26  City's enactment of the CU Controls and Broad CU Controls was arbitrary, capricious, and/or

27  without reasonable basis; the CU Controls and Broad CU Controls retroactive application

28

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

violates Petitioner's Due Process rights under the California and U.S. Constitution and Petitioner's vested rights in the Permit; the CU Controls and Broad CU Controls constitute a per se taking, a regulatory taking, and/or a physical taking without just compensation, and thus violate Petitioner's rights protected by the California Constitution and U.S. Constitution, and entitles Petitioner to compensation under the same and the cases of *Horne v. Dep't of Agric.* (2015) 135 S. Ct. 2419; *Penn Central Transp. Co. v. City of New York* (1978) 438 U.S. 104; *Ali v. City of Los Angeles* (1999) 77 Cal.App.4th 246; *Lingle v. Chevron USA, Inc.* (2005) 544 U.S. 528; *Loretto v. Teleprompter Manhattan CATV Corp.* (1982) 458 U.S. 419; *Lockaway Storage v. County of Alameda* (2013) 216 Cal. App. 4th 161, 183-184; *Jefferson Street Ventures, LLC v. City of Indio* (2015) 236 Cal. App. 4th 1175; *Armstrong v United States* (1960) 364 U.S. 40; *Shaw v. County of Santa Cruz* (2008) 170 Cal. App. 4th 229; *Lucas v. South Carolina Coastal Council* (1992) 505 U.S. 1003; *Nollan v. California Coastal Commission* (1987) 483 U.S. 825; *Dolan v. City of Tigard* (1994) 512 U.S. 374.

108.   Petitioner has a beneficial interest in ensuring the CU Controls and Broad CU Controls are found to be invalid and void, and that the City is ordered to rescind them and bar their enforcement, so that Petitioner's statutory and constitutional rights are not infringed upon.

109.   Because this is a statutory challenge, the Court's review is *de novo*.

110.   Petitioner exhausted the available administrative remedies required to be pursued by it as follows: Petitioner served written comments and oral objections on the City regarding the CU Controls and Broad CU Controls prior to their enactment and during the period of administrative hearings, on or about February 1, 2016, February 8, 2016, and February 22, 2016, in which each of the legal deficiencies plead in this cause of action were raised.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

111.   Petitioner does not have a plain, speedy, or adequate remedy in the ordinary course of law, and therefore writ relief is necessary in order to compel the City to perform its ministerial duty and/or correct its legislative action which is unlawful and/or in excess of its authority.

112.   Petitioner seeks an immediate stay to enjoin the City from enforcing the CU Controls and Broad CU Controls, as their enforcement would further harm Petitioner by violating its aforesaid statutory and constitutional rights.

WHEREFORE, Petitioner demands judgment against the City for the following:

On Petitioner's First Cause of Action - Writ of Mandate to compel CEQA Compliance:

1.   For a peremptory writ of mandate commanding the City to rescind, void, and set aside the City's finding that the CU Controls and Broad CU Controls were not projects subject to CEQA, and instead require the City to find that the CU Controls and Broad CU Controls are projects within the meaning of CEQA and perform an initial study of environmental impacts to ascertain the proper scope of environmental review for the CU Controls and Broad CU Controls;

2.   For costs of suit herein;

3.   For a stay of the CU Controls and Broad CU Controls pending the determination of the merits;

4.   For reasonable attorneys' fees under Code of Civil Procedure section 1021.5 and Government Code section 800;

5.   For any other relief that the Court deems just and proper.

On Petitioner's Second Cause of Action - Writ of Mandate pursuant to CCP § 1085:

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1.      For a writ of mandate or other appropriate relief, including a mandatory injunction, directing and commanding the City not to enforce the CU Controls and Broad CU Controls for all of the aforesaid reasons specified herein;

2.      For a writ of mandate commanding the City not to allow anyone else, natural person or otherwise, to enforce the CU Controls and Broad CU Controls;

3.      For an alternative writ against the City;

4.      For a stay of the CU Controls and Broad CU Controls pending the determination of the merits;

5.      For costs of suit herein;

6.      For reasonable attorneys' fees under Code of Civil Procedure section 1021.5 and/or Government Code section 800;

7.      For any other relief that the Court deems just and proper.

Dated: May 23, 2016                    ZACKS, FREEDMAN & PATTERSON, PC


                                        Andrew M. Zacks
                                        Emily L. Brough
                                        Attorneys for Petitioner
                                        1049 MARKET STREET, LLC.

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

**VERIFICATION**

I, the undersigned, declare:

I, John Gall, am a member of Petitioner 1049 Market Street, LLC ("1049 Market"), and am authorized to execute this verification on behalf of 1049 Market. I have read the foregoing Petition for Writs of Mandate and Request for Immediate Stay and know its contents. The matters stated in this Petition for Writs of Mandate and Request for Immediate Stay are true based on my own knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on May *23* 2016, in San Francisco, California.

John Gall

ZACKS & FREEDMAN, P.C.
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT 1

# NOTICE OF VIOLATION
### of the San Francisco Municipal Codes Regarding Unsafe, Substandard or Noncomplying Structure or Land or Occupancy

**COMPLAINT NUMBER**

☒ FIRST NOTICE
☐ SECOND NOTICE
☐ OTHER: _____

**DEPARTMENT OF BUILDING INSPECTION**
City and County of San Francisco
1660 Mission St. • San Francisco, CA 94103 - 2414

2007,1185.0

DATE 10/25/07

ADDRESS 1049 MARKET St

BLOCK 3703 LOT 067

OCCUPANCY / USE R-1  R-2

STORIES 6  ☐ BASEMENT

CONST. TYPE 3

☒ If checked, this information is based upon the observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued

OWNER / AGENT _____  CITY _____  ZIP _____  PHONE # _____

MAILING ADDRESS _____  PHONE # _____

PERSON CONTACTED @ SITE _____

## VIOLATION DESCRIPTION:

☒ WORK WITHOUT PERMIT (SFBC 106.1.1);   ☐ ADDITIONAL WORK PERMIT REQUIRED (SFBC 106.4.7);
☐ EXPIRED PERMIT (SFBC 106.4.4)   ☐ CANCELLED PERMIT (SFBC 106.3.7)   PA# _____
☐ UNSAFE BUILDING (SFBC 102);   ☐ SEE ATTACHMENTS

| VIOLATION DESCRIPTION | CODE / SECTION # |
|---|---|
| A Complaint was Been Received By The Department Of Regarding The Illegal Conversion of Office Space to Live/Work Units Building Permit # 9104252 was Approved for Six Live Work Units on Top Floor Site Inspection Revealed Existing Office Unit Converted to Habitable Space on Remaining Floors No Permit Exists for this Conversion | 106.1.1  3405  109 |

BC - Building Code   HC - Housing Code   PO - Plumbing Code   EC - Electrical Code   MC - Mechanical Code

## CORRECTIVE ACTION:

☐ STOP ALL WORK  SFBC 104.2.4

☒ FILE BUILDING PERMIT APPLICATION WITHIN 30 DAYS (☒ WITH PLANS) A Copy of This Notice Must Accompany the Permit Application.
☐ _____ DAYS AND COMPLETE ALL WORK WITHIN 90 DAYS, INCLUDING FINAL INSPECTION AND SIGNOFF.
☒ OBTAIN PERMIT WITHIN 60 DAYS AND COMPLETE ALL WORK WITHIN DAYS.   ☐ NO PERMIT REQUIRED.
☐ CORRECT VIOLATIONS WITHIN _____ DAYS.
☐ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED _____ THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.
☒ FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN, SEE REVERSE SIDE FOR ADDITIONAL WARNINGS.
Obtain Building Permit with Planning Department Approval for Conversion of Office Unit to Live Work Unit

INVESTIGATION FEE OR OTHER FEE WILL APPLY See reverse side for further explanation
△ 9x Fee (Work w/o Permit after 9/1/60)   △ 2x Fee (Work Exceeding Scope of Permit)   ☐ No penalty (Work w/o permit prior to 9/1/60)
☐ Other _____   ☐ Reinspection Fee $ _____
VALUE OF WORK PERFORMED WITHOUT PERMIT _____
APPROX. DATE OF WORK W/O PERMIT _____

## BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION

CONTACT INSPECTOR DUFFY

OFFICE HOURS 7:30 to 8:30 AM AND 3 to 4 PM

PHONE # 558-6120

By: (Inspector's Signature) _____   DISTRICT # _____

CC ☒ HCP ☐ EID ☐ PID ☐ BID ☐ HIS ☐ GED ☐ CPC ☐ DAD ☐ SFFD ☐ DPH ☐ HPC

☒ Building Inspection Division   558-6096
3rd Floor, 1660 Mission St.
☐ Housing Inspection Services   558-6220
6th Floor, 1660 Mission St.
☐ Electrical Inspection Division   558-6030
3rd Floor, 1660 Mission St.
☐ Plumbing Inspection Division   558-6054
3rd Floor, 1660 Mission St.
☐ Code Enforcement Division   558-6454
3rd Floor, 1660 Mission St.

11/2- showed to Larry
11/5- faxed & mailed originals to Rockn

M 90006   (Rev. 6/00)
☒ Printed on recycled materials

# EXHIBIT 2

# NOTICE OF VIOLATION

of the San Francisco Municipal Codes Regarding Unsafe,
Substandard or Noncomplying Structure or Land or Occupancy

**DEPARTMENT OF BUILDING INSPECTION**
City and County of San Francisco
1660 Mission St. San Francisco, CA 94103

NOTICE: 2

NUMBER: 200711850
DATE: 16-FEB-13

ADDRESS: 1049 MARKET ST
OCCUPANCY/USE: M (MERCANTILE)

BLOCK: 3703   LOT: 067

☐ If checked, this information is based upon site-observation only. Further research may indicate that legal use is different. If so, a revised Notice of Violation will be issued.

PHONE #: --

OWNER/AGENT: SHIH, HO INC
MAILING          SHIH, HO INC
ADDRESS         % TERRY BOGART
                      16351 SKYLAND BLVD
                      WOODSIDE CA                94062

PERSON CONTACTED @ SITE:  SHIH, HO INC

PHONE #: --

## VIOLATION DESCRIPTION:

| | CODE/SECTION# |
|---|---|
| | 106.1.1 |
| ☐ WORK WITHOUT PERMIT | 106.4.7 |
| ☐ ADDITIONAL WORK-PERMIT REQUIRED | 106.4.4 |
| ☐ EXPIRED OR ☐ CANCELLED PERMIT PA#: | 102.1 |

☐ UNSAFE BUILDING    ☐ SEE ATTACHMENTS

You failed to comply with NOV dated 10/25/2007. Therefore this Department has initiated abatement proceedings against this property.

## CORRECTIVE ACTION:

☐ STOP ALL WORK SFBC 104.2.4                        415-558-6008

☐ FILE BUILDING PERMIT WITHIN DAYS     ☐ (WITH PLANS) A copy of This Notice Must Accompany the Permit Application
☐ OBTAIN PERMIT WITHIN DAYS AND COMPLETE ALL WORK WITHIN DAYS, INCLUDING FINAL INSPECTION AND SIGNOFF.
☐ CORRECT VIOLATIONS WITHIN DAYS.            ☐ NO PERMIT REQUIRED
☑ YOU FAILED TO COMPLY WITH THE NOTICE(S) DATED  25-OCT-07, THEREFORE THIS DEPT. HAS INITIATED ABATEMENT PROCEEDINGS.

• FAILURE TO COMPLY WITH THIS NOTICE WILL CAUSE ABATEMENT PROCEEDINGS TO BEGIN.
  SEE ATTACHMENT FOR ADDITIONAL WARNINGS.

This case has been referred to our Code Enforcement Division. You will be notified of a time, place and date of a Director's Hearing.

INVESTIGATION FEE OR OTHER FEE WILL APPLY
☐ 9x FEE (WORK W/O PERMIT AFTER 9/1/60)   ☐ 2x FEE (WORK EXCEEDING SCOPE OF PERMIT)   ☐ NO PENALTY
                                                                                                                         (WORK W/O PERMIT PRIOR TO 9/1/60)
☐ OTHER:                                               ☐ REINSPECTION FEE $
APPROX. DATE OF WORK W/O PERMIT              VALUE OF WORK PERFORMED W/O PERMITS $

BY ORDER OF THE DIRECTOR, DEPARTMENT OF BUILDING INSPECTION
CONTACT INSPECTOR: Robert J Power
PHONE # 415-558-6008                   DIVISION: BID           DISTRICT : 17
By:(Inspector's Signature) _____

EXHIBIT 3

APPROVED
Dept. of Building Insp.

AUG 0 2 2013

Tom C. Hui
TOM C. HUI, S.E.
ACTING DIRECTOR
DEPT. OF BUILDING INSPECTION

SAN FRANCISCO
OFFICIAL COPY
BUILDING INSPECTION

BLDG.
FORM 3/8

CES: 2007/1850

**APPLICATION FOR BUILDING PERMIT ADDITIONS, ALTERATIONS OR REPAIRS**

**CITY AND COUNTY OF SAN FRANCISCO DEPARTMENT OF BUILDING INSPECTION**

FORM 3 ☐ OTHER AGENCIES REVIEW REQUIRED

FORM 8 ☑ OVER-THE-COUNTER ISSUANCE

#2 NUMBER OF PLAN SETS 0B/2

APPLICATION IS HEREBY MADE TO THE DEPARTMENT OF BUILDING INSPECTION OF SAN FRANCISCO FOR PERMISSION TO BUILD IN ACCORDANCE WITH THE PLANS AND SPECIFICATIONS SUBMITTED HEREWITH AND ACCORDING TO THE DESCRIPTION AND FOR THE PURPOSE HEREINAFTER SET FORTH.

▼ DO NOT WRITE ABOVE THIS LINE ▼

DATE FILED: AUG 0 2 2013

STREET ADDRESS OF JOB: 1049 Market St.   BLOCK & LOT: 3703 067

PERMIT NO. 1300626   DATE 8-2-13   ESTIMATED COST OF JOB: 10,000   REVISED COST: 20,000   14:00   DATE 8/2/13

**INFORMATION TO BE FURNISHED BY ALL APPLICANTS**

**LEGAL DESCRIPTION OF EXISTING BUILDING**

TYPE OF CONSTR. III   NO. OF STORIES: 6   NO. OF BASEMENTS AND CELLARS:   PRESENT USE: Office / Retail / Live Work   OCCUP. CLASS: B/M   NO. OF DWELLING UNITS: 6

**DESCRIPTION OF BUILDING AFTER PROPOSED ALTERATION**

TYPE OF CONSTR. III   NO. OF STORIES: 6   NO. OF BASEMENTS AND CELLARS: 1   PROPOSED USE: Office / Retail / Live Work   OCCUP. CLASS: B/M   NO. OF DWELLING UNITS: 6

OWNER/BUILDER

Haley Boghal   ADDRESS: 1005 Market St. Suite 310 San Francisco   PHONE: 050-301-057

DESCRIPTION OF ALL WORK: To comply with Notice or Violation #2007/1850

Demo of office walls on Fifth Fl. through First Fl.
LIVE WORK ONLY ON 6th Flr.   SFAB-017

**ADDITIONAL INFORMATION**

ARCHITECT OR ENGINEER: Roland Carpenter

APPREDLA0140

**IMPORTANT NOTICES**

**NOTICE TO APPLICANT**

HOLD HARMLESS CLAUSE. The permittee(s) by acceptance of the permit, agree(s) to indemnify and hold harmless the City and County of San Francisco from and against any and all claims, demands and actions for damages resulting from operations under this permit, regardless of negligence of the City and County of San Francisco, and to assume the defense of the City and County of San Francisco against all such claims, demands or actions.

## CONDITIONS AND STIPULATIONS

| REFER TO: | APPROVED: | | DATE: |
|---|---|---|---|
| | SAN FRANCISCO BUILDING INSPECTION | *Iamsudoy (Architect)* | REASON: |
| | | AGS 0 2 283 | NOTIFIED MR. |
| | | BUILDING INSPECTOR, DEPT. OF BLDG. INSP. | |
| ☐ | APPROVED: | ↓ | DATE: |
| | | | REASON: |
| | | DEPARTMENT OF CITY PLANNING | NOTIFIED MR. |
| ☐ | APPROVED: | LOW ~RISE "B" | DATE: |
| | | N/A Jed. 8/2/13 | REASON: |
| | | BUREAU OF FIRE PREVENTION & PUBLIC SAFETY | NOTIFIED MR. |
| ☐ | APPROVED: | ↓ | DATE: |
| | | | REASON: |
| | | MECHANICAL ENGINEER, DEPT. OF BLDG. INSPECTION | NOTIFIED MR. |
| ☑ | APPROVED: *struct. only* | Gary S. Ho, DBI     JUL 26 2013 | DATE: |
| | | | REASON: |
| | | CIVIL ENGINEER, DEPT. OF BLDG. INSPECTION | NOTIFIED MR. |
| ☐ | APPROVED: *Street Space Only* | By ___ Clinton Choy, DPW/BSM | DATE: |
| | | BUREAU OF ENGINEERING | REASON: |
| | | | NOTIFIED MR. |
| ☐ | APPROVED: | | DATE: |
| | | | REASON: |
| | | DEPARTMENT OF PUBLIC HEALTH | NOTIFIED MR. |
| ☐ | APPROVED: | | DATE: 7/16/8 |
| | | | REASON: |

ARREOLA015065

City and County of San Francisco

## DEPARTMENT OF BUILDING INSPECTION

# JOB CARD



OFFICE HOURS: THE BUILDING INSPECTION IS OPEN DAILY, MONDAY THRU FRIDAY,
FROM 8:00 a.m. TO 5:00 p.m.  DISTRICT BUILDING INSPECTORS KEEP OFFICE HOURS DAILY,
MONDAY THRU FRIDAY, FROM 8:00 a.m. TO 9:00 a.m. AND FROM 3:00 p.m. TO 4:00 p.m.

REQUESTS FOR INSPECTIONS ARE TAKEN 24 HOURS A DAY/7 DAYS A WEEK
BY CALLING  (415) 575-6955

APPLICATION NO. _2013 - 0726 - 2890_                       ISSUED _8-2-13_

JOB ADDRESS: _1049 Market St_                  BLOCK: ____    LOT: ____

NATURE OF WORK: _____

WORK PERMITTED UNDER AUTHORITY OF THIS BUILDING PERMIT NUMBER MUST BE COMPLETED
PRIOR TO EXPIRATION DATE OF _7-22-14_

EXTENSION OF TIME TO COMPLETE WORK UNDER THIS BUILDING PERMIT NUMBER MAY BE GRANTED UPON
WRITTEN REQUEST PRIOR TO THE DATES NOTED ABOVE.

For information on the Permit Process, Building Plans Review, Account Issues, etc., please see page 4 of the
JOB CARD for useful and appropriate telephone numbers.

* ELECTRICAL & PLUMBING WORK MUST HAVE PERMITS SEPARATE FROM A BUILDING PERMIT. *

KEEP THIS CARD POSTED IN A CONSPICUOUS PLACE ON THE JOB SITE AT ALL TIMES.
PLANS AND PERMIT DOCUMENTS SHALL BE ON THE JOB SITE
AT ALL TIMES WHEN WORK IS IN PROGRESS.
AFTER COMPLETION OF WORK, RETAIN THIS CARD FOR YOUR RECORDS.

FOR INFORMATION ON THE PERMIT PROCESS, CALL THE DEPARTMENT OF BUILDING INSPECTION'S CUSTOMER SERVICES DIVISION AT 415-558-6088.

PLEASE CALL THE FOLLOWING PHONE NUMBERS FOR QUESTIONS AND/OR COMPLAINTS RELATED TO PERMITTED WORK UNDER WAY:

| | | | |
|---|---|---|---|
| BUILDING INSPECTION: | 415-558-6570 | ENERGY/MECHANICAL PLAN CHECK: | 415-558-6133 |
| CENTRAL PERMIT BUREAU: | 415-558-6070 | RECORDS: | 415-558-6080 |
| CODE ENFORCEMENT: | 415-558-6454 | PLANNING DEPARTMENT: | 415-558-6377 |
| PLAN REVIEW SERVICES: | 415-558-6133 | PLUMBING INSPECTION: | 415-558-6570 |
| DISABLED ACCESS: | 415-558-6110 | REROOFING INSPECTION: | 415-558-6570 |
| ELECTRICAL INSPECTION: | 415-558-6570 | SPECIAL INSPECTION: | 415-558-6133 |
| FIRE INSPECTION: | 415-558-3300 | DPW-BSM: | 415-558-6060 |
| FIRE PLAN CHECK: | 415-558-6177 | STREET USE & MAPPING | |
| GENERAL INFORMATION: | 415-558-6088 | AT 875 STEVENSON: | 415-554-5810 |
| HEALTH INSPECTION: | 415-558-2770 | BUREAU OF URBAN FORESTRY | 415-641-2674 |
| HOUSING INSPECTION: | 415-558-6330 | | |

A FINAL REMINDER

AFTER COMPLETION OF WORK BEING PERFORMED UNDER AUTHORITY OF YOUR BUILDING PERMIT, RETAIN THIS JOB CARD WITH YOUR IMPORTANT BUILDING RECORDS.

IMPORTANT:

If this permit was applied for to clear a NOTICE OF VIOLATION issued by HOUSING INSPECTION SERVICES, you must take a copy of the completed JOB CARD and mail it to the attention of the HOUSING INSPECTOR who wrote the NOTICE at the following:

San Francisco Department of Building Inspection
Housing Inspection Services
1660 Mission Street, 6th Floor
San Francisco, California 94103-2414

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No: 1303626
Application/Permit No: 201.3073626

PERMIT IS GRANTED TO

ERECT SIGN   DATE OF ISSUE   02-AUG-13

ERECT   X   ALTER BUILDING      GRADE      PILING FEE RECEIPTS

DEMOLISH BUILDING

LOWER CURB   X   OCCUPY STREET SPACE

EXCAVATE STREET OR SIDEWALK   POSTPONED

HOUSE NUMBER CERTIFICATE   REPAIR OR CONSTRUCT SIDEWALK

THIS PERMIT IS GRANTED IN ACCORDANCE WITH
PROVISIONS OF THE CHARTER AND ORDINANCES OF
THE CITY AND COUNTY OF SAN FRANCISCO AND/OR
THE CURRENT STANDARD SPECIFICATIONS OF THE
DEPARTMENT OF BUILDING INSPECTION

- ADDITIONAL INFORMATION REGARDING SPECIFIC
  PERMITS IS GIVEN ON THE BACK OF THIS FORM

$0.00

SUPPLEMENTAL FEES PAID                    DBI INC PAID AT FILING

FINAL PLAN CHECK   PENALTY                  AUDITED FOR/CHGRAD

FILING FEE PAID   EXPEDITER FEE                                              FEE
STRUCTURAL LTD   DCP FEE              BUILDING              234.47
OWNER                                 PLAN REVIEW           543.1
HALE/MICHIN SUGAR/SMALL              ST. SPACE             249.82
                                      RECORDS RETENTION     8.00
LOCATION OF JOB:                      BLDG STDS ADMIN FUND  4.00
STREET NUMBER                         TECH SURCHARGE        20.67
1046  MARKET   ST

PROJECT #   3      5      B.M
            # STORIES  TYPE

BUILDING USE   OFFICE   ESTIMATED COST $   20,000.00

                                            LEGAL DESCRIPTION

JOHN (CA), 6502080187   PLAN# 1300626

APPLICANT
14350  MCKINLAY #209
ADDRESS
STAPLETON NY 11434

SUBTOTAL OF FEES TO/ON APPLICABLE SURCHARGES   $1,055.59

SURCHARGE                    0.00
BDX SURCHARGE                31.00

STRONG MOTION                4.56

SUBTOTAL OTHER FEES  $      4.50

TOTAL  $            $1,060.78

CENTRAL PERMIT BUREAU
1660 Mission Street
San Francisco, California 94103

CITY AND COUNTY OF SAN FRANCISCO
DEPARTMENT OF BUILDING INSPECTION
(415)558-6088

Receipt No:
Application/Permit No:

ADDITIONAL INFORMATION

**WARNING**

Pursuant to Article 20 of Chapter 10, Part II of the San Francisco Municipal Code (Public Works Code), certain building permits may be issued only after the permittee analyzes the soil for the presence of hazardous wastes and where applicable, certifies that it has completed site mitigation. No officer, employee, or agency of the City conducted the soil sampling and analysis, recommended site mitigation measures, conducted the site mitigation or checked or verified the reports submitted or work performed for accuracy, reliability or adherence to the permit. In issuing this permit, probable, the City nor any of its officers or employees make any representation relating to hazardous waste contamination under state and federal law. Neither soil analysis pursuant to Article 20 of Public Works Code nor the issuance of this permit, is intended to alter, extinguish, or transfer these responsibilities.

1. Building Permit.

2. Demolition Permit.

3. Permit to Lower, Enclose or Stand on Sidewalk.

4. Street Space Permit.

5. Permit to Repair or Construct Sidewalk.

6. Sand Harmless Clause.

SIGNED BY PERMIT APPLICANT/STIPULATIONS.

# EXHIBIT 4



## SAN FRANCISCO
# PLANNING DEPARTMENT

1650 Mission St,
Suite 400
San Francisco,
CA 94103-2479

Reception:
415.558.6378

## Suspension Request

Fax:
415.558.6409

October 28, 2013

Mr. Tom Hui, CBO
Director, Department of Building Inspection
1660 Mission Street
San Francisco, CA 94103

Planning
Information:
415.558.6377

| | |
|---|---|
| Building Application No.: | 201307262890 |
| Property Address: | 1049-1051 Market Street |
| Block and Lot | 3703 / 067 |
| Zoning District: | C-3-G / 90-X |
| Staff Contact: | Dario Jones, Acting Chief of Enforcement – (415) 558-6477 |
| | dario.jones@sfgov.org |

Dear Director Hui,

This letter is to request that the Department of Building Inspection (DBI) suspend Building Permit Application Number 201307262890 ("Permit") for the building located at 1049-1051 Market Street ("Building"). The Permit was sought in order to demolish office walls on the first through fifth floors of the Building and was approved and issued by DBI on August 2, 2013.

The Planning Department did not review or approve the Permit, and is now aware of evidence that calls into question the current authorized use of the Building under the Planning Code. This, in turn, may affect the review and approval process for the office use proposed under the Permit. Accordingly, we are requesting suspension of the Permit in order to obtain and analyze permits, plans, and relevant occupancy information related to the existing and proposed uses of the Building.

Evidence thus far suggests that nearly all of the Building was converted to some type of residential use more than five years ago. This evidence includes (1) materials associated with DBI Complaint Number 200711850, which substantiated allegations of conversion to some type of residential occupancy, (2) testimony received at the Building Inspection Commission hearing on October 16, 2013 by individuals who represented themselves as current or previous residential tenants of the Building, (3) articles in the San Francisco Chronicle and San Francisco Examiner during the week of October 8, 2013, and (4) verbal reports by the property owners themselves during a meeting with DBI and Planning Department Staff on October 13, 2013.

The application for the Permit identifies office space as the existing use at the subject property. If that use (considered "preexisting office space" under Planning Code §320[k]) was converted to another use more than five years ago, it may be considered abandoned. A resumption of that use on the first through fifth floors of the Building may then be subject to Planning Commission authorization under the City's Office Development Annual Limit Program (Planning Code §320 et. seq; also known as

Tom Hui, Director - DBI
Suspension Request
1049-1051 Market Street
October 28, 2013

Proposition M), payment of associated development impact fees, and other applicable requirements of the Planning Code.

This issue is particularly relevant because the owners of the subject property also control the property at 1067-1071 Market Street (Parcel Number 3703/063). Very similarly, that property also appears to (1) have historically been used as office space, and (2) have more recently been converted to a residential-type use. A similar Planning Code analysis may be required to return 1067-1071 Market Street to an office use.

As staff from both the Planning Department and DBI have previously made clear to the property owners, there are multiple ways in which both properties — and the existing residential-type uses - can be maintained and improved in a fashion consistent with the Planning and Building Codes. The Planning Department remains prepared to collaborate with the property owners but at the present time respectfully requests that you suspend the Permit so that we can further investigate this matter.

**APPEAL:** Any aggrieved person may appeal this letter to the Board of Appeals within fifteen (15) days after the date of the issuance of this letter. For further information, please contact the Board of Appeals in person at 1650 Mission Street, Room 304, or call 575-6880.

Sincerely,

Corey A. Teague
Acting Zoning Administrator

cc:   Mr. John Gall - 1005 Market St #310, San Francisco CA 94103 (property owner)
Mr. Terry Bogart - 16351 Skyline Blvd, Woodside CA 94062 (property owner)
Mr. Daniel Lowrey, DBI
Mr. Patrick O'Riordan, DBI
Mr. Joe Duffy, DBI
Mr. Bernie Curran, DBI
Mr. Tom Venizelos, DBI
Ms. Yin Pei, DBI
Mr. Ben Man, DBI
Mr. Daniel Sider, Planning Department
Mr. Mark Luellen, Planning Department
Mr. Dario Jones, Planning Department

2

# EXHIBIT 5



# SAN FRANCISCO
# PLANNING DEPARTMENT

## Release of Suspension Request

1050 Mission St,
Suite 400
San Francisco, ·
CA 94103-2479

Reception:
415.558.6378

Fax:
415.558.6409

Planning
Information:
415.558.6377

February 2, 2015

Mr. Tom Hul, S.E., CBO
Director
Department of Building Inspection
1660 Mission Street
San Francisco, CA 94103

| | |
|---|---|
| Building Application No.: | 201307262890 |
| Property Address: | 1049-1051 Market Street |
| Block and Lot | 3703 / 067 |
| Zoning District: | C-3-G / 90-X |
| Staff Contact: | Corey Teague, Assistant Zoning Administrator |
| | (415) 575-9081 or corey.teague@sfgov.org |

Dear Director Hui,

This letter is to request that the Department of Building Inspection (DBI) release suspension of Building Permit Application Number 201307262890 ("Permit") for the property at 1049-1051 Market Street.

On October 28, 2013, Corey A. Teague (Acting Zoning Administrator) submitted a Request for Suspension for the Permit because it was not reviewed by the Planning Department, and there was a question as to whether the work proposed in the Permit triggered additional requirements and/or procedures under the Planning Code.

That Request for Suspension was appealed to the Board of Appeals by John Gall on November 13, 2013. Planning Department staff met with John Gall and others representing the subject property in January 2014. The result of the meeting was a shared understanding that the property owner(s) would request a letter of determination from the Zoning Administrator regarding the possibility of converting some or all of the unpermitted habitable space referenced in DBI Notice of Violation No. 200711850 into dwelling units that are integrated with the working space of artists, artisans and other craftspersons, pursuant to Planning Code Section 204.4(b). Subsequent to that meeting, the appeal of the Request for Suspension was withdrawn on February 19, 2014.

Despite the outcome of the January 2014 meeting the Planning Department received no communication from the permit holder or property owner(s) until December 2014. At that time, counsel for the property owner(s) requested that the Department either seek reinstatement or revocation of the Permit. The Department understood it to be implicit in this request that the permit holder and property owner(s) no longer intended to move forward with a conversion of

www.sfplanning.org

Tom Hui, Director of Building Inspection
Release of Suspension Request
1049-51 Market Street
February 2, 2015

the preexisting office space to dwelling units that are integrated with the working space of artists, artisans and other craftspersons, as had been previously discussed.

As such, it is my determination that the current legal use of the portion of the building subject to the Permit is the last legal use, which was office space here. Absent an abandonment of use recognized by the Planning Code, when a legal use of a property is changed without the benefit of a permit, the legal use remains the last legal use if that use is permitted as of right. While the principle of abandonment may apply in some circumstances to change this presumption, there is no provision for abandonment in the Code for a principally permitted use. The Planning Code provides for abandonment of nonconforming uses (Section 183) and conditional uses (Section 178). Here, the preexisting office space was legally established, and office is permitted as of right in the C-3-G Zoning District. Office is neither a nonconforming use nor a conditional use on the subject property. As such, the construction of walls and other facilities for the purpose of residential use in the subject building did not constitute abandonment under the Planning Code of the preexisting legal office space. Because the office space was not abandoned, the subject permit does not constitute a change of use or reestablishment of the office use, nor any associated Planning Code provisions that would apply to such activity.

As noted in the Request for Suspension, staff from both the Planning Department and DBI maintain that there are multiple ways in which residential uses at this Property and another property controlled by the owners of the subject property, 1067-1071 Market Street, may be maintained and improved in a manner consistent with the Planning and Building Codes. The Planning Department remains prepared to work with the property owner toward such a solution.

Therefore, the Planning Department is requesting that the Department of Building Inspection reinstate the Permit.

APPEAL: Any aggrieved person may appeal this letter to the Board of Appeals within fifteen (15) days after the date of the issuance of this letter. For further information, please contact the Board of Appeals in person at 1650 Mission Street, Room 304, or call 575-6880.

Sincerely,

Scott F. Sanchez
Zoning Administrator

CC:     Mr. John Gall - 1005 Market St #310, San Francisco CA 94103 (property owner)
        Mr. Terry Bogart - 16351 Skyline Blvd, Woodside CA 94062 (property owner)
        Mr. Daniel Lowrey, DBI
        Mr. Patrick O'Riordan, DBI
        Mr. Ron Tom
        Mr. Ed Sweeny
        Mr. Joe Duffy, DBI
        Mr. Bernie Curran, DBI

SAN FRANCISCO
PLANNING DEPARTMENT

2

Tom Hui, Director of Building Inspection
Release of Suspension Request
1049-51 Market Street
February 2, 2015

    Ms. Yin Pei, DBI
    Mr. Ben Man, DBI
    Mr. Daniel Sider, Planning Department
    Mr. Mark Luellen, Planning Department
    Mr. Dario Jones, Planning Department
    Mr. Corey Teague, Planning Department
    Ms. Susan Cleveland-Knowles, City Attorney's Office

3

# EXHIBIT 6

FILE NO. 150494

AMENDED IN COMMITTEE
2/8/2016

ORDINANCE NO. 23–16

1    [Planning, Building Codes - Conditional Use Required to Remove Any Residential Unit <u>and</u>
2    Mandatory Legalization of Illegal Units <u>in C-3 Districts</u>; Permeable Surfaces and Landscaping
     Requirements <u>Citywide for Building Additions and Residential Mergers</u>]

3

4    Ordinance amending the Planning Code to require Conditional Use authorization for

5    the removal of any residential unit <u>in a C-3 (Downtown Commercial) District</u> (whether

6    legal or illegal) and <u>to require</u> compliance <u>Citywide</u> with landscaping and permeable

7    surfaces requirements for building additions and residential mergers, and to exempt

8    from the Conditional Use application requirement illegal units <u>in C-3 Districts</u> where

9    there is no legal path for legalization and residential units that have received prior

10   Planning approval; amending the Building Code to require that notices of violation <u>in a</u>

11   <u>C-3 District</u> mandate legalization of an illegal unit unless infeasible under the Building

12   Code or the Planning Commission approves its removal, and <u>to require</u> ~~requiring~~ re-

13   issuance of unabated notices of violation <u>in a C-3 District</u> to include the new

14   requirement; affirming the Planning Department's determination under the California

15   Environmental Quality Act; and making findings of consistency with the General Plan,

16   Planning Code, Section 302, and the eight priority policies of Planning Code, Section

17   101.1.

18       NOTE:     Unchanged Code text and uncodified text are in plain Arial font.
19                 Additions to Codes are in <u>*single-underline italics Times New Roman font*</u>.
                   Deletions to Codes are in *~~strikethrough italics Times New Roman font~~*.
20                 Board amendment additions are in <u><u>double-underlined Arial font</u></u>.
                   Board amendment deletions are in ~~strikethrough Arial font~~.
21                 Asterisks (*   *   *   *) indicate the omission of unchanged Code
                   subsections or parts of tables.

22

23       Be it ordained by the People of the City and County of San Francisco:

24

25       Section 1. Findings.

1       (a)    The Planning Department has determined that the actions contemplated in this

2   ordinance comply with the California Environmental Quality Act (California Public Resources

3   Code Sections 21000 et seq.). Said determination is on file with the Clerk of the Board of

4   Supervisors in File No. 150494 and is incorporated herein by reference. The Board affirms

5   this determination.

6       (b)    On December 10, 2015, the Planning Commission, in Resolution No. 19532,

7   adopted findings that the actions contemplated in this ordinance are consistent, on balance,

8   with the City's General Plan and the eight priority policies of Planning Code Section 101.1.

9   The Board adopts these findings as its own. A copy of said Resolution is on file with the Clerk

10  of the Board of Supervisors in File No. 150494, and is incorporated herein by reference.

11      (c)    Pursuant to Planning Code Section 302, this Board finds that these Planning

12  Code amendments will serve the public necessity, convenience, and welfare for the reasons

13  set forth in Planning Commission Resolution No. 19532 and the Board incorporates such

14  reasons herein by reference.

15

16      Section 2. The Planning Code is hereby amended by revising Sections 132 and 317

17  adding Section 317.1, to read as follows:

18  **SEC. 132. FRONT SETBACK AREAS, RTO, RH AND RM DISTRICTS AND FOR**

19  **REQUIRED SETBACKS FOR PLANNED UNIT DEVELOPMENTS.**

20      The following requirements for minimum front setback areas shall apply to every

21  building in all RH, RTO, and RM Districts, in order to relate the setbacks provided to the

22  existing front setbacks of adjacent buildings. Buildings in RTO Districts which have more than

23  75 feet of street frontage are additionally subject to the Ground Floor Residential Design

24  Guidelines, as adopted and periodically amended by the Planning Commission. Planned Unit

25

1   Developments or PUDs, as defined in Section 304, shall also provide landscaping in required

2   setbacks in accord with Section 132(g).

3       \*   \*   \*   \*

4       (g)    **Landscaping and Permeable Surfaces.** The landscaping and permeable

5   surface requirements of this ~~Section~~ Subsection (g) and ~~Section~~ Subsection (h) below shall be

6   met by the permittee in the case of construction of a new building; the addition of a new

7   Dwelling Unit, a garage, or additional parking; *any addition to a structure that would result in an*

8   *increase of 20% or more of the existing Gross Floor Area, as defined in Section 102; a Residential*

9   *Merger, as defined in Section 317;* or paving or repaving more than 200 square feet of the front

10  setback. All front setback areas required by this Section 132 shall be appropriately

11  landscaped, meet any applicable water use requirements of Administrative Code Chapter 63,

12  and in every case not less than 20% ~~percent~~ of the required setback area shall be and remain

13  unpaved and devoted to plant material, including the use of climate appropriate plant material

14  as defined in Public Works Code Section 802.1. For the purposes of this Section 132,

15  permitted obstructions as defined by Section 136(c)(6) chimneys, *Section* 136(c)(14) *steps*

16  ~~stairs~~, and *Section* 136(c)(26) ~~(27)~~ underground garages, shall be excluded from the front

17  setback area used to calculate the required landscape and permeable surface area. If the

18  required setback area is entirely taken up by one or more permitted obstructions, the Zoning

19  Administrator may allow the installation of sidewalk landscaping that is compliant with

20  applicable water use requirements of Chapter 63 of the Administrative Code to satisfy the

21  requirements of this Section 132, subject to permit approval from the Department of Public

22  Works in accordance with Public Works Code Section 810B.

23      \*   \*   \*   \*

24

25

1   SEC. 317.1. LOSS OF RESIDENTIAL AND UNAUTHORIZED UNITS IN C-3 DISTRICTS

2   THROUGH DEMOLITION, MERGER, AND CONVERSION.

3       (a)    Definitions. For the purposes of this Section 317.1, the terms below shall be as

4   defined below. Capitalized terms not defined below are defined in Section 102 of this Code.

5       "Removal" shall mean, with reference to a Residential or Unauthorized Unit, its

6   Conversion, Demolition, or Merger.

7       "Residential Conversion" shall mean the removal of cooking facilities, change of

8   occupancy (as defined and regulated by the Building Code), or change of use (as defined and

9   regulated by the Planning Code), of any Residential Unit or Unauthorized Unit to a Non-

10  Residential or Student Housing use.

11      "Residential Demolition" shall have the meaning set forth in Section 317(b)(2) of this

12  Code.

13      "Residential Merger" shall mean the combining of two or more Residential or

14  Unauthorized Units, resulting in a decrease in the number of Residential Units and

15  Unauthorized Units within a building, or the enlargement of one or more existing units while

16  reducing the size of other units by more than 25% of their original floor area, even if the

17  number of units is not reduced. The Planning Commission may reduce the numerical element

18  of this criterion by up to 20% of its value should it deem that adjustment necessary to

19  implement the intent of this Section 317.1, to conserve existing housing and preserve

20  affordable housing.

21      "Residential Unit" shall mean a legal conforming or legal nonconforming Dwelling Unit,

22  or a legal nonconforming Live/Work Unit or Group Housing.

23      "Unauthorized Unit" shall mean one or more rooms within a building that have been

24  used, without the benefit of a building permit, as a separate and distinct living or sleeping

25  space independent from Residential Units on the same property. In this context,

1    "independent" shall mean that (A) the space has separate access that does not require

2    entering a Residential Unit on the property and (B) there is no open, visual connection to a

3    Residential Unit on the property.

4          (b)      **Applicability; Exemption for Unauthorized Unit.**

5          (1)    Any application for a permit that would result in the Removal of one or

6    more Residential Units or Unauthorized Units in a C-3 (Downtown Commercial) District is

7    required to obtain Conditional Use authorization. The application for a replacement building or

8    alteration permit shall also be subject to Conditional Use requirements.

9          (2)    The Conditional Use requirement of Subsection (b)(1) shall apply to (A)

10   any building or site permit for Removal of an Unauthorized Unit issued on or after March 1,

11   2016, and (B) any permit for Removal of an Unauthorized Unit issued prior to March 1, 2016,

12   that has been suspended by the City or in which the applicant's rights have not vested.

13         (3)    The Removal of a Residential Unit that has received approval from the

14   Planning Department through administrative approval or the Planning Commission through

15   Discretionary Review or Conditional Use authorization prior to the effective date of this

16   Section 317.1 is not required to apply for an additional approval under Subsection (b)(1).

17         (4)    The Removal of an Unauthorized Unit does not require a Conditional Use

18   authorization pursuant to Subsection (b)(1) if the Department has determined that there is no

19   legal path for legalization.

20         (c)      **Demolition.**

21         (1)    No permit to Demolish a Residential Building in a C-3 District shall be

22   issued until a building permit for the replacement structure is finally approved, unless the

23   building is determined to pose a serious and imminent hazard as defined in the Building Code.

24   A building permit is finally approved if the Board of Appeals has taken final action for approval

25

1   on an appeal of the issuance or denial of the permit or if the permit has been issued and the

2   time for filing an appeal with the Board of Appeals has lapsed with no appeal filed.

3           (2)    Conditional Use authorization is required for approval of the permit for

4   Residential Demolition in a C-3 District, and the Commission shall consider the replacement

5   structure as part of its decision on the Conditional Use application. If Conditional Use

6   authorization is required for the replacement structure by other sections of this Code, the

7   Commission shall consider the demolition as part of its decision on the Conditional Use

8   application.

9           (3)    Nothing in this Section 317.1 is intended to exempt buildings or sites

10  where demolition is proposed from undergoing review with respect to Articles 10 and 11 of the

11  Planning Code, where the requirements of those Articles apply. Notwithstanding the definition

12  of "Residential Demolition" in this Section 317.1 and as further described in the Code

13  Implementation Document with regard to Residential Demolition, the criteria of Section 1005

14  shall apply to projects subject to review under the requirements of Article 10 with regard to the

15  structure itself.

16      (d)    **Conversion to Student Housing.** The conversion of Residential Units to

17  Student Housing is prohibited in C-3 Districts. For the purposes of this subsection (d),

18  Residential Units that have been defined as such by the time a First Certificate of Occupancy

19  has been issued by the Department of Building Inspection for new construction shall not be

20  converted to Student Housing.

21      (e)    **Conditional Use Criteria.** When considering whether to grant Conditional Use

22  authorization for the loss or Removal of Residential or Unauthorized Unit(s) in C-3 Districts, in

23  lieu of the criteria set forth in Planning Code Section 303, consideration shall be given to the

24  adverse impact on the public health, safety, and general welfare of the loss of housing stock

25  in the zoning district and to any unreasonable hardship to the applicant if the permit is denied.

1    (1)    **Residential Merger.** In addition to the criteria set forth in Section 317(e)

2    of this Code, the Planning Commission shall consider the following criteria in the review of

3    applications to merge Residential Units or Unauthorized Units in C-3 Districts:

4              (A)    how recently the unit being removed was occupied by a tenant or

5    tenants; and

6              (B)    the appraised value of the least expensive Residential Unit

7    proposed for merger, when the merger does not involve an Unauthorized Unit.

8         The Planning Commission shall not approve an application for Residential Merger if

9    any tenant has been evicted pursuant to Administrative Code Sections 37.9(a)(9) through

10   37.9(a)(14) where the tenant was served with a notice of eviction after December 10, 2013, if

11   the notice was served within 10 years prior to filing the application for merger. Additionally, the

12   Planning Commission shall not approve an application for Residential Merger if any tenant

13   has been evicted pursuant to Administrative Code Section 37.9(a)(8) where the tenant was

14   served with a notice of eviction after December 10, 2013, if the notice was served within five

15   years prior to filing the application for merger. The restriction of thisi paragraph shall not apply

16   if the tenant was evicted under Section 37.9(a)(11) or 37.9(a)(14) and the applicant(s) either

17   (A) have certified that the original tenant reoccupied the unit after the temporary eviction or (B)

18   have submitted to the Planning Commission a declaration from the property owner or the

19   tenant certifying that the property owner or the Rent Board notified the tenant of the tenant's

20   right to reoccupy the unit after the temporary eviction and that the tenant chose not to

21   reoccupy it.

22             (2)    **Residential Conversion.** The Planning Commission shall consider the

23   criteria set forth in Section 317(f)(1) through (4) of this Code in the review of applications for

24   Residential Conversion in C-3 Districts.

25

1    (3)    Residential Demolition. In addition to the criteria set forth in Section

2    317(d) of this Code, the Planning Commission shall also consider the following criteria in the

3    review of applications for Residential Demolition in C-3 Districts:

4    (A)    whether the replacement project would maximize density on the

5    subject lot; and

6    (B)    if replacing a building not subject to the Residential Rent

7    Stabilization and Arbitration Ordinance, whether the new project replaces all of the existing

8    units with new Dwelling Units of a similar size and with the same number of bedrooms or

9    more.

10    (4)    Removal of Unauthorized Units. In addition to the criteria set forth in

11    Subsections (e)(1) through (e)(3) above, the Planning Commission shall also consider the

12    criteria below in the review of applications for removal of Unauthorized Units:

13    (A)    whether the Unauthorized Unit or Units are eligible for legalization

14    under Section 207.3 of this Code;

15    (B)    whether the costs to legalize the Unauthorized Unit or Units under

16    the Planning, Building, and other applicable Codes is reasonable based on how such cost

17    compares to the average cost of legalization per unit derived from the cost of projects on the

18    Planning Department's Master List of Additional Dwelling Units Approved required by Section

19    207.3(k) of this Code;

20    (C)    whether it is financially feasible to legalize the Unauthorized Unit or

21    Units, based on the costs to legalize the Unauthorized Unit(s) under the Planning, Building,

22    and other applicable Codes in comparison to the added value that legalizing said Units would

23    provide to the subject property. The gain in the value of the subject property shall be based on

24    the current value of the property with the Unauthorized Unit(s) compared to the value of the

25    property if the Unauthorized Unit(s) is/are legalized. The calculation of the gain in value shall

1   be conducted and approved by a California licensed property appraiser. Legalization shall be

2   deemed financially feasible if the gain in the value of the subject property is equal to or greater

3   than the cost to legalize the Unauthorized Unit.

4       (5)   **Denial of Application to Remove an Unauthorized Unit; Requirement**

5   **to Legalize the Unit.** If the Planning Commission denies an application to Remove an

6   Unauthorized Unit, the property owner shall file an application for a building permit to legalize

7   the Unit. Failure to do so within a reasonable period of time, as determined by the Zoning

8   Administrator, shall be deemed a violation of the Planning Code.

9       (f)   **Notice of Conditional Use Hearing.** At least 20 days prior to any hearing to

10   consider a Conditional Use authorization under Subsection (b) of this Section 317.1, the

11   Zoning Administrator shall cause a written notice containing the following information to be

12   mailed to all Residential Units and if known any Unauthorized Units in the building, in addition

13   to any other notice required under this Code:

14       (1)   Notice of the time, place, and purpose of the hearing; and

15       (2)   An explanation of the process for demolishing, merging, or converting

16   Residential Units or Unauthorized Units, including a description of subsequent permits that

17   would be required from the Planning Department and Department of Building Inspection and

18   how they could be appealed.

19       (g)   **Exemptions.** This Section 317.1 shall not apply to property:

20       (1)   Owned by the United States or any of its agencies;

21       (2)   Owned by the State of California or any of its agencies, with the

22   exception of such property not used exclusively for a governmental purpose;

23       (3)   Under the jurisdiction of the Port of San Francisco or the Successor

24   Agency to the Redevelopment Agency of the City and County of San Francisco where the

25   application of this Section is prohibited by State or local law; or

1    (4)    Where demolition of the building or Removal of a Residential Unit or

2  Unauthorized Unit is necessary to comply with a court order or order of a City agency that

3  directs the owner to demolish the building or remove the unit, due to conditions that present

4  an imminent threat to life safety.

5

6    Section 3.  The Planning Code is hereby amended by revising Zoning Control Table

7  210.2, to read as follows:

### Table 210.2
### ZONING CONTROL TABLE FOR C-3 DISTRICTS

| Zoning Category | § References | C-3-O | C-3-O(SD) | C-3-R | C-3-G | C-3-S |
|---|---|---|---|---|---|---|
| * * * * | | | | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | | | | |
| **Development Standards** | | | | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 36 square feet if private, and 48 square feet per dwelling unit if common. | | | | |
| Residential Parking Requirements | §§ 150, 151.1, 161 | None required. P up to one car for each two Dwelling Units; C up to three cars for each four Dwelling Units. NP above. | | | | |
| Rear Yard Setback | §§ 130, 134 | 25% of the total depth lot depth, but in no case less than 15 feet for lowest story containing a dwelling unit and each succeeding story. Exceptions are permitted by § 309. | | | | |
| Residential Conversion, Demolition, or Merger | § 317 317.1 | *C for Removal of one or more Residential Units or Unauthorized Units* in C-3, C only for Removal above the ground floor *Loss of 1-2 units mandatory DR/Loss of 3 or more units C.* | | | | |

1      \*   \*   \*   \*

2      Section 4. The Building Code is hereby amended by revising Section 102A, to read as

3 follows:

4 **SECTION 102A -- UNSAFE BUILDINGS, STRUCTURES, OR PROPERTY**

5      All buildings, structures, property, or parts thereof, regulated by this code that are

6 structurally unsafe or not provided with adequate egress, or that constitute a fire hazard, or

7 are otherwise dangerous to human life, safety, or health of the occupants or the occupants of

8 adjacent properties or the public by reason of inadequate maintenance, dilapidation,

9 obsolescence, or abandonment, or by reason of occupancy or use in violation of law or

10 ordinance, or were erected, moved, altered, constructed, or maintained in violation of law or

11 ordinance are, for the purpose of this chapter, unsafe.

12      \*   \*.   \*   \*

13      **102A.3 Inspections and Complaints.** The Building Official is hereby authorized to

14 inspect or cause the inspection of any building, structure or property for the purpose of

15 determining whether or not it is unsafe in any of the following circumstances:

16      1.      Whenever the Building Official, with reasonable discretion, determines that such

17 inspection is necessary or desirable.

18      2.      Whenever any person files with the Building Official a complaint from which

19 there is, in the Building Official's opinion, probable cause to believe that the building, structure,

20 or property or any portion thereof, is unsafe.

21      3.      Whenever an agency or department of the City and County of San Francisco

22 transmits to the Building Official a written report from which there is, in the opinion of the

23 Building Official, probable cause to believe that the building, structure, or property, or any

24 portion thereof, is unsafe.

25

1   Upon the completion of any such inspection and the finding by the Building Official of

2   any condition which renders the building, structure, or property unsafe, the Building Official

3   shall, within 15 days thereafter, serve a written notice of violation upon the building owner

4   which shall contain specific allegations, setting forth each condition the Building Official has

5   found which renders the building, structure, or property unsafe. The Building Official shall,

6   within three days of mailing of such notice of violation, post a copy thereof in a conspicuous

7   place in or upon such building, structure, or property and make available a copy of the notice

8   of violation to each tenant thereof. Such notice shall also set forth the penalties for violation

9   prescribed in Section 103A of this code. In addition to the civil penalties prescribed in Section

10   103A, the Department's cost of preparation for and appearance at the hearing required by

11   Section 102A.4, and all prior and subsequent attendant and administrative costs, shall be

12   assessed upon the property owner monthly, after failure to comply with a written notice of

13   violation that has been served upon the property owner. Said violations will not be deemed

14   legally abated until the property owner makes full payment of the assessment of costs to the

15   Department of Building Inspection. See Section 110A, Table 1A-D – Standard Hourly Rates

16   and Table 1A-K – Penalties, Hearings, Code Enforcement Assessments – for the applicable

17   rate. Failure to pay the assessment of costs shall result in tax lien proceedings against the

18   property per Section 102A.18.

19   If the unsafe conditions observed on the property have not been corrected within the

20   time period provided, the matter shall be set for hearing within 60 days from the compliance

21   date specified on the notice of violation, if not substantial progress in abating the Code

22   violations has commenced.

23   *102A.3.1. Dwelling Units constructed or installed without required permit(s). In the case of an*

24   *unauthorized Dwelling Unit constructed or installed in an existing building in a C-3 Zoning District*

25   *without the required permit or permits, in addition to the above requirements the written notice of*

1   *violation shall order the property owner to file an application for a building and other permits required*

2   *to legalize the unit pursuant to Building Code Section 106A.3.1.3 and Planning Code Section 207.3*

3   *unless removal of the unit is approved by the Planning Commission pursuant to Planning Code Section*

4   *317.1*

5   *102A.3.1.1. Re-issuance of an unabated notice of violation. Any notice of violation* in a C-3

6   Zoning District *issued prior to the effective date of Section 102A.3.1 and that remains unabated shall*

7   *be re-issued in compliance with the requirements of Section 102A.3.1.*

8

9   Section 5.  Effective Date.  This ordinance shall become effective 30 days after

10  enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

11  ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

12  of Supervisors overrides the Mayor's veto of the ordinance.

13

14  Section 6.  Scope of Ordinance.  In enacting this ordinance, the Board of Supervisors

15  intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

16  numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

17  Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

18  additions, and Board amendment deletions in accordance with the "Note" that appears under

19  the official title of the ordinance.

20  APPROVED AS TO FORM:
    DENNIS J. HERRERA, City Attorney

21

22  By:

23      JUDITH A. BOYAJIAN
        Deputy City Attorney

24  n:\legana\as2016\1500751\01079640.docx

25



**City and County of San Francisco**

Tails

Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA  94102-4689

**File Number:**   150494          **Date Passed:**  February 23, 2016

Ordinance amending the Planning Code to require Conditional Use authorization for the removal of any residential unit in a C-3 (Downtown Commercial) District (whether legal or illegal) and to require compliance Citywide with landscaping and permeable surfaces requirements for building additions and residential mergers, and to exempt from the Conditional Use application requirement illegal units in C-3 Districts where there is no legal path for legalization and residential units that have received prior Planning approval; amending the Building Code to require that notices of violation in a C-3 District order the filing of an application to legalize an illegal unit unless infeasible under the Building Code or the Planning Commission approves its removal, and to require re-issuance of unabated notices of violation in a C-3 District to include the new requirement; affirming the Planning Department's determination under the California Environmental Quality Act; and making findings of consistency with the General Plan, Planning Code, Section 302, and the eight priority policies of Planning Code, Section 101.1.

February 01, 2016 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE

February 01, 2016 Land Use and Transportation Committee - CONTINUED AS AMENDED

February 08, 2016 Land Use and Transportation Committee - DUPLICATED

February 08, 2016 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE

February 08, 2016 Land Use and Transportation Committee - RECOMMENDED AS AMENDED AS A COMMITTEE REPORT

February 09, 2016 Board of Supervisors - PASSED, ON FIRST READING

Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

February 23, 2016 Board of Supervisors - FINALLY PASSED

Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

File No. 150494

I hereby certify that the foregoing
Ordinance was FINALLY PASSED on
2/23/2016 by the Board of Supervisors of
the City and County of San Francisco.

Angela Calvillo
Clerk of the Board

_____
Mayor

_____
Date Approved

3/4/16

# EXHIBIT 7

FILE NO. 160115

AMENDED IN BOARD
3/1/2016

ORDINANCE NO. 33-16

[Planning, Building Codes - Conditional Use Required to Remove Any Residential Unit, including an ~~Illegal~~ Unauthorized Unit]

Ordinance amending the Planning Code to require Conditional Use authorization for the removal of any residential unit (whether authorized ~~legal~~ or unauthorized ~~illegal~~) and to exempt from the Conditional Use application requirement unauthorized ~~illegal~~ units where there is no legal path for legalization, ~~and~~ residential units that have received prior Planning approval, and single-family homes that are demonstrably unaffordable or unsound; amending the Building Code to require that notices of violation ~~mandate~~ order the filing of an application to legalize ~~legalization of~~ an unauthorized ~~illegal~~ unit unless infeasible under the Building Code, or the Planning Commission approves its removal, or a serious and imminent hazard exists on the property ~~and requiring re-issuance of unabated notices of violation to include the new requirement~~; affirming the Planning Department's determination under the California Environmental Quality Act; and making findings of consistency with the General Plan, Planning Code Section 302, and the eight priority policies of Planning Code Section 101.1.

NOTE:   Unchanged Code text and uncodified text are in plain Arial font.
Additions to Codes are in *single-underline italics Times New Roman font*.
Deletions to Codes are in ~~*strikethrough italics Times New Roman font*~~.
Board amendment additions are in double-underlined Arial font.
Board amendment deletions are in ~~strikethrough Arial font~~.
Asterisks (*   *   *   *) indicate the omission of unchanged Code subsections or parts of tables.

Be it ordained by the People of the City and County of San Francisco:

Section 1. Findings.

Supervisor Avalos
BOARD OF SUPERVISORS

1   (a)  The Planning Department has determined that the actions contemplated in this

2 ordinance comply with the California Environmental Quality Act (California Public Resources

3 Code Sections 21000 et seq.).  Said determination is on file with the Clerk of the Board of

4 Supervisors in File No. ~~150494~~  and is incorporated herein by reference.  The Board affirms

5 this determination.

6   (b)  On December 10, 2015, the Planning Commission, in Resolution No. 19532,

7 adopted findings that the actions contemplated in this ordinance are consistent, on balance,

8 with the City's General Plan and the eight priority policies of Planning Code Section 101.1.

9 The Board adopts these findings as its own. A copy of said Resolution is on file with the Clerk

10 of the Board of Supervisors in File No. ~~150494~~ <u>160115</u>, and is incorporated herein by

11 reference.

12   (c)  Pursuant to Planning Code Section 302, this Board finds that these Planning

13 Code amendments will serve the public necessity, convenience, and welfare for the reasons

14 set forth in Planning Commission Resolution No. 19532 and the Board incorporates such

15 reasons herein by reference.

16

17   Section 2.  The Planning Code is hereby amended by revising Section 317 <u>and</u>

18 <u>deleting Section 317.1</u>, to read as follows:

19 **SEC. 317. LOSS OF ~~*DWELLING*~~ <u>*RESIDENTIAL AND UNAUTHORIZED*</u> UNITS THROUGH**

20 **DEMOLITION, MERGER AND CONVERSION.**

21   * * * *

22   (b)  **Definitions.** For the purposes of this Section 317, the terms below shall be <u>as</u>

23 defined <u>below</u> ~~as follows:~~ <u>Capitalized terms not defined below are defined in Section 102 of</u>

24 <u>this Code.</u>

25

1        (1)    "Residential Conversion" shall mean the removal of cooking facilities,

2  change of occupancy (as defined and regulated by the Building Code), or change of use (as

3  defined and regulated by the Planning Code), of any Residential Unit *or Unauthorized Unit* to a

4  *n*Non-*r*Residential or Student Housing use.

5       *   *   *   *

6        (7)    "Residential Merger" shall mean the combining of two or more *legal*

7  Residential *or Unauthorized* Units, resulting in a decrease in the number of Residential Units

8  *and Unauthorized Units* within a building, or the enlargement of one or more existing units while

9  substantially reducing the size of others by more than 25% of their original floor area, even if

10  the number of units is not reduced. The Planning Commission may reduce the numerical

11  element of this criterion by up to 20% of its value should it deem that adjustment is necessary

12  to implement the intent of this Section 317, to conserve existing housing and preserve

13  affordable housing.

14       *   *   *   *

15        (10)   "Removal" shall mean, with reference to a Residential *or Unauthorized*

16  Unit, its Conversion, Demolition, or Merger.

17       *   *   *   *

18        (12)   "Residential Unit" shall mean a legal conforming or *legal* nonconforming

19  Dwelling Unit, *or* a legal nonconforming Live/Work Unit or Group Housing, which are defined

20  in Section 102 of this Code.

21        (13)   *"Unauthorized Unit" shall mean one or more rooms within a building that have*

22  *been used, without the benefit of a building permit, as a separate and distinct living or sleeping space*

23  *independent from Residential Units on the same property. "Independent" shall mean that (i) the space*

24  *has independent access that does not require entering a Residential Unit on the property and (ii) there*

25  *is no open, visual connection to a Residential Unit on the property.*

1    (14) "Vertical Envelope Elements" shall mean all exterior walls that provide

2 weather and thermal barriers between the interior and exterior of the building, or that provide

3 structural support to other elements of the building envelope.

4   * * * *

5  (c)  **Applicability**; *Exemptions*.

6   (1) ~~An~~ *Any* application for a permit that would result in the ~~loss~~ *Removal* of one

7 or more Residential Units *or Unauthorized Units* is required to obtain Conditional Use

8 authorization~~; provided, however, that~~ *in the RTO, RTO-M, NCT, and Upper Market NCD Zoning*

9 ~~Districts, as well as the loss of any residential unit above the ground floor~~ in the C-3 Zoning District,

10 ~~only the Removal of a Residential Unit or Unauthorized Unit above the ground floor requires a~~

11 ~~Conditional Use authorization~~. The application for a replacement building or alteration permit

12 shall also be subject to Conditional Use requirements. ~~When considering whether to grant~~

13 ~~Conditional Use authorization for the loss of dwelling unit(s) in the C-3 districts, in lieu of the criteria~~

14 ~~set forth in Planning Code Section 303, consideration shall be given to the adverse impact on the~~

15 ~~public health, safety, and general welfare of the loss of housing stock in the district and to any~~

16 ~~unreasonable hardship to the applicant if the permit is denied. Any application for a permit that would~~

17 ~~result in the loss or Removal of three or more Residential Units, notwithstanding any other sections of~~

18 ~~this Code, shall require a Conditional Use authorization for the Removal and replacement of the units.~~

19 ~~Approval of any other application that would result in the loss or Removal of up to two Residential~~

20 ~~Units is prohibited unless the Planning Commission approves such permit application and the~~

21 ~~replacement structure permit application at a Mandatory Discretionary Review hearing, with certain~~

22 ~~exceptions specified below.~~

23   (2) The Conditional Use requirement of Subsection (c)(1) shall apply to (A)

24 any building or site permit issued for Removal of an Unauthorized Unit on or after March 1,

25

1   2016, and (B) any permit issued for Removal of an Unauthorized Unit prior to March 1, 2016

2   that has been suspended by the City or in which the applicant's rights have not vested.

3          *(23)   The Removal of a Residential or Unauthorized Unit that has received approval*

4   *from the Planning Department through administrative approval or the Planning Commission through a*

5   *Discretionary Review or Conditional Use authorization prior to the effective date of the Conditional*

6   *Use requirement of Subsection (c)(1) is not required to apply for an additional approval under*

7   *Subsection (c)(1).*

8          *(34)   The Removal of an Unauthorized Unit  does not require a Conditional Use*

9   *authorization pursuant to Subsection (c)(1) if the Department of Building Inspection has determined*

10   *that there is no legal path for legalization under Section 106A.3.1.3 of the Building Code.*

11          (5)   The Demolition of a Single-Family Residential Building that meets the

12   requirements of Subsection (d)(3) below may be approved by the Department without

13   requiring a Conditional Use authorization.

14       (d)    **Demolition.**

15          (1)   No permit to Demolish a Residential Building in any zoning district shall

16   be issued until a building permit for the replacement structure is finally approved, unless the

17   building is determined to pose a serious and imminent hazard as defined in the Building Code.

18   A building permit is finally approved if the Board of Appeals has taken final action for approval

19   on an appeal of the issuance or denial of the permit or if the permit has been issued and the

20   time for filing an appeal with the Board of Appeals has lapsed with no appeal filed.

21          (2)   *If* Conditional Use authorization is required for approval of the permit for

22   Residential Demolition *by other sections of this Code, and* the Commission shall consider the

23   replacement structure as part of its decision on the Conditional Use application. If Conditional

24   Use authorization is required for the replacement structure by other sections of this Code, the

25   Commission shall consider the demolition as part of its decision on the Conditional Use

1   application. *In either case, Mandatory Discretionary Review is not required, although the Commission*

2   *shall apply appropriate criteria adopted under this Section 317 in addition to the criteria in Section*

3   *303 of the Planning Code in its consideration of Conditional Use authorization. If neither permit*

4   *application is subject to Conditional Use authorization, then separate Mandatory Discretion Review*

5   *cases shall be heard to consider the permit applications for the demolition and the replacement*

6   *structure.*

7   (3)   *For those applications for a Residential Demolition in districts that require*

8   *Mandatory Discretionary Review, administrative review criteria shall ensure that only a*An

9   application to demolish a Single-Family Residential Building on a site in a RH-1 or RH-1(D)

10   District that is demonstrably not affordable or financially accessible housing, *or Residential*

11   *Buildings of two units or fewer that are found to be unsound housing,* is exempt from the Conditional

12   Use authorization requirement of Subsection (c)(1). *Mandatory Discretionary Review hearings.*

13   Specific numerical criteria for such analyses shall be adopted by the Planning Commission in

14   the Code Implementation Document, in accordance with this Section 317, and shall be

15   adjusted periodically by the Zoning Administrator based on established economic real estate

16   and construction indicators.

17   (A)   The Planning Commission shall determine a level of affordability or

18   financial accessibility, such that Single-Family Residential Buildings on sites in RH-1 and RH-

19   1(D) Districts that are demonstrably not affordable or financially accessible, that is, housing

20   that has a value greater than at least 80% of the combined land and structure values of

21   single-family homes in San Francisco as determined by a credible appraisal, made within six

22   months of the application to demolish, are not subject to a Conditional Use hearing. The

23   demolition and replacement building applications shall undergo notification as required by

24   other sections of this Code. The Planning Commission, in the Code Implementation

25   Document, may increase the numerical criterion in this Subsection by up to 10% of its value

should it deem that adjustment is necessary to implement the intent of this Section 317, to conserve existing housing and preserve affordable housing.

(B)  The Planning Commission, in the Code Implementation Document, shall adopt criteria and procedures for determining the soundness of a structure proposed for demolition, where "soundness" is an economic measure of the feasibility of upgrading a residence that is deficient with respect to habitability and Housing Code requirements, due to its original construction. The "soundness factor" for a structure shall be the ratio of a construction upgrade cost (i.e., an estimate of the cost to repair specific habitability deficiencies) to the replacement cost (i.e., an estimate of the current cost of building a structure the same size as the existing building proposed for demolition), expressed as a percent. A building is unsound if its soundness factor exceeds 50%. A Residential Building that is unsound may be approved for demolition.

(C)  The Planning Commission shall consider the following additional criteria in the review of applications for Residential Demolition:

(i)  whether the property is free of a history of serious, continuing Code violations;

(ii)  whether the housing has been maintained in a decent, safe, and sanitary condition;

(iii)  whether the property is an "historical resource" under CEQA;

(iv)  whether the removal of the resource will have a substantial adverse impact under CEQA;

(v)  whether the project converts rental housing to other forms of tenure or occupancy;

(vi)  whether the project removes rental units subject to the Rent Stabilization and Arbitration Ordinance or affordable housing;

1          (vii)   whether the project conserves existing housing to preserve

2 cultural and economic neighborhood diversity;

3          (viii)  whether the project conserves neighborhood character to

4 preserve neighborhood cultural and economic diversity;

5          (ix)   whether the project protects the relative affordability of existing

6 housing;

7          (x)   whether the project increases the number of permanently

8 affordable units as governed by Section 415;

9          (xi)   whether the project locates in fill housing on appropriate sites in

10 established neighborhoods;

11          (xii)  whether the project increases the number of family-sized units on

12 site;

13          (xiii)  whether the project creates new supportive housing;

14          (xiv) whether the project is of superb architectural and urban design,

15 meeting all relevant design guidelines, to enhance existing neighborhood character;

16          (xv)  whether the project increases the number of on-site dwelling

17 units;

18          (xvi)  whether the project increases the number of on-site bedrooms.

19         (4) (3) Nothing in this Section is intended to permit Residential Demolition in

20 those areas of the City where other sections of this Code prohibit such demolition or

21 replacement structure.

22         (5) (4) Nothing in this Section is intended to exempt buildings or sites where

23 demolition is proposed from undergoing review with respect to Articles 10 and 11 of the

24 *Planning* Code, where the requirements of those articles apply. Notwithstanding the definition

25 of "Residential Demolition" in this section and as further described in the Code

Implementation Document with regard to Residential Demolition, the criteria of Section 1005 shall apply to projects subject to review under the requirements of Article 10 with regard to the structure itself.

(e) *Conversion to Student Housing. The conversion of Residential Units to Student Housing is prohibited. For the purposes of this subsection, Residential Units that have been defined as such by the time a First Certificate of Occupancy has been issued by the Department of Building Inspection for new construction shall not be converted to Student Housing.*

(f) *Residential Merger. The Merger of Residential Units, not otherwise subject to Conditional Use authorization by this Code, shall be prohibited.*

(g) *Conditional Use Criteria.*

(1) *C-3 Districts. When considering whether to grant Conditional Use authorization for the loss or Removal of Residential or Unauthorized Unit(s) in the C-3 districts, in lieu of the criteria set forth in Planning Code Section 303, consideration shall be given to the adverse impact on the public health, safety, and general welfare of the loss of housing stock in the district and to any unreasonable hardship to the applicant if the permit is denied.*

\*  \*  \*  \*

~~(e)~~ (2) **Residential Merger.**

~~(1)    The Merger of Residential Units, not otherwise subject to Conditional Use authorization by this Code, shall be prohibited, unless the Planning Commission approves the building permit application at a Mandatory Discretionary Review hearing, applying the criteria in subsection (2) below, or the project qualifies for administrative approval and the Planning Department approves the project administratively in accordance with subsection (3) below.~~

~~(2)~~    The Planning Commission shall consider the following criteria in the review of applications to merge Residential Units *or Unauthorized Units*:

1   (A)   whether removal of the unit(s) would eliminate only owner

2   occupied housing, and if so, for how long the unit(s) proposed to be removed have been

3   owner occupied;

4   (B)   whether removal of the unit(s) and the merger with another is

5   intended for owner occupancy;

6   (C)   whether ~~the~~ removal of the unit(s) will remove an affordable

7   housing unit as defined in Section _401_ ~~415~~ of this Code or housing subject to the _Residential_

8   Rent Stabilization and Arbitration Ordinance;

9   ~~(D)     whether removal of the unit(s) will bring the building closer into~~

10  ~~conformance with prescribed zoning;~~

11  ~~(E)~~ _(D)_ if removal of the unit(s) removes an affordable housing unit as

12  defined in Section 401 of this Code or units subject to the _Residential_ Rent Stabilization and

13  Arbitration Ordinance, whether replacement housing will be provided which is equal or greater

14  in size, number of bedrooms, affordability, and suitability to households with children to the

15  units being removed;

16  _(E)   how recently the unit being removed was occupied by a tenant or tenants;_

17  (F)   whether the number of bedrooms provided in the merged unit will

18  be equal to or greater than the number of bedrooms in the separate units;

19  (G)   whether removal of the unit(s) is necessary to correct design or

20  functional deficiencies that cannot be corrected through interior alterations_;_

21  _(H)   the appraised value of the least expensive Residential Unit proposed for_

22  _merger only when the merger does not involve an Unauthorized Unit._

23  ~~(3)     Administrative review criteria shall ensure that only those Residential Units~~

24  ~~proposed for Merger that are demonstrably not affordable or financially accessible housing are exempt~~

25  ~~from Mandatory Discretionary Review hearings. Applications for which the least expensive unit~~

1    ~~proposed for merger has a value greater than at least 80% of the combined land and structure values~~

2    ~~of single-family homes in San Francisco, as determined by a credible appraisal, made within six~~

3    ~~months of the application to merge, are not subject to a Mandatory Discretionary Review hearing. The~~

4    ~~Planning Commission, in the Code Implementation Document, may increase the numerical criterion in~~

5    ~~this subsection by up to 10% of its value should it deem that adjustment is necessary to implement the~~

6    ~~intent of this Section 317, to conserve existing housing and preserve affordable housing.~~

7          ~~(4)~~      The Planning Commission shall not approve an application for _Residential_

8    ~~m~~_M_erger if any tenant has been evicted pursuant to Administrative Code Sections 37.9(a)(9)

9    through 37.9(a)(14) where the tenant was served with a notice of eviction after December 10,

10   2013 if the notice was served within ~~ten (~~10~~)~~ years prior to filing the application for merger.

11   Additionally, the Planning Commission shall not approve an application for _Residential_

12   ~~m~~_M_erger if any tenant has been evicted pursuant to Administrative Code Section 37.9(a)(8)

13   where the tenant was served with a notice of eviction after December 10, 2013 if the notice

14   was served within five (5) years prior to filing the application for merger. This Subsection ~~(e)(4)~~

15   _(g)(2)(H)_ shall not apply if the tenant was evicted under Section 37.9(a)(11) or 37.9(a)(14) and

16   the applicant(s) either (A) have certified that the original tenant reoccupied the unit after the

17   temporary eviction or (B) have submitted to the Planning Commission a declaration from the

18   property owner or the tenant certifying that the property owner or the Rent Board notified the

19   tenant of the tenant's right to reoccupy the unit after the temporary eviction and that the tenant

20   chose not to reoccupy it.

21         ~~(f)~~    _(3)_    **Residential Conversion.**

22         ~~(1)~~    ~~Residential Conversion not otherwise prohibited or subject to Conditional Use~~

23   ~~authorization by this Code, shall be prohibited, unless the Planning Commission approves the building~~

24   ~~permit application at a Mandatory Discretionary Review hearing, or is exempted from such approval~~

25   ~~as provided in subsections (f)(3) or (4) below. The conversion of Residential Units to Student Housing~~

is prohibited. For the purposes of this subsection, Residential Units that have been defined as such by the time a First Certificate of Occupancy has been issued by the Department of Building Inspection for new construction shall not be converted to Student Housing.

(2) The Planning Commission shall consider the following criteria in the review of applications for Residential *Conversion* Conversation;

(A) whether conversion of the unit(s) would eliminate only owner occupied housing, and if so, for how long the unit(s) proposed to be removed were owner occupied;

(B) whether Residential *Conversion* Conversation would provide desirable new *n**N*on-*r**R*esidential *u**U*se(s) appropriate for the neighborhood and adjoining district(s);

(C) in districts where Residential Uses are not permitted, whether Residential Conversion will bring the building closer into conformance with the *u**U*ses permitted in the zoning district;

(D) whether conversion of the unit(s) will be detrimental to the City's housing stock;

(E) whether conversion of the unit(s) is necessary to eliminate design, functional, or habitability deficiencies that cannot otherwise be corrected;

(F) whether the Residential Conversion will remove Affordable Housing, or units subject to the *Residential* Rent Stabilization and Arbitration Ordinance.

\* \* \* \*

(4) (5) *Residential Demolition. The Planning Commission shall consider the following additional criteria in the review of applications for Residential Demolition:*

(A) *whether the property is free of a history of serious, continuing Code violations;*

1             (B)     *whether the housing has been maintained in a decent, safe, and sanitary*

2  *condition;*

3             (C)     *whether the property is an "historical resource" under CEQA;*

4             (D)     *whether the removal of the resource will have a substantial adverse*

5  *impact under CEQA;*

6             (E)     *whether the project converts rental housing to other forms of tenure or*

7  *occupancy;*

8             (F)     *whether the project removes rental units subject to the Residential Rent*

9  *Stabilization and Arbitration Ordinance or affordable housing;*

10             (G)     *whether the project conserves existing housing to preserve cultural and*

11  *economic neighborhood diversity;*

12             (H)     *whether the project conserves neighborhood character to preserve*

13  *neighborhood cultural and economic diversity;*

14             (I)     *whether the project protects the relative affordability of existing housing;*

15             (J) *whether the project increases the number of permanently affordable units as*

16  *governed by Section 415;*

17             (K)     *whether the project locates in-fill housing on appropriate sites in*

18  *established neighborhoods;*

19             (L)     *whether the project increases the number of family-sized units on-site;*

20             (M)     *whether the project creates new supportive housing;*

21             (N)     *whether the project is of superb architectural and urban design, meeting*

22  *all relevant design guidelines, to enhance existing neighborhood character;*

23             (O)     *whether the project increases the number of on-site Dwelling Units;*

24             (P)     *whether the project increases the number of on-site bedrooms.*

25

1          *(O)     whether or not the replacement project would maximize density on the*

2   *subject lot; and*

3                *(R)     if replacing a building not subject to the Residential Rent Stabilization*

4   *and Arbitration Ordinance, whether the new project replaces all of the existing units with new*

5   *Dwelling Units of a similar size and with the same number of bedrooms.*

6                *(5) (6) Removal of Unauthorized Units. In addition to the criteria set forth in*

7   *sSubsections (g)(1) through (g)(4) above, the Planning Commission shall consider the criteria below*

8   *in the review of applications for removal of Unauthorized Units:*

9                *(A)     whether the Unauthorized Unit or Units are eligible for legalization*

10  *under Section 207.3 of this Code;*

11               *(B)     whether the costs to legalize the Unauthorized Unit or Units under the*

12  *Planning, Building, and other applicable Codes is reasonable based on how such cost compares to the*

13  *average cost of legalization per unit derived from the cost of projects on the Planning Department's*

14  *Master List of Additional Dwelling Units Approved required by Section 207.3(k) of this Code;*

15               *(C)     whether it is financially feasible to legalize the Unauthorized Unit or*

16  *Units. Such determination will be based on the costs to legalize the Unauthorized Unit(s) under the*

17  *Planning, Building, and other applicable Codes in comparison to the added value that legalizing said*

18  *Units would provide to the subject property. The gain in the value of the subject property shall be based*

19  *on the current value of the property with the Unauthorized Unit(s) compared to the value of the*

20  *property if the Unauthorized Unit(s) is/are legalized. The calculation of the gain in value shall be*

21  *conducted and approved by a California licensed property appraiser. Legalization would be deemed*

22  *financially feasible if gain in the value of the subject property is equal to or greater than the cost to*

23  *legalize the Unauthorized Unit.*

24               *(D)     If no City funds are available to assist the property owner with the*

25  *cost of legalization, whether the cost would constitute a financial hardship,*

1         (6) (7) *Denial of Application to Remove an Unauthorized Unit; Requirement to*

2 *Legalize the Unit. If the Planning Commission denies an application to Remove an Unauthorized Unit,*

3 *the property owner shall file an application for a building permit to legalize the Unit. Failure to do so*

4 *within a reasonable period of time, as determined by the Zoning Administrator, shall be deemed to be a*

5 *violation of the Planning Code.*

6         *(h)*      *Notice of Conditional Use Hearing. At least twenty days prior to any hearing to*

7 *consider a Conditional Use authorization under Subsection (g)(2), (g)(3), g(4), or (g)(5), the Zoning*

8 *Administrator shall cause a written notice containing the following information to be mailed to all*

9 *Residential Units and if known any Unauthorized Units in the building, in addition to any other notice*

10 *required under this Code:*

11         *(1)*      *Notice of the time, place, and purpose of the hearing; and*

12         *(2)*      *An explanation of the process for demolishing, merging, or converting Residential*

13 *Units or Unauthorized Units, including a description of subsequent permits that would be required*

14 *from the Planning Department and Department of Building Inspection and how they could be appealed.*

15         (g) *(i)* **Additional Exemptions.** This Section 317 shall not apply to property:

16         (1)      Owned by the United States or any of its agencies;

17         (2)      Owned by the State of California or any of its agencies, with the

18 exception of such property not used exclusively for a governmental purpose;

19         (3)      Under the jurisdiction of the Port of San Francisco or the Successor

20 Agency to the Redevelopment Agency of the City and County of where the application of this

21 Section is prohibited by State or local law; or

22         (4)      Where demolition of the building or Removal of a Residential Unit *or*

23 *Unauthorized  Unit* is necessary to comply with a court order or City order that directs the

24 owner to demolish the building or remove the unit, due to conditions that present an imminent

25 threat to life safety.

Supervisor Avalos
**BOARD OF SUPERVISORS**

Page 15

SEC. 317.1. LOSS OF RESIDENTIAL AND UNAUTHORIZED UNITS IN C-3 DISTRICTS THROUGH DEMOLITION, MERGER, AND CONVERSION.

(a)     Definitions. For the purposes of this Section 317.1, the terms below shall be as defined below. Capitalized terms not defined below are defined in Section 102 of this Code.

"Removal" shall mean, with reference to a Residential or Unauthorized Unit, its Conversion, Demolition, or Merger.

"Residential Conversion" shall mean the removal of cooking facilities, change of occupancy (as defined and regulated by the Building Code), or change of use (as defined and regulated by the Planning Code), of any Residential Unit or Unauthorized Unit to a Non-Residential or Student Housing use.

"Residential Demolition" shall have the meaning set forth in Section 317(b)(2) of this Code.

"Residential Merger" shall mean the combining of two or more Residential or Unauthorized Units, resulting in a decrease in the number of Residential Units and Unauthorized Units within a building, or the enlargement of one or more existing units while reducing the size of other units by more than 25% of their original floor area, even if the number of units is not reduced. The Planning Commission may reduce the numerical element of this criterion by up to 20% of its value should it deem that adjustment necessary to implement the intent of this Section 317.1, to conserve existing housing and preserve affordable housing.

"Residential Unit" shall mean a legal conforming or legal nonconforming Dwelling Unit, or a legal nonconforming Live/Work Unit or Group Housing.

"Unauthorized Unit" shall mean one or more rooms within a building that have been used, without the benefit of a building permit, as a separate and distinct living or sleeping space independent from Residential Units on the same property. In this context,

1    "independent" shall mean that (A) the space has separate access that does not require

2    entering a Residential Unit on the property and (B) there is no open, visual connection to a

3    Residential Unit on the property.

4        (b)    **Applicability; Exemption for Unauthorized Unit.**

5        (1)    Any application for a permit that would result in the Removal of one or

6    more Residential Units or Unauthorized Units in a C-3 (Downtown Commercial) District is

7    required to obtain Conditional Use authorization. The application for a replacement building or

8    alteration permit shall also be subject to Conditional Use requirements.

9        (2)    The Conditional Use requirement of Subsection (b)(1) shall apply to (A)

10    any building or site permit for Removal of an Unauthorized Unit issued on or after March 1,

11    2016, and (B) any permit for Removal of an Unauthorized Unit issued prior to March 1, 2016,

12    that has been suspended by the City or in which the applicant's rights have not vested.

13        (3)    The Removal of a Residential Unit that has received approval from the

14    Planning Department through administrative approval or the Planning Commission through

15    Discretionary Review or Conditional Use authorization prior to the effective date of this

16    Section 317.1 is not required to apply for an additional approval under Subsection (b)(1).

17        (4)    The Removal of an Unauthorized Unit does not require a Conditional Use

18    authorization pursuant to Subsection (b)(1) if the Department has determined that there is no

19    legal path for legalization.

20        (c)    **Demolition.**

21        (1)    No permit to Demolish a Residential Building in a C-3 District shall be

22    issued until a building permit for the replacement structure is finally approved, unless the

23    building is determined to pose a serious and imminent hazard as defined in the Building Code.

24    A building permit is finally approved if the Board of Appeals has taken final action for approval

25

1   on an appeal of the issuance or denial of the permit or if the permit has been issued and the

2   time for filing an appeal with the Board of Appeals has lapsed with no appeal filed.

3   (2)   Conditional Use authorization is required for approval of the permit for

4   Residential Demolition in a C-3 District, and the Commission shall consider the replacement

5   structure as part of its decision on the Conditional Use application. If Conditional Use

6   authorization is required for the replacement structure by other sections of this Code, the

7   Commission shall consider the demolition as part of its decision on the Conditional Use

8   application.

9   (3)   Nothing in this Section 317.1 is intended to exempt buildings or sites

10  where demolition is proposed from undergoing review with respect to Articles 10 and 11 of the

11  Planning Code, where the requirements of those Articles apply. Notwithstanding the definition

12  of "Residential Demolition" in this Section 317.1 and as further described in the Code

13  Implementation Document with regard to Residential Demolition, the criteria of Section 1005

14  shall apply to projects subject to review under the requirements of Article 10 with regard to the

15  structure itself.

16  (d)   **Conversion to Student Housing.** The conversion of Residential Units to

17  Student Housing is prohibited in C-3 Districts. For the purposes of this subsection (d),

18  Residential Units that have been defined as such by the time a First Certificate of Occupancy

19  has been issued by the Department of Building Inspection for new construction shall not be

20  converted to Student Housing.

21  (e)   **Conditional Use Criteria.** When considering whether to grant Conditional Use

22  authorization for the loss or Removal of Residential or Unauthorized Unit(s) in C-3 Districts, in

23  lieu of the criteria set forth in Planning Code Section 303, consideration shall be given to the

24  adverse impact on the public health, safety, and general welfare of the loss of housing stock

25  in the zoning district and to any unreasonable hardship to the applicant if the permit is denied.

1    (1)    Residential Merger. In addition to the criteria set forth in Section 317(e)

2  of this Code, the Planning Commission shall consider the following criteria in the review of

3  applications to merge Residential Units or Unauthorized Units in C-3 Districts:

4            (A)    how recently the unit being removed was occupied by a tenant or

5  tenants; and

6            (B)    the appraised value of the least expensive Residential Unit

7  proposed for merger, when the merger does not involve an Unauthorized Unit.

8        The Planning Commission shall not approve an application for Residential Merger if

9  any tenant has been evicted pursuant to Administrative Code Sections 37.9(a)(9) through

10  37.9(a)(14) where the tenant was served with a notice of eviction after December 10, 2013, if

11  the notice was served within 10 years prior to filing the application for merger. Additionally, the

12  Planning Commission shall not approve an application for Residential Merger if any tenant

13  has been evicted pursuant to Administrative Code Section 37.9(a)(8) where the tenant was

14  served with a notice of eviction after December 10, 2013, if the notice was served within five

15  years prior to filing the application for merger. The restriction of this paragraph shall not apply

16  if the tenant was evicted under Section 37.9(a)(11) or 37.9(a)(14) and the applicant(s) either

17  (A) have certified that the original tenant reoccupied the unit after the temporary eviction or (B)

18  have submitted to the Planning Commission a declaration from the property owner or the

19  tenant certifying that the property owner or the Rent Board notified the tenant of the tenant's

20  right to reoccupy the unit after the temporary eviction and that the tenant chose not to

21  reoccupy it.

22            (2)    Residential Conversion. The Planning Commission shall consider the

23  criteria set forth in Section 317(f)(1) through (4) of this Code in the review of applications for

24  Residential Conversion in C-3 Districts.

25

1    (3)   ~~Residential Demolition. In addition to the criteria set forth in Section~~

2    ~~317(d) of this Code, the Planning Commission shall also consider the following criteria in the~~

3    ~~review of applications for Residential Demolition in C-3 Districts:~~

4    ~~(A)   whether the replacement project would maximize density on the~~

5    ~~subject lot; and~~

6    ~~(B)   if replacing a building not subject to the Residential Rent~~

7    ~~Stabilization and Arbitration Ordinance, whether the new project replaces all of the existing~~

8    ~~units with new Dwelling Units of a similar size and with the same number of bedrooms or~~

9    ~~more.~~

10   ~~(4)   Removal of Unauthorized Units. In addition to the criteria set forth in~~

11   ~~Subsections (e)(1) through (e)(3) above, the Planning Commission shall also consider the~~

12   ~~criteria below in the review of applications for removal of Unauthorized Units:~~

13   ~~(A)   whether the Unauthorized Unit or Units are eligible for legalization~~

14   ~~under Section 207.3 of this Code;~~

15   ~~(B)   whether the costs to legalize the Unauthorized Unit or Units under~~

16   ~~the Planning, Building, and other applicable Codes is reasonable based on how such cost~~

17   ~~compares to the average cost of legalization per unit derived from the cost of projects on the~~

18   ~~Planning Department's Master List of Additional Dwelling Units Approved required by Section~~

19   ~~207.3(k) of this Code;~~

20   ~~(C)   whether it is financially feasible to legalize the Unauthorized Unit or~~

21   ~~Units, based on the costs to legalize the Unauthorized Unit(s) under the Planning, Building,~~

22   ~~and other applicable Codes in comparison to the added value that legalizing said Units would~~

23   ~~provide to the subject property. The gain in the value of the subject property shall be based on~~

24   ~~the current value of the property with the Unauthorized Unit(s) compared to the value of the~~

25   ~~property if the Unauthorized Unit(s) is/are legalized. The calculation of the gain in value shall~~

1   be conducted and approved by a California licensed property appraiser. Legalization shall be

2   deemed financially feasible if the gain in the value of the subject property is equal to or greater

3   than the cost to legalize the Unauthorized Unit.

4          (5)   **Denial of Application to Remove an Unauthorized Unit; Requirement**

5   **to Legalize the Unit.** If the Planning Commission denies an application to Remove an

6   Unauthorized Unit, the property owner shall file an application for a building permit to legalize

7   the Unit. Failure to do so within a reasonable period of time, as determined by the Zoning

8   Administrator, shall be deemed a violation of the Planning Code.

9          (f)   **Notice of Conditional Use Hearing.** At least 20 days prior to any hearing to

10  consider a Conditional Use authorization under Subsection (b) of this Section 317.1, the

11  Zoning Administrator shall cause a written notice containing the following information to be

12  mailed to all Residential Units and if known any Unauthorized Units in the building, in addition

13  to any other notice required under this Code:

14          (1)   Notice of the time, place, and purpose of the hearing; and

15          (2)   An explanation of the process for demolishing, merging, or converting

16  Residential Units or Unauthorized Units, including a description of subsequent permits that

17  would be required from the Planning Department and Department of Building Inspection and

18  how they could be appealed.

19  (g)   **Exemptions.** This Section 317.1 shall not apply to property:

20          (1)   Owned by the United States or any of its agencies;

21          (2)   Owned by the State of California or any of its agencies, with the

22  exception of such property not used exclusively for a governmental purpose;

23          (3)   Under the jurisdiction of the Port of San Francisco or the Successor

24  Agency to the Redevelopment Agency of the City and County of San Francisco where the

25  application of this Section is prohibited by State or local law; or

1  ~~(4)   Where demolition of the building or Removal of a Residential Unit or~~

2  ~~Unauthorized Unit is necessary to comply with a court order or order of a City agency that~~

3  ~~directs the owner to demolish the building or remove the unit, due to conditions that present~~

4  ~~an imminent threat to life safety.~~

5

6  Section 3.  The Planning Code is hereby amended by revising Zoning Control Tables

7  209.1, 209.2, 209.3, 209.4, 210.1, 210.2, 210.3, 210.4, to read as follows:

8

9  **Table 209.1**

   **ZONING CONTROL TABLE FOR RH DISTRICTS**

10  * * * *

| Zoning Category | § References | RH-1(D) | RH-1 | RH-1(S) | RH-2 | RH-3 |
|---|---|---|---|---|---|---|
| * * * * | | | | | | |
| RESIDENTIAL STANDARDS AND USES | | | | | | |
| Development Standards | | | | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 300 square feet if private, and 400 square feet if common. | At least 300 square feet if private, and 400 square feet if common. | At least 300 square feet for the first unit and 100 for the minor second unit if private, and 400 square feet for the first unit and 133 square feet for | At least 125 square feet if private, and 166 square feet if common. | At least 100 square feet if private, and 133 square feet if common. |

| | | | | the second unit if common. | | |
|---|---|---|---|---|---|---|
| Parking Requirements | §§ 151, 161 | Generally, a minimum of one space for every dDwelling uUnit required. Certain exceptions permitted per § 161. | | | | |
| Residential Conversion, Demolition, or Merger | § 317 | _C for Removal of one or more Residential Units or Unauthorized Units._ ~~Loss of 1-2 units Mandatory DR/Loss of 3 or more units C.~~ | | | | |
| * * * * | | | | | | |

### Table 209.2
### ZONING CONTROL TABLE FOR RM DISTRICTS

* * * *

| Zoning Category | § References | RM-1 | RM-2 | RM-3 | RM-4 |
|---|---|---|---|---|---|
| **RESIDENTIAL STANDARDS AND USES** | | | | | |
| **Development Standards** | | | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 100 square feet if private, and 133 square feet per dDwelling uUnit if common. | At least 80 square feet if private, and 106 square feet per dDwelling | At least 60 square feet if private and 80 square feet per dDwelling | At least 36 square feet if private, and 48 square feet per dDwelling uUnit if common. |

| | | | *u**U**nit if common.* | *u**U**nit if common.* | |
|---|---|---|---|---|---|
| Parking Requirements | §§ 151, 161 | | Generally one space for every *d**D*welling *u**U*nit minimum. Certain exceptions permitted per § 161. | | |
| Residential Conversion, Demolition, or Merger | § 317 | | *C for Removal of one or more Residential Units or Unauthorized Units.* ~~Loss of 1-2 units mandatory DR/Loss of 3 or more C.~~ | | |
| * * * * | | | | | |

**Table 209.3**
**ZONING CONTROL TABLE FOR RESIDENTIAL-COMMERCIAL DISTRICTS**

* * * *

| Zoning Category | § References | RC-3 | RC-4 |
|---|---|---|---|
| * * * * | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | |
| **Development Standards** | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 60 square feet if private, and 80 square feet per *d**D*welling *u**U*nit if common. | At least 36 square feet if private, and 48 square feet per *d**D*welling *u**U*nit if common. |
| Parking Requirements | § 151.1 | None Required. Up to one space for every two units permitted, and up to three spaces for every | |

| | | |
|---|---|---|
| | | four units permitted with Conditional Use per § 151.1. |
| Residential Conversion, Demolition, or Merger | § 317 | ~~Loss of 2 units or fewer DR/Loss of 3 or more~~ C *for Removal of one or more Residential Units or Unauthorized Units.* |
| * * * * | * * * * | * * * * |

**Table 209.4**
**ZONING CONTROL TABLE FOR RTO DISTRICTS**

* * * *

| Zoning Category | § References | RTO | RTO-M |
|---|---|---|---|
| **RESIDENTIAL STANDARDS AND USES** | | | |
| **Development Standards** | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 100 square feet if private, and 133 square feet per ~~d~~Dwelling ~~u~~Unit if common. | |
| Parking Requirements | § 151.1, 151.1 | None required. Maximum permitted per § 151.1 | |
| Residential Conversion, | § 317 | ~~Loss of 2 units or fewer DR/Loss of 3 or more~~ | C *for Removal of one or more Residential* |

| Demolition, or Merger | | C *for Removal of one or more Residential Units or Unauthorized Units.* | *Units or Unauthorized Units.* |
|---|---|---|---|
| * * * * | | | |

\* \* \* \*

**Table 210.1**
**ZONING CONTROL TABLE FOR C-2 DISTRICTS**

| Zoning Category | § References | C-2 |
|---|---|---|
| * * * * | | |
| **RESIDENTIAL STANDARDS AND USES** | | |
| **Development Standards** | | |
| Usable Open Space for Dwelling Units and Group Housing | § 135 | Same as for the R District establishing the dwelling unit density ratio for the property. Group Housing requirement is 1/3 the amount required for a Dwelling Unit. |
| Residential Parking Requirements | § 151, 161 | Generally one space per Dwelling Unit. Exceptions permitted per § 161. None required in the Washington-Broadway Special Use District. |
| Rear Yard Setback | §§ 130, 134 | 25% of the total depth lot depth, but in no case less than 15 feet. Rear yards shall be provided at the lowest story containing a dwelling unit, and at each succeeding level or story of the building. |

| Residential Conversion, Demolition, or Merger | § 317 | *C for Removal of one or more Residential Units or Unauthorized Units.*<br><br>~~*Loss of 2 units or fewer DR/Loss of 3 or more C.*~~ |
|---|---|---|
| * * * * | | |

**Table 210.2**
**ZONING CONTROL TABLE FOR C-3 DISTRICTS**

* * * *

| Zoning Category | § References | C-3-O | C-3-O(SD) | C-3-R | C-3-G | C-3-S |
|---|---|---|---|---|---|---|
| * * * * | | | | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | | | | |
| **Development Standards** | | | | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 36 square feet if private, and 48 square feet per *d*Dwelling *u*Unit if common. | | | | |
| Residential Parking Requirements | §§ 150, 151.1, 161 | None required. P up to one car for each two Dwelling Units; C up to three cars for each four Dwelling Units. NP above. | | | | |
| Rear Yard Setback | §§ 130, 134 | 25% of the total depth lot depth, but in no case less than 15 feet for lowest story containing a dwelling unit and each succeeding story. Exceptions are permitted by § 309. | | | | |
| Residential Conversion, | § ~~317.1~~ <u>317</u> | *C for Removal of one or more Residential Units or Unauthorized Units;* in C-3, C only for Removal above the ground floor.<br><br>~~*Loss of 1-2 units mandatory DR/Loss of 3 or more units C.*~~ | | | | |

| Demolition, or Merger | | |
|---|---|---|
| * * * * | | |

**Table 210.3**
**ZONING CONTROL TABLE FOR PDR DISTRICTS**

| Zoning Category | § References | PDR-1-B | PDR-1-D | PDR-1-G | PDR-2 |
|---|---|---|---|---|---|
| * * * * | | | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | | | |
| **Development Standards** | | | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | N/A | N/A | N/A | N/A |
| Residential Parking Requirements | §§ 151.1, 161 | N/A | N/A | N/A | N/A |
| Residential Conversion, Demolition, or Merger | § 317 | *C for Removal of one or more Residential Units or Unauthorized Units; in C-3, only for Removal above the ground floor.* ~~Loss of 1-2 units mandatory DR/Loss of 3 or more units C.~~ | | | |
| * * * * | | | | | |

**Table 210.4**
**ZONING CONTROL TABLE FOR M DISTRICTS**

| Zoning Category | § References | M-1 | M-2 |
|---|---|---|---|
| **\* \* \* \*** | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | |
| **Development Standards** | | | |
| Usable Open Space [Per Dwelling Unit] | §§ 135, 136 | At least 36 square feet if private, and 48 square feet per ~~d~~_D_welling ~~u~~_U_nit if public. | |
| Residential Parking Requirements | §§ 151, 161 | None required. P up to one space for every two units. C up to three spaces for every four units. NP above. | |
| Rear Yard Setback | §§ 130, 134 | 25 percent of the total depth lot depth, but in no case less than 15 feet. | |
| Residential Conversion, Demolition, or Merger | § 317 | _C for Removal of one or more Residential Units or Unauthorized Units._ ~~Loss of 1-2 units mandatory DR/Loss of 3 or more units C.~~ | |
| **\* \* \* \*** | | | |

Section 4.  The Planning Code is hereby amended by revising Zoning Control Tables

710 through 748 and 810 through 818, to read as follows:

### Table 710. NEIGHBORHOOD COMMERCIAL CLUSTER DISTRICT NC-1 ZONING CONTROL TABLE

\* \* \* \*

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | NC-1 Controls by Story | | |
|-----|-----------------|--------------|------|------|-------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~710.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | | |
| ~~710.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

**RESIDENTIAL STANDARDS AND USES**

| | \* \* \* \* | | | | |
|-----|-----------------|--------------|------|------|-------|
| _710.96_ | _Removal of Residential and Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

### Table 711. SMALL-SCALE NEIGHBORHOOD COMMERCIAL DISTRICT NC-2 ZONING CONTROL TABLE

\* \* \* \*

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | NC-2 Controls by Story | | |
|-----|-----------------|--------------|------|------|-------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~711.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | |

| 711.37 | Residential Demolition | § 317 | P | C | C |

\* \* \* \*

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| \* \* \* \* | | | | | |
| 711.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | C | NP |
| 711.97 | Removal of Residential or Unauthorized Units through Demolition, or Merger | § 317 | C | | |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

### Table 712. MODERATE-SCALE NEIGHBORHOOD COMMERCIAL DISTRICT NC-3 ZONING CONTROL TABLE

\* \* \* \*

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | NC-3 Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 712.36 | Residential Conversion | § 317 | P | C | C# |
| 712.37 | Residential Demolition | § 317 | P | C | C |

\* \* \* \*

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| \* \* \* \* | | | | | |

| | | | |
|---|---|---|---|
| _712.96_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ |
| * * * * | * * * * | * * * * | * * * * |

### Table 713. NEIGHBORHOOD COMMERCIAL SHOPPING CENTER DISTRICT NC-S ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | NC-S Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| _713.36_ | _Residential Conversion_ | _§ 317_ | _p_ | | |
| _713.37_ | _Residential Demolition_ | _§ 317_ | _p_ | _C_ | _C_ |

* * * *

## RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
|---|---|---|---|---|---|
| _713.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | _§ 317_ | _C_ | _NP_ | _NP_ |
| _713.97_ | _Removal of Residential or Unauthorized Units through Demolition, or Merger_ | _§ 317_ | _C_ | | |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 714. BROADWAY NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

\* \* \* \*

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Broadway Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~714.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | |
| ~~714.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

### RESIDENTIAL STANDARDS AND USES

| \* \* \* \* | | | | | |
|---|---|---|---|---|---|
| 714.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | C | NP |
| 714.97 | Residential Conversion, Demolition, or Merger | § 317 | C | | |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

## Table 715. CASTRO STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

\* \* \* \*

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Castro Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |

| 715.36 | *Residential Conversion* | *§ 317* | *P* | *C* | |
| 715.37 | *Residential Demolition* | *§ 317* | *P* | *C* | *C* |

* * * *

### RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
| 715.96 | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *C* | *NP* |
| 715.97 | *Removal of Residential or Unauthorized Units through Conversion,, Demolition, or Merger* | *§ 317* | *C* | | |
| * * * * | * * * * | * * * * | * * * * | | |

### Table 716. INNER CLEMENT STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Inner Clement Street Controls by Story | | |
| --- | --- | --- | --- | --- | --- |
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 716.36 | *Residential Conversion* | *§ 317* | *P* | | |
| 716.37 | *Residential Demolition* | *§ 317* | *P* | *C* | *C* |

* * * *

### RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| **\* \* \* \*** | | | | | |
| _716.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | _§ 317_ | _C_ | _NP_ | _NP_ |
| _716.97_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| **\* \* \* \*** | **\* \* \* \*** | **\* \* \* \*** | **\* \* \* \*** | | |

### Table 717. OUTER CLEMENT STREET NEIGHBORHOOD COMMERCIAL DISTRICT
### ZONING CONTROL TABLE

**\* \* \* \***

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Outer Clement Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~717.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | | |
| ~~717.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

**\* \* \* \***

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| **\* \* \* \*** | | | | | |
| _717.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | _§ 317_ | _C_ | _NP_ | _NP_ |

| | | | |
|---|---|---|---|
| *717.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* |
| * * * * | * * * * | * * * * | * * * * |

### Table 718. UPPER FILLMORE STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Upper Fillmore Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| *718.36* | *Residential Conversion* | *§ 317* | *P* | *C* | |
| *718.37* | *Residential Demolition* | *§ 317* | *P* | *C* | *C* |

* * * *

## RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
|---|---|---|---|---|---|
| *718.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *C* | *NP* |
| *718.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |

| * * * * | * * * * | | * * * * | * * * * |

**Table 719. HAIGHT STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | Haight Street Controls by Story | | |
|-----|-----------------|--------------|------|-----|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~719.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | | |
| ~~719.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

* * * *

**RESIDENTIAL STANDARDS AND USES**

| * * * * | | | | | |
|---------|---|---|---|---|---|
| *719.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *NP* | *NP* |
| *719.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| * * * * | * * * * | * * * * | * * * * | | |

Table 720. HAYES-GOUGH NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT
ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Hayes-Gough Transit Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
|     |                 | § 790.118    | 1st  | 2nd  | 3rd+ |
| *720.36* | *Residential Conversion* | *§ 317* | *C* | *C* |  |
| *720.37* | *Residential Demolition* | *§ 317* | *C* | *C* | *C* |
| *720.38* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|-----|-----------------|--------------|------|------|------|
| * * * * |  |  |  |  |  |
| *720.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *C* | *NP* |
| *720.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* |  |  |
| *720.98* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| * * * * | * * * * | * * * * | * * * * |  |  |

**Table 721. UPPER MARKET STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Upper Market Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 721.36 | Residential Conversion | § 317 | C | C | |
| 721.37 | Residential Demolition | § 317 | C | C | C |
| 721.38 | Residential Division | § 207.8 | P | P | P |
| 721.39 | Residential merger | § 317 | C | C | C |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 721.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | C | NP |
| 721.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| 721.98 | Residential Division | § 207.8 | P | P | P |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 722. NORTH BEACH NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | North Beach Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 722.36 | *Residential Conversion* | *§ 317* | P | | |
| 722.37 | *Residential Demolition* | *§ 317* | P | C | C |

* * * *

### RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 722.96 | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | C | NP | NP |
| 722.97 | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | C | | |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 723. POLK STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

\* \* \* \*

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Polk Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~723.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | |
| ~~723.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

## RESIDENTIAL STANDARDS AND USES

| \* \* \* \* | | | | | |
|---|---|---|---|---|---|
| 723.96 | _Removal of Residential or Unauthorized Units  through Conversion_ | | _C_ | _C_ | _NP_ |
| 723.97 | _Removal of Residential or Unauthorized Units  through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

**Table 724. SACRAMENTO STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

\* \* \* \*

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Sacramento Street Controls by Story |
|---|---|---|---|

| | | § 790.118 | 1st | 2nd | 3rd+ |
|---|---|---|---|---|---|
| ~~724.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | | |
| ~~724.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 724.96 | Removal of Residential or Unauthorized Units through Conversion | | C | NP | NP |
| 724.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C for Removal of one or more Residential Units or Unauthorized Units. | | |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 725. UNION STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Union Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~725.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |
| ~~725.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *725.96* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *Cf* | | |
| * * * * | * * * * | * * * * | * * * * | | |

### Table 726. VALENCIA STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Valencia Street Controls by Story | | |
|---|---|---|---|---|---|
| | | | 1st | 2nd | 3rd+ |
| | | § 790.118 | | | |
| *726.36* | *Residential Conversion* | *§ 317* | *C* | | |
| *726.37* | *Residential Demolition* | *§ 317* | *C* | *C* | *C* |
| *726.38* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| *726.39* | *Residential Merger* | *§ 317* | *C* | *C* | *C* |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *726.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *NP* | *NP* |

| | | | | | |
|---|---|---|---|---|---|
| *726.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| *726.98* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 727. 24th STREET - MISSION NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT**
**ZONING CONTROL TABLE**

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | 24th Street – Mission Transit Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| *727.36* | *Residential Conversion* | *§ 317* | *C* | | |
| *727.37* | *Residential Demolition* | *§ 317* | *C* | *C* | *C* |
| *727.38* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| *727.39* | *Residential Merger* | *§ 317* | *C* | *C* | *C* |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *727.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *NP* | *NP* |

| 727.97 | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| 727.98 | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 728. 24TH STREET – NOE VALLEY NEIGHBORHOOD COMMERCIAL DISTRICT
## ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | 24th Street – Noe Valley Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 728.36 | Residential Conversion | § 317 | P | | |
| 728.37 | Residential Demolition | § 317 | P | C | C |

* * * *

### RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
|---------|---|---|---|---|---|
| 728.96 | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *NP* | *NP* |
| 728.97 | *Removal of Residential or Unauthorized Units through* | *§ 317* | *C* | | |

| | Conversion, Demolition, or Merger | | |
|---|---|---|---|
| | * * * * | * * * * | * * * * |

**Table 729. WEST PORTAL AVENUE NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | West Portal Avenue Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 729.36 | Residential Conversion | § 317 | P | | |
| 729.37 | Residential Demolition | § 317 | P | C | C |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 729.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | NP | NP |
| 729.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 730. INNER SUNSET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Inner Sunset Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 730.36 | Residential Conversion | § 317 | P | | |
| 730.37 | Residential Demolition | § 317 | P | C | C |

* * * *

## RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 730.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | NP | NP |
| 730.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 731. MODERATE-SCALE NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT
## ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | NCT-3 Controls by Story | | |
|-----|-----------------|--------------|-----|-----|------|
|     |                 | § 790.118    | 1st | 2nd | 3rd+ |
| ~~731.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~731.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~731.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~731.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

* * * *

## RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| _731.96_ | _Removal of Residential or Unauthorized Units  through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| _731.97_ | _Residential Division_ | _§ 207.8_ | _P_ | _P_ | _P_ |
| * * * * | * * * * | * * * * | * * * * | | |

* * * *

1
2

### Table 732. PACIFIC AVENUE NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

3

* * * *

4

COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Pacific Avenue Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 732.36 | *Residential Conversion* | *§ 317* | *C* | | |
| 732.37 | *Residential Demolition* | *§ 317* | *C* | | *C* |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *732.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *NP* | *NP* |
| *732.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| * * * * | * * * * | * * * * | * * * * | | |

22
23
24
25

## Table 733. UPPER MARKET STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT
### ZONING CONTROL TABLE

\* \* \* \*

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Upper Market Street Transit Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~733.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | |
| ~~733.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~733.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~733.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

## RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| \* \* \* \* | | | | | |
| *733.96* | *Removal of Residential or Unauthorized Units  through Conversion* | *§ 317* | *C* | *C* | *NP* |
| *733.97* | *Removal of Residential or Unauthorized Units  through Conversion, Demolition, or Merger* | *§ 317* | *C for Removal of one or more Residential Units or Unauthorized Units.* | | |
| *733.98* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

## Table 733A. NEIGHBORHOOD COMMERCIAL TRANSIT CLUSTER DISTRICT NCT-1 ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | NCT-1 Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| *733A.36* | *Residential Conversion* | *§ 317* | *P* | | |
| *733A.37* | *Residential Demolition* | *§ 317* | *C* | *C* | *C* |
| *733A.38* | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| *733A.39* | *Residential Merger* | *§ 317* | *C* | *C* | *C* |

* * * *

### RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
|---------|--|--|--|--|--|
| _733A.96_ | _Removal of Residential or Unauthorized Units  through Conversion_ | _§ 317_ | _C_ | _NP_ | _NP_ |
| _733A.97_ | _Removal of Residential or Unauthorized Units  through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| _733A.98_ | _Residential Division_ | _§ 207.8_ | _P_ | _P_ | _P_ |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 734. SMALL-SCALE NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT NCT-2 ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | NCT-2 Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
|     |                 | § 790.118    | 1st  | 2nd  | 3rd+ |
| ~~734.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ |      |
| ~~734.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~734.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~734.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

* * * *

### RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| _734.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | | _C_ | _C_ | _NP_ |
| _734.97_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| _734.98_ | _Residential Division_ | _§ 207.8_ | _P_ | _P_ | _P_ |
| * * * * | * * * * | * * * * | * * * * | | |

### Table 735. SOMA NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

\* \* \* \*

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | SoMa Transit Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~735.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | |
| ~~735.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~735.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~735.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

| RESIDENTIAL STANDARDS AND USES | | | | | |
|-----|-----------------|--------------|------|------|------|
| \* \* \* \* | | | | | |
| _735.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | _§ 317_ | _C_ | _C_ | _NP_ |
| _735.96_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| _735.97_ | _Residential Division_ | _§ 207.8_ | _P_ | _P_ | _P_ |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

## Table 736. MISSION STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

\* \* \* \*

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Mission Street Transit Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~736.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~736.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~736.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~736.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

| RESIDENTIAL STANDARDS AND USES | | | | | |
|-----|-----------------|--------------|------|------|------|
| \* \* \* \* | | | | | |
| _736.96_ | _Residential Conversion, Demolition, or Merger_ | _§ 317_ | _C for Removal of one or more Residential Units or Unauthorized Units._ | | |
| _736.97_ | _Residential Division_ | _§ 207.8_ | _P_ | _P_ | _P_ |

## Table 737.  OCEAN AVENUE NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

\* \* \* \*

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Ocean Avenue Transit Controls by Story |
|-----|-----------------|--------------|------|

| | | § 790.118 | 1st | 2nd | 3rd+ |
|---|---|---|---|---|---|
| ~~737.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | |
| ~~737.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~737.38~~ | ~~Residential Division~~ | ~~§ 207.8~~ | ~~P~~ | ~~P~~ | ~~P~~ |
| ~~737.39~~ | ~~Residential Merger~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

\* \* \* \*

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| \* \* \* \* | | | | | |
| 737.96 | *Removal of Residential or Unauthorized Units  through Conversion* | *§ 317* | *C* | *C* | *NP* |
| 737.97 | *Removal of Residential or Unauthorized Units  through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| 737.98 | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |

**Table 738.  GLEN PARK NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE**

\* \* \* \*

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Glen Park Transit Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~738.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~C~~ | ~~C~~ | |

| 738.37 | *Residential Demolition* | *§ 317* | *C* | *C* | *C* |
| 738.38 | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |
| 738.39 | *Residential Merger* | *§ 317* | *C* | *C* | *C* |

* * * *

**RESIDENTIAL STANDARDS AND USES**

| * * * * | | | | | |
|---|---|---|---|---|---|
| 738.96 | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *C* | *NP* |
| 738.97 | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| 738.98 | *Residential Division* | *§ 207.8* | *P* | *P* | *P* |

**Table 739. NORIEGA STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | Noriega Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 739.36 | *Residential Conversion* | *§ 317* | *P* | *C* | |
| 739.37 | *Residential Demolition* | *§ 317* | *P* | *C* | *C* |

* * * *

**RESIDENTIAL STANDARDS AND USES**

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| _739.96_ | _Removal of Residential or Unauthorized Units  through Conversion_ | _§ 317_ | _C_ | _C_ | _NP_ |
| _739.97_ | _Residential Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 740. IRVING STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | Irving Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| _740.36_ | _Residential Conversion_ | _§ 317_ | _P_ | _C_ | |
| _740.37_ | _Residential Demolition_ | _§ 317_ | _P_ | _C_ | _C_ |

* * * *

**RESIDENTIAL STANDARDS AND USES**

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| _740.96_ | _Removal of Residential or Unauthorized Units  through Conversion_ | _§ 317_ | _C_ | _C_ | _NP_ |

| | | | |
|---|---|---|---|
| *740.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* |
| * * * * | * * * * | * * * * | * * * * |

### Table 741. TARAVAL STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Taraval Street Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| *741.36* | *Residential Conversion* | *§ 317* | *P* | *C* | |
| *741.37* | *Residential Demolition* | *§ 317* | *P* | *C* | *C* |

* * * *

### RESIDENTIAL STANDARDS AND USES

| | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *741.96* | *Removal of Residential or Unauthorized Units through Conversion* | *§ 317* | *C* | *C* | *NP* |
| *741.97* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C for Removal of one or more Residential Units or Unauthorized Units.* | | |

| * * * * | * * * * | | * * * * | * * * * |

### Table 742. JUDAH STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

## COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Judah Street Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~742.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | |
| ~~742.37~~ | ~~Residential Demolition~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | ~~C~~ |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|-----|-----------------|--------------|------|------|------|
| * * * * | | | | | |
| _742.96_ | _Removal of Residential or Unauthorized Units through Conversion_ | _§ 317_ | _C_ | _C_ | _NP_ |
| _742.96_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 743. FOLSOM STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

* * * *

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Folsom Street Controls by Story | | |
|-----|-----------------|--------------|------|------|------|
|     |                 | § 790.118    | 1st  | 2nd  | 3rd+ |
| ~~743.37~~ | ~~Residential Conversion~~ | ~~§§ 207.7, 317, 790.84~~ | ~~C~~ | ~~C~~ | |
| ~~743.38~~ | ~~Residential Demolition~~ | ~~§§ 207.7, 317, 790.86~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~743.39~~ | ~~Residential Division~~ | ~~§ 207.8, 317~~ | ~~C~~ | ~~C~~ | ~~C~~ |

* * * *

### RESIDENTIAL STANDARDS AND USES

| * * * * | | | | | |
|---------|---|---|---|---|---|
| 743.96 | _Removal of Residential or Unauthorized Units through Conversion_ | | _C_ | _C_ | _NP_ |
| 743.97 | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| 743.98 | _Residential Division_ | _§ 207.8, 317_ | _C_ | _C_ | _C_ |
| * * * * | * * * * | * * * * | * * * * | | |

## Table 744. REGIONAL COMMERCIAL DISTRICT ZONING CONTROL TABLE

\* \* \* \*

### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Regional Commercial Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 744.37 | Residential Conversion | §§ 207.7, 317, 790.84 | C | C | |
| 744.38 | Residential Demolition | §§ 207.7, 317, 790.86 | C | C | C |
| 744.39 | Residential Division | § 207.8, 317 | C | C | C |

\* \* \* \*

### RESIDENTIAL STANDARDS AND USES

| \* \* \* \* | | | | | |
|---|---|---|---|---|---|
| 744.96 | Removal of Residential or Unauthorized Units through Conversion | § 317 | C | C | NP |
| 744.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| 744.98 | Residential Division | § 207.8 | C | C | C |
| \* \* \* \* | \* \* \* \* | \* \* \* \* | \* \* \* \* | | |

### Table 745. EXCELSIOR OUTER MISSION STREET NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

#### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Excelsior Outer Mission Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~745.36~~ | ~~Residential Conversion~~ | ~~§§ 317, 790.84~~ | ~~C~~ | ~~C~~ | ~~C~~ |
| ~~745.37~~ | ~~Residential Demolition~~ | ~~§§ 317, 790.86~~ | ~~C~~ | ~~C~~ | ~~C~~ |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| _745.96_ | _Residential Conversion, Demolition, or Merger_ | _§ 317_ | _C for Removal of one or more Residential Units or Unauthorized Units._ | | |
| * * * * | * * * * | * * * * | * * * * | | |

### Table 746. DIVISADERO STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

* * * *

#### COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Divisadero Street Transit Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| ~~746.36~~ | ~~Residential Conversion~~ | ~~§ 317~~ | ~~P~~ | ~~C~~ | |

| 746.37 | Residential Demolition | § 317 | P | C | C |
| 746.38 | Residential Division | § 207.8 | P | P | P |
| 746.39 | Residential Merger | § 317 | C | C | C |

* * * *

**RESIDENTIAL STANDARDS AND USES**

| * * * * | | | | | |
|---|---|---|---|---|---|
| 746.96 | Removal of Residential or Unauthorized Units through Conversion | | C | C | NP |
| 746.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| 746.98 | Residential Division | § 207.8 | P | P | P |
| * * * * | * * * * | * * * * | * * * * | * * * * | * * * * |

### Table 747. FILLMORE STREET NEIGHBORHOOD COMMERCIAL TRANSIT DISTRICT ZONING CONTROL TABLE

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES**

| No. | Zoning Category | § References | Fillmore Street Transit Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 747.36 | Residential Conversion | § 317 | P | NP | NP |
| 747.37 | Residential Demolition | § 317 | P | C | C |

| 747.38 | Residential Division | § 207.8 | P | P | P |
| 747.39 | Residential Merger | § 317 | C | C | C |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| 747.96 | Removal of Residential or Unauthorized Units through Conversion | | C | NP | NP |
| 747.97 | Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger | § 317 | C | | |
| 747.98 | Residential Division | § 207.8 | P | P | P |
| * * * * | * * * * | * * * * | * * * * | * * * * | * * * * |

### Table 748.  JAPANTOWN NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE

* * * *

COMMERCIAL AND INSTITUTIONAL STANDARDS AND USES

| No. | Zoning Category | § References | Japantown Controls by Story | | |
|---|---|---|---|---|---|
| | | § 790.118 | 1st | 2nd | 3rd+ |
| 748.36 | Residential Conversion | §§ 317 | P | C | C |
| 748.37 | Residential Demolition | §§ 317 | P | C | C |

* * * *

| RESIDENTIAL STANDARDS AND USES | | | | | |
|---|---|---|---|---|---|
| * * * * | | | | | |
| *748.96* | *Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger* | *§ 317* | *C* | | |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 810**
**CHINATOWN COMMUNITY BUSINESS DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND SERVICES**

| No. | Zoning Category | § References | Chinatown Community Business Controls by Story | | |
|---|---|---|---|---|---|
| | | | 1st | 2nd | 3rd+ |
| *38a* | *Residential Conversion, Residential Hotels* | *Ch. 41 Admin. Code* | | | |
| *38b* | *Residential Demolition, Residential Hotels* | *Ch. 41 Admin. Code* | | | |
| *39a* | *Residential Conversion* | *§ 317* | | | |
| *39b* | *Residential Demolition* | *§ 317* | | | |
| RESIDENTIAL STANDARDS AND USES | | | | | |
| * * * * | | | | | |

| No. | Zoning Category | § References | | | |
|---|---|---|---|---|---|
| _97_ | _Residential Conversion or Demolition, Residential Hotels_ | _Ch. 41 Admin. Code_ | | | |
| _98_ | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 811**
**CHINATOWN VISITOR RETAIL DISTRICT ZONING CONTROL TABLE**

* * * *

COMMERCIAL AND INSTITUTIONAL STANDARDS AND SERVICES

| No. | Zoning Category | § References | Chinatown Visitor Retail Controls by Story | | |
|---|---|---|---|---|---|
| | | | 1st | 2nd | 3rd+ |
| ~~38a~~ | ~~Residential Conversion, Residential Hotels~~ | ~~Ch. 41 Admin. Code~~ | | | |
| ~~38b~~ | ~~Residential Demolition, Residential Hotels~~ | ~~Ch. 41 Admin. Code~~ | | | |
| ~~39a~~ | ~~Residential Conversion~~ | ~~§ 317~~ | | | |
| ~~39b~~ | ~~Residential Demolition~~ | ~~§ 317~~ | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | | | |
| * * * * | | | | | |

| 97 | _Residential Conversion or Demolition, Residential Hotels_ | Ch. 41 Admin. Code | | | |
|---|---|---|---|---|---|
| 98 | _Removal of Residential or Unauthorized Units through Conversion, Demolition, or Merger_ | _§ 317_ | _C_ | | |
| * * * * | * * * * | * * * * | * * * * | | |

**Table 812**
**CHINATOWN RESIDENTIAL NEIGHBORHOOD COMMERCIAL DISTRICT ZONING CONTROL TABLE**

* * * *

**COMMERCIAL AND INSTITUTIONAL STANDARDS AND SERVICES**

| No. | Zoning Category | § References | Chinatown Residential Neighborhood Commercial Controls by Story | | |
|---|---|---|---|---|---|
| | | | 1st | 2nd | 3rd+ |
| ~~38a~~ | ~~Residential Conversion, Residential Hotels~~ | ~~Ch. 41 Admin. Code~~ | | | |
| ~~38b~~ | ~~Residential Demolition, Residential Hotels~~ | ~~Ch. 41 Admin. Code~~ | | | |
| ~~39a~~ | ~~Residential Conversion~~ | ~~§ 317~~ | | | |
| ~~39b~~ | ~~Residential Demolition~~ | ~~§ 317~~ | | | |
| **RESIDENTIAL STANDARDS AND USES** | | | | | |
| * * * * | | | | | |

Supervisor Avalos
BOARD OF SUPERVISORS

| | | | | | | |
|---|---|---|---|---|---|---|
| _97_ | _Residential Conversion or Demolition, Residential Hotels_ | Ch. 41 Admin. Code | | | | |
| _98_ | _Residential Conversion, Demolition, or Merger_ | _§ 317_ | | _C for Removal of one or more Residential Units or Unauthorized Units._ | | |
| * * * * | * * * * | * * * * | | * * * * | | |

**Table 813**
**RED – RESIDENTIAL ENCLAVE DISTRICT ZONING CONTROL TABLE**

| No. | Zoning Category | § References | Residential Enclave Controls |
|---|---|---|---|
| * * * * | | | |
| **USE STANDARDS** | | | |
| * * * * | * * * * | * * * * | * * * * |
| 813.04 | Non-Residential Density _Limit_ | §§ 102~~.9~~, 123, 124, 127 | Generally, 1.0 to 1 floor area ratio |
| * * * * | * * * * | * * * * | * * * * |
| 813.13 | Residential Demolition _or Merger_ | § 317 | C _for Removal of one or more Residential Units or Unauthorized Units._ |
| * * * * | | | |

**Table 814**
**SPD – SOUTH PARK DISTRICT ZONING CONTROL TABLE**

| No. | Zoning Category | § References | South Park District Controls |
|-----|-----------------|--------------|------------------------------|
| * * * * | * * * * | * * * * | * * * * |
| 814.05 | Non-~~r~~Residential ~~d~~Density _Limit_ | §§ 102~~.9~~, 123, 124, 127 | Generally, 1.8 to 1 floor area ratio |
| * * * * | * * * * | * * * * | * * * * |
| 814.12 | Residential Conversion _or Merger_ | § 317 | C _for Removal of one or more Residential Units or Unauthorized Units._ |
| 814.13 | Residential Demolition | § 317 | C _for Removal of one or more Residential Units or Unauthorized Units._ |

* * * *

**Table 815**
**RSD – RESIDENTIAL/SERVICE MIXED USE DISTRICT ZONING CONTROL TABLE**

| No. | Zoning Category | § References | Residential/Service Mixed Use District Controls |
|-----|-----------------|--------------|--------------------------------------------------|
| * * * * | * * * * | * * * * | * * * * |

| | | | |
|---|---|---|---|
| 815.04 | Non-Residential Density *Limit* | §§ 102.9, 123, 124, 127 | Generally, 1.8 to 1 floor area ratio subject to § 803.5(j) |
| * * * * | * * * * | * * * * | * * * * |
| 815.12 | Residential Conversion *or Merger* | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |
| 815.13 | Residential Demolition | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |

* * * *

### Table 816
### SLR – SERVICE/LIGHT INDUSTRIAL/RESIDENTIAL MIXED USED DISTRICT ZONING CONTROL TABLE

| No. | Zoning Category | § References | Service/Light Industrial/Residential Mixed Use District Controls |
|---|---|---|---|
| * * * * | * * * * | * * * * | * * * * |
| 816.04 | Non-Residential Density Limit | §§ 102.9, 123, 124, 127 | Generally, 2.5 to 1 floor area ratio |
| * * * * | * * * * | * * * * | * * * * |

| No. | Zoning Category | § References | Service/Light Industrial District Controls |
|---|---|---|---|
| 816.12 | Residential Conversion *or Merger* | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |
| 816.13 | Residential Demolition | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |

* * * *

**Table 817**
**SLI – SERVICE/LIGHT INDUSTRIAL DISTRICT ZONING CONTROL TABLE**

| No. | Zoning Category | § References | Service/Light Industrial District Controls |
|---|---|---|---|
| * * * * | * * * * | * * * * | * * * * |
| 817.04 | Non-Residential Density Limit | §§ 102.9, 123, 124, 127 | Generally, 2.5 to 1 floor area ratio |
| * * * * | * * * * | * * * * | * * * * |
| 817.12 | Residential Conversion *or Merger* | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |
| 817.13 | Residential Demolition | § 317 | C *for Removal of one or more Residential Units or Unauthorized Units.* |

* * * *

**Table 818**
**SSO – SERVICE/SECONDARY OFFICE DISTRICT ZONING CONTROL TABLE**

| No. | Zoning Category | § References | Service/Secondary Office District Controls |
|---|---|---|---|
| * * * * | * * * * | * * * * | * * * * |
| 818.04 | Non-Residential Density Limit | §§ 102.9, 123, 124, 127 | 3.0 to 1 floor area ratio in 40 or 50 foot height districts; 4.0 to 1 in 65 or 80 foot height districts, and 4.5 to 1 in 130 foot height districts |
| * * * * | * * * * | * * * * | * * * * |
| 818.12 | Residential Conversion _or Merger_ | § 317 | C _for Removal of one or more Residential Units or Unauthorized Units._ |
| 818.13 | Residential Demolition | § 317 | C _for Removal of one or more Residential Units or Unauthorized Units._ |

* * * *

1          Section 5.  The Building Code is hereby amended by revising Section 102A, to read as

2    follows:

3    SECTION 102A – UNSAFE BUILDINGS, STRUCTURES OR PROPERTY

4          All buildings, structures, property, or parts thereof, regulated by this code that are

5    structurally unsafe or not provided with adequate egress, or that constitute a fire hazard, or

6    are otherwise dangerous to human life, safety or health of the occupants or the occupants of

7    adjacent properties or the public by reason of inadequate maintenance, dilapidation,

8    obsolescence or abandonment, or by reason of occupancy or use in violation of law or

9    ordinance, or were erected, moved, altered, constructed or maintained in violation of law or

10   ordinance are, for the purpose of this chapter, unsafe.

11          *    *    *    *

12          102A.3  Inspections and Complaints. The Building Official is hereby authorized to

13   inspect or cause the inspection of any building, structure or property for the purpose of

14   determining whether or not it is unsafe in any of the following circumstances:

15          1.    Whenever the Building Official, with reasonable discretion, determines that such

16   inspection is necessary or desirable.

17          2.    Whenever any person files with the Building Official a complaint from which

18   there is, in the Building Official's opinion, probable cause to believe that the building, structure

19   or property or any portion thereof, is unsafe.

20          3.    Whenever an agency or department of the City and County of San Francisco

21   transmits to the Building Official a written report from which there is, in the opinion of the

22   Building Official, probable cause to believe that the building, structure or property, or any

23   portion thereof, is unsafe.

24          Upon the completion of any such inspection and the finding by the Building Official of

25   any condition which renders the building, structure or property unsafe, the Building Official

1   shall, within 15 days thereafter, serve a written notice of violation upon the building owner

2   which shall contain specific allegations, setting forth each condition the Building Official has

3   found which renders the building, structure or property unsafe. The Building Official shall,

4   within three days of mailing of such notice of violation, post a copy thereof in a conspicuous

5   place in or upon such building, structure or property and make available a copy of the notice

6   of violation to each tenant thereof. Such notice shall also set forth the penalties for violation

7   prescribed in Section 103A of this code. In addition to the civil penalties prescribed in Section

8   103A, the Department's cost of preparation for and appearance at the hearing required by

9   Section 102A.4, and all prior and subsequent attendant and administrative costs, shall be

10  assessed upon the property owner monthly, after failure to comply with a written notice of

11  violation that has been served upon the property owner. Said violations will not be deemed

12  legally abated until the property owner makes full payment of the assessment of costs to the

13  Department of Building Inspection. See Section 110A, Table 1A-D – Standard Hourly Rates

14  and Table 1A-K – Penalties, Hearings, Code Enforcement Assessments – for the applicable

15  rate. Failure to pay the assessment of costs shall result in tax lien proceedings against the

16  property per Section 102A.18.

17          If the unsafe conditions observed on the property have not been corrected within the

18  time period provided, the matter shall be set for hearing within 60 days from the compliance

19  date specified on the notice of violation, if not substantial progress in abating the Code

20  violations has commenced.

21          *102A.3.1. Dwelling Units constructed or installed without required permit(s). In the case of an*

22  *unauthorized Dwelling Unit constructed or installed in an existing building without the required permit*

23  *or permits, in addition to the above requirements the written notice of violation shall order the property*

24  *owner to file an application for a building and other permits required to legalize the unit pursuant to*

25  *Building Code Section 106A.3.1.3 and Planning Code Section 207.3.*

1  **EXCEPTIONS:**

2  1. unless rRemoval of the unit is has been approved by the Planning Commission pursuant to

3  Planning Code Section 317; or

4  2. After performing a screening under Section 106A.3.1.3(a) of this Code, the

5  Department has determined that the unauthorized Dwelling Unit is not able to be legalized

6  under Section 106A.3.1.3 of this Code; or

7  3. The Building Official has determined that a serious and imminent hazard under

8  Section 102A.16 of this Code exists on the subject property.

9  102A.3.1.1. Re-issuance of an unabated notice of violation. Any notice of violation

10  issued prior to the effective date of Section 102A.3.1 and that remains unabated shall be re-

11  issued in compliance with the requirements of Section 102A.3.1.

12  Upon submission of an application for legalization or removal of an unauthorized

13  Dwelling Unit by the owner or the owner's authorized agent, the Department will suspend a

14  notice of violation issued pursuant to this Section 102A.3.1 pending a decision on the

15  application unless the Building Official has determined that a serious and imminent hazard

16  exists on the property. If approval of either legalization or removal of the unauthorized

17  Dwelling Unit occurs within one year of issuance of the notice of violation, the notice of

18  violation and any liens recorded against the property with respect to the violation will be

19  rescinded. The Building Official may extend this time if a delay in obtaining approval is not the

20  fault of the property owner.

21

22  Section 6. Effective Date. This ordinance shall become effective 30 days after

23  enactment. Enactment occurs when the Mayor signs the ordinance, the Mayor returns the

24  ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board

25  of Supervisors overrides the Mayor's veto of the ordinance.

Section 7. Scope of Ordinance. In enacting this ordinance, the Board of Supervisors intends to amend only those words, phrases, paragraphs, subsections, sections, articles, numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal Code that are explicitly shown in this ordinance as additions, deletions, Board amendment additions, and Board amendment deletions in accordance with the "Note" that appears under the official title of the ordinance.

APPROVED AS TO FORM:
DENNIS J. HERRERA, City Attorney

By: _____
JUDITH A. BOYAJIAN
Deputy City Attorney

n:\legana\as2016\1500751\01086266.docx

Supervisor Avalos
BOARD OF SUPERVISORS



# City and County of San Francisco

## Tails

### Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4689

**File Number:**    160115                **Date Passed:**   March 08, 2016

Ordinance amending the Planning Code to require Conditional Use authorization for the removal of any residential unit (whether authorized or unauthorized) and to exempt from the Conditional Use application requirement unauthorized units where there is no legal path for legalization, residential units that have received prior Planning approval, and single-family homes that are demonstrably unaffordable or unsound; amending the Building Code to require that notices of violation order the filing of an application to legalize an unauthorized unit unless infeasible under the Building Code, the Planning Commission approves its removal, or a serious and imminent hazard exists on the property; affirming the Planning Department's determination under the California Environmental Quality Act; and making findings of consistency with the General Plan, Planning Code, Section 302, and the eight priority policies of Planning Code, Section 101.1.

February 08, 2016 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE

February 08, 2016 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE

February 08, 2016 Land Use and Transportation Committee - CONTINUED AS AMENDED

February 22, 2016 Land Use and Transportation Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE

February 22, 2016 Land Use and Transportation Committee - DUPLICATED AS AMENDED

February 22, 2016 Land Use and Transportation Committee - RECOMMENDED AS AMENDED

March 01, 2016 Board of Supervisors - AMENDED, AN AMENDMENT OF THE WHOLE BEARING SAME TITLE
        Ayes: 11 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang, Wiener and Yee

March 01, 2016 Board of Supervisors - PASSED ON FIRST READING AS AMENDED
        Ayes: 9 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin and Wiener
        Noes: 2 - Tang and Yee

March 08, 2016 Board of Supervisors - FINALLY PASSED
        Ayes: 10 - Avalos, Breed, Campos, Cohen, Farrell, Kim, Mar, Peskin, Tang and Wiener
        Noes: 1 - Yee

File No. 160115

I hereby certify that the foregoing
Ordinance was FINALLY PASSED on
3/8/2016 by the Board of Supervisors of the
City and County of San Francisco.

Angela Calvillo
Clerk of the Board

_____
Mayor

3/11/2016
Date Approved

# EXHIBIT 8

1   ANDREW M. ZACKS (SBN 147794)
    EMILY L. BROUGH (SBN 284943)
2   ZACKS, FREEDMAN & PATTERSON, PC
    235 Montgomery Street, Suite 400
3   San Francisco, CA 94104
    Tel: (415) 956-8100
4   Fax: (415) 288-9755

5   Attorneys for Plaintiff
    1049 MARKET STREET, LLC

6

7            **SUPERIOR COURT – STATE OF CALIFORNIA**

8      **COUNTY OF SAN FRANCISCO – UNLIMITED CIVIL JURISDICTION**

9

10   1049 MARKET STREET, LLC, a California    Case Number:
    Limited Liability Company,
11

12        Petitioner,            **NOTICE OF INTENT TO**
                                    **FILE CEQA PETITION**
13        vs.

14   CITY AND COUNTY OF SAN
    FRANCISCO, BOARD OF SUPERVISORS
15   OF THE CITY AND COUNTY OF SAN
    FRANCISCO, PLANNING DEPARTMENT
16   OF THE CITY AND COUNTY OF SAN
    FRANCISCO, SAN FRANCISCO
17   DEPARTMENT OF BUILDING
    INSPECTION, SAN FRANCISCO
18   BUILDING INSPECTION COMMISSION,
    SAN FRANCISCO BOARD OF APPEALS,
19   and DOES 25-50,
20

21        Respondents.

22
        To CITY AND COUNTY OF SAN FRANCISCO, BOARD OF SUPERVISORS OF
23

24  THE CITY AND COUNTY OF SAN FRANCISCO, PLANNING DEPARTMENT OF THE

25  CITY AND COUNTY OF SAN FRANCISCO, SAN FRANCISCO DEPARTMENT OF

26  BUILDING INSPECTION, SAN FRANCISCO BUILDING INSPECTION COMMISSION,

27  SAN FRANCISCO BOARD OF APPEALS:

28

1       PLEASE TAKE NOTICE, under Public Resources Code § 21167.5, that petitioner, 1049

2 MARKET STREET, LLC, intends to file a petition under the provisions of the California

3 Environmental Quality Act (CEQA) against respondent, CITY AND COUNTY OF SAN

4 FRANCISCO, a municipal corporation, BOARD OF SUPERVISORS OF THE CITY AND

5 COUNTY OF SAN FRANCISCO, PLANNING DEPARTMENT OF THE CITY AND

6 COUNTY OF SAN FRANCISCO, SAN FRANCISCO DEPARTMENT OF BUILDING

7 INSPECTION, SAN FRANCISCO BUILDING INSPECTION COMMISSION, SAN

8 FRANCISCO BOARD OF APPEALS, challenging its finding that Ordinance No. 23-16 and

9 Ordinance No. 33-16 were not defined as a project under CEQA Guidelines Section 15378

10 and 15060(c)(2) "because it does not result in a physical change in the environment."

Dated:   May 19, 2016            ZACKS, FREEDMAN & PATTERSON, P.C.

                            Emily L. Brough
                            Attorneys for Plaintiff/Petitioner
                            1049 MARKET STREET, LLC.

**PROOF OF SERVICE**
Superior Court-San Francisco
Superior Court Case Number:

I, Betzy Lesser, declare that:

I am employed in the County of San Francisco, State of California. I am over the age of 18, and am not a party to this action. My business address is 235 Montgomery Street, Suite 400, San Francisco, California 94104.

On May 19, 2016, I served:

**NOTICE OF INTENT TO FILE CEQA PETITION**

in said cause addressed as follows:

| | |
|---|---|
| *City & County of San Francisco*<br>*1 Dr. Carlton B. Goodlett Place*<br>*City Hall, Room 200*<br>*San Francisco, CA 94102* | *San Francisco Board of Supervisors*<br>*San Francisco City Hall*<br>*1 Dr. Carlton B. Goodlett Place*<br>*City Hall, Room 244*<br>*San Francisco, CA 94102* |
| *San Francisco Planning Department*<br>*1650 Mission Street, Suite 400*<br>*San Francisco, CA 94103* | *San Francisco Board of Appeals*<br>*1650 Mission Street, #304*<br>*San Francisco, CA 94103* |
| *San Francisco Department of Building*<br>*Inspection*<br>*1660 Mission Street*<br>*San Francisco, CA 94103* | *San Francisco Building Inspection Commission*<br>*1660 Mission Street*<br>*San Francisco, CA 94103* |

**/XX/ (BY MAIL)** By placing a true copy thereof enclosed in a sealed envelope. I placed each such sealed envelope, with postage thereon fully prepaid for first-class mail, for collection and mailing at San Francisco, California, following ordinary business practices.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on May 19, 2016 at San Francisco, California.

*Betzy Lesser*

*PROOF OF SERVICE*

ZACKS, FREEDMAN & PATTERSON, PC
235 MONTGOMERY STREET, SUITE 400
SAN FRANCISCO, CALIFORNIA 94104